IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 11-cv-1468-WJM-BNB

SOLIDFX, LLC,

     Plaintiff,

v.

JEPPESEN SANDERSON, INC.,

     Defendant.

---

## SOLIDFX'S RESPONSE TO JEPPESEN'S MOTION FOR SUMMARY JUDGMENT [FILED UNDER SEAL][1]

---

Kenzo S. Kawanabe
Shannon Wells Stevenson
John A. Francis
Natalie West
Matthew Baisley
DAVIS GRAHAM & STUBBS LLP
1550 17th Street, Suite 500
Denver, CO  80202
Tel: (303) 892-9400
Fax: (303) 893-1379

Attorneys for SOLIDFX, LLC

---

[1] Counsel for SOLIDFX has conferred with counsel for Jeppesen, Lufthansa, Navtech, Foreflight, Southwest Airlines, Alaska Airlines, and Michelle Schopp regarding certain documents and testimony that those parties designated as confidential under the Protective Order in this case, and SOLIDFX has attached as exhibits to this Response. While SOLIDFX has initially filed this Response under seal, it has informed these parties that they will need to file the appropriate Motion to Seal pursuant to D.C.Colo.L.Civ.R.7.2.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................................v

INTRODUCTION..............................................................................................................1

SOLIDFX's STATEMENT OF UNDISPUTED MATERIAL FACTS ...............................2

    Defendant Jeppesen...............................................................................................2

    Terminal Charts......................................................................................................2

    Jeppesen's Terminal Chart Business......................................................................2

    Jeppesen's Terminal Chart Products......................................................................3

    The Terminal Charts Market .................................................................................3

        Commercial Aviation ................................................................................4

        Business Aviation......................................................................................4

        General Aviation .......................................................................................4

    Pricing of Jeppesen's Terminal Charts..................................................................5

    Development of Apps Market for Mobile Devices ................................................5

    The Relationship Between Jeppesen and SOLIDFX .............................................6

    Negotiation of the Agreement ...............................................................................6

    SOLIDFX's Performance Under the Agreement ...................................................7

    Jeppesen's Refusal to Cooperate with SOLIDFX on the iPad ..............................7

    Jeppesen's Denial of the JIT for iPad ...................................................................8

    Jeppesen Had No Legitimate Business Reason to Prevent SOLIDFX from
        Developing an App for the iPad .............................................................9

        Copyright/Brand Protection Was Not a Reason that Jeppesen Denied the
            JIT to Third Parties................................................................................11

# TABLE OF CONTENTS
## (Continued)

Page

Uncertainty Regarding Apple Was Not a Reason Jeppesen Denied the JIT to Third Parties. ........................................................................................11

Cost of Support Was Not a Reason that Jeppesen Denied the JIT to Third Parties...........................................................................................12

Jeppesen's Apps..........................................................................................12

The Apps Market ........................................................................................13

Demand for Charts on Mobile Devices.......................................................14

Barriers to Entry.........................................................................................15

Jeppesen Interfered with SOLIDFX's Prospective Business Relationships .............15

Jeppesen's Exclusion of Competitors Has Harmed Consumers .................16

RESPONSE TO JEPPESEN'S STATEMENT OF MATERIAL FACTS...........................17

ARGUMENT.............................................................................................................20

I.    COPYRIGHT LAW DOES NOT GIVE JEPPESEN ANTITRUST IMMUNITY. ...........20

      A.    Jeppesen May Not Use Its Allegedly Copyrighted Terminal Charts to Extend Its Monopoly into the Separate Apps Market.................................21

      B.    SOLIDFX's Claims Do Not Implicate Any Jeppesen Copyright Anyway.................22

      C.    Evidence of Jeppesen's Anticompetitive Misuse Demonstrates that Its Copyright Defense Is Pretextual and Precludes Summary Judgment..................23

II.   SOLIDFX HAS PROPERLY DEFINED THE RELEVANT MARKETS. .........................25

      A.    The First Amended Complaint Adequately Defines the Relevant Markets.................25

      B.    The Second Amended Complaint Defines the Broadest Possible Markets.................27

III.  JEPPESEN IS NOT ENTITLED TO SUMMARY JUDGMENT ON TYING. .................28

      A.    Charts and Apps Are Separate Products.........................................28

# TABLE OF CONTENTS
## (Continued)

Page

B.    Customers Desiring to View Jeppesen's Terminal Charts on a Personal Electronic Device Are Forced to Use Jeppesen's App and No Other.......................29

IV.    JEPPESEN HAS MONOPOLIZED THE APPS MARKET. ...................................31

    A.    Jeppesen Possesses Monopoly Power in the Apps Market.............................31

    B.    Jeppesen Has Engaged in Anticompetitive Conduct.....................................33

        1.    Jeppesen's Refusal to Deal Is Anticompetitive.................................33

        2.    Jeppesen Has Engaged in Unlawful Monopoly Leveraging. ............37

        3.    Jeppesen Has Denied Competitors Access to an Essential Facility. ..............38

        4.    The Totality of Jeppesen's Conduct Is Anticompetitive..................39

V.    SOLIDFX HAS SUFFERED ANTITRUST INJURY. ....................................39

VI.    JEPPESEN CANNOT WIN SUMMARY JUDGMENT ON THE CONTRACT.............40

    A.    The Agreement's Four Corners Include Non-iRex Viewers Like The iPad...............41

        1.    The term "e-book viewer".................................................................41

        2.    Other terms in the Agreement...........................................................42

    B.    Extrinsic Evidence Confirms that the Agreement Includes the iPad........................43

        1.    Drafts of the Agreement and Discussions Were Not Limited to iRex..........43

        2.    The Parties' Course of Dealing Confirms that the iPad is Covered...............43

    C.    Jeppesen Wrongfully Refused to Provide Tailored Data for Commercial Customers.............................................................................................44

    D.    Jeppesen Acted in Bad Faith and Damaged SOLIDFX.................................45

    E.    The Agreement Does Not Exclude SOLIDFX's Damages.............................46

        **1.**    The Plain Terms and Evidence Support SOLIDFX's Position.......................46

        **2.**    The Damages Limitation Is, at a Minimum, a Jury Question. .........................47

**<u>TABLE OF CONTENTS</u>**
**(Continued)**

**<u>Page</u>**

VII.   SOLIDFX'S REMAINING CLAIMS MUST BE DECIDED BY A JURY.........................48

    A.   SOLIDFX's Estoppel and Tort Claims May Be Tried in the Alternative...................48

    B.   Jeppesen Tortiously Interfered with SOLIDFX's Prospective Customers ................50

# **TABLE OF AUTHORITIES**

**Page**

<u>Cases</u>

*Ad Two Inc. v. City & County of Denver,*
9 P.3d 373 (Colo. 2000) ...........................................................................................41

*ADT Sec. Servs., Inc. v. Envision Tele., Inc.,*
2008 WL 5064268 (D. Colo. Nov. 21, 2008) ...........................................................48

*Alaska Airlines v. United Airlines,*
948 F.2d 536 (9th Cir. 1991) .....................................................................................39

*Alcatel USA, Inc. v. DGI Techs., Inc.,*
166 F.3d 772 (5th Cir. 1999) ...............................................................................21, 22

*Am. Cen. E. Tex. Gas Co. v. Union Pac. Res. Group Inc.,*
93 F. App'x 1 (5th Cir. 2004) ...................................................................................34

*Am. Tobacco Co. v. United States,*
328 U.S. 781 (1946) ...................................................................................................31

*Amer. Cncl. Of Cert. Podiatric Phys. & Surgeons v. Amer. Bd.
Of Podiatric Surgery, Inc.,*
185 F. 3d 606 (6th Cir. 1999) ....................................................................................32

*Applera Corp. v. MJ Research, Inc.,*
349 F. Supp. 2d 338 (D. Conn. 2004) .......................................................................38

*Aspen Highlands Skiing Corp. v. Aspen Skiing Co.,*
738 F.2d 1509 (10th Cir. 1984), *aff'd,* 472 U.S. 585 ..............................................39

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
472 U.S. 585 (1985) .......................................................................................33, 34, 36

*Atl. Richfield Co. v. USA Petroleum Co.,*
495 U.S. 328 (1990) ...................................................................................................40

*Avery Dennison Corp. v. ACCO Brands,*
2000 U.S. Dist. LEXIS 3938 (C.D. Cal. 2000) .........................................................38

*B&B Livery, Inc. v. Riehl,*
960 P.2d 134 (Colo. 1998) .........................................................................................48

*Bd. of Reg. of U. of Okl. v. NCAA,*
  707 F. 2d 1147 (10th Cir. 1983) ..................................................................33

*Booklocker.com, Inc. v. Amazon.com, Inc.,*
  650 F. Supp. 2d 89 (D. Me. 2009) ...............................................................30

*Brody v. Bock,*
  897 P.2d 769 (Colo. 1995) ...........................................................................49

*Brown Shoe Co. v. United States,*
  370 U.S. 294 (1962) ......................................................................................27

*Cascade Health Sol'ns v. PeaceHealth,*
  515 F.3d 883 (9th Cir. 2008) ........................................................................30

*Christy Sports, LLC v. Deer Valley Resort Co.,*
  555 F.3d 1188 (10th Cir. 2009) ....................................................................36

*City of Denver v. Adolf Coors Co.,*
  813 F. Supp. 1476 (D. Colo. 1993) ..............................................................45

*City of Denver v. Dist. Ct.,*
  939 P.2d 1353 (Colo. 1997) ..........................................................................48

*Colo. Inter. Gas Co. v. Nat. Gas Pipeline Co.,*
  885 F. 2d 683 (10th Cir. 1989) .....................................................................32

*Continental Ore Co. v. Union Carbide & Carbon Corp.,*
  370 U.S. 690 (1962) ......................................................................................39

*Core-Mark Midcontinent, Inc. v. Sonitrol Corp.,*
  __ P.3d __, 2012 WL 2994956 (Colo. App. Jul. 19, 2012) ..........................48

*Creative Copier Servs. v. Xerox Corp.,*
  344 F. Supp. 2d 858 (D. Conn. 2004) ..........................................................36

*Data Gen. Corp. v. Grumman Sys. Support Corp.,*
  36 F.3d 1147 (1st Cir. 1994) ........................................................................24

*Doctor's Hosp. v. Se. Med. Alliance,*
  123 F.3d 301 (5th Cir. 1997) ........................................................................40

*Downs v. Insight Comm'ns Co.,*
  No. 3:09-cv-93, 2010 WL 2228295 (W.D. Ky. June 3, 2010) .....................30

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
  504 U.S. 451 (1992) ...............................................................................passim

*Eatoni Ergonomics, Inc. v. Research in Motion Corp.,*
  826 F. Supp. 2d 705 (S.D.N.Y. 2011),
  *aff'd,* 2012 WL 2348443 (2d Cir. June 21, 2012)................................................................38

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
  499 U.S. 340 (1991)................................................................35

*Fishman v. Estate of Wirtz,*
  807 F.2d 520 (7th Cir. 1986)................................................................39

*Four Corners Nephrology Assocs. v. Mercy Med. Ctr.,*
  582 F.3d 1216 (10th Cir. 2009)................................................................33, 36

*FTC v. Whole Foods Market, Inc.,*
  548 F.3d 1028 (D.C. Cir. 2008)................................................................27

*Gulfstream Aerospace Corp. v. Camp Sys. Int'l, Inc.,*
  428 F. Supp. 2d 1369 (S.D. Ga. 2006)................................................................21

*H&H Dist., Inc. v. BBC Int'l, Inc.,*
  812 P.2d 659 (Colo. App. 1990)................................................................49

*Hamill v. Cheley Colo. Camps, Inc.,*
  262 P.3d 945 (Colo. App. 2011)................................................................47

*Heartland Payment Sys., Inc. v. Micros Sys., Inc.,*
  3:07-cv-5629, 2008 WL 4510260 (D.N.J. Sept. 29, 2008)................................................................29, 30, 31

*Heil Valley Ranch, Inc. v. Simkin,*
  784 P.2d 781 (Colo. 1990)................................................................47, 48

*Image Tech. Servs., Inc. v. Eastman Kodak Co.,*
  125 F.3d 1195 (9th Cir. 1997)................................................................22, 24

*In re Am. Express Merch.s' Litig.,*
  634 F.3d 187 (2d Cir. 2011)................................................................47

*In re Cox Enters., Inc.,*
  09-ML-2048, 2010 WL 5136047 (W.D. Okla. Jan. 19, 2010)................................................................29, 30

*In re Indep. Serv. Orgs. Antitrust Litig.,*
  203 F.3d 1322 (Fed. Cir. 2000)................................................................21, 23, 24, 25

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde,*
  466 U.S. 2 (1984)................................................................28, 29, 30, 31

*Kinetic Concepts v. Hillenbrand Indus.,*
    262 F. Supp. 2d 722 (W.D. Tex. 2003) ............................................................38

*Kopeikin v. Merch. Mort. & Trust Corp.,*
    679 P.2d 599 (Colo. 1984) ..............................................................................49

*Lasercomb Am., Inc. v. Reynolds,*
    911 F.2d 970 (4th Cir. 1990) ..........................................................................21

*Lehman v. Williamson,*
    533 P.2d 63 (Colo. App. 1975) ........................................................................43

*LePage's, Inc. v. 3M,*
    324 F.3d 141 (3d Cir. 2003) ...................................................................... 37, 38

*Lorain Journal Co. v. United States,*
    342 U.S. 143 (1951) .......................................................................................33

*M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.,*
    981 F.2d 160 (4th Cir. 1992) ..........................................................................37

*Marquardt v. Perry,*
    200 P.3d 1126 (Colo. App. 2008) ....................................................................49

*Mincin v. Vail Holdings, Inc.,*
    308 F.3d 1105 (10th Cir. 2002) .......................................................................48

*Mishawaka v. Am. Elec. Power Co.,*
    616 F.2d 976 (7th Cir. 1980) ..........................................................................39

*Morris Commc'ns Corp. v. PGA Tour, Inc.,*
    235 F. Supp. 2d 1269 (M.D. Fla. 2002) ..........................................................38

*Mot. Picture Patents Co. v. Univ. Film Mfg. Co.,*
    243 U.S. 502 (1917) .......................................................................................29

*Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal &
    Prof'l Publ'ns, Inc.,*
    63 F.3d 1540 (10th Cir. 1995) .................................................................. 30, 37

*Nobody in Particular Presents, Inc. v. Clear Channel Comm'ns, Inc.,*
    311 F. Supp. 2d 1048 (D. Colo. 2004) ....................................................passim

*Ortho Diagnostic Systems v. Abbott Labs.,*
    920 F. Supp. 455 (S.D.N.Y. 1996) ............................................................ 37, 38

*Palmyra Park Hosp. v. Phoebe Putney Mem'l Hosp.*,
   604 F.3d 1291 (11th Cir. 2010) ................................................................40

*Parsons v. Bright House Networks, L.L.C.*,
   No. 2:09-cv-0267, 2010 WL 5094258 (N.D. Ala. Feb, 23, 2010) ................ 28, 30

*Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*,
   499 F.3d 1151 (10th Cir. 2007) ................................................................47

*Pers. Dep't, Inc. v. Prof's Staff Leasing Corp.*,
   297 Fed. App'x 773 (10th Cir. 2008.) ......................................................50

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997) ....................................................................26

*Randall & Blake, Inc. v. Metro Wastewater Reclam. Dist.*,
   77 P.3d 804 (Colo. App. 2003) ................................................................42

*Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*,
   899 F.2d 951 (10th Cir. 1990) ............................................................ 27, 32

*Rebel Oil v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ..................................................................26

*Rhino Fund, LLLP v. Hutchins*,
   215 P.3d 1186 (Colo. App. 2008) ............................................................48

*Rich Floors, LLC v. Jaylon, inc.*,
   2010 WL 1332944 (D. Colo. 2010) ..........................................................48

*Rich Floors, LLC v. Jaylon, Inc.*,
   2010 WL 1332944 (D. Colo. 2010) ..........................................................49

*Rural Tel. Serv. Co. v. Feist Publ'ns*,
   957 F.2d 765 (10th Cir. 1992) ................................................................31

*Safeway Inc. v. Abbott Labs.*,
   761 F. Supp. 2d 874 (N.D. Cal. 2011) ................................................ 36, 37

*Sega Enters. Ltd. v. Accolade, Inc.*,
   977 F.2d 1510 (9th Cir. 1993) ............................................................ 21, 22

*Shoppin'Bag of Pueblo, Inc. v. Dillon Co.*,
   783 F.2d 159 (10th Cir. 1986) ................................................................32

*SmithKline Corp. v. Eli Lilly & Co.*,
   575 F.2d 1056 (3d Cir. 1975) ................................................................38

*Spectrum Sports v. McQuillan*,
   506 U.S. 447 (1993) ...................................................................................................31

*State Office Sys., Inc. v. Olivetti Corp.*,
   762 F.2d 843 (10th Cir. 1985) ....................................................................................46

*TCA Bldg. Co. v. Nw. Res. Co.*,
   873 F. Supp. 29 (S.D. Tex. 1995) .............................................................................39

*Tele Atlas N.V. v. NAVTEQ Corp.*,
   2008 WL 4911230 (N.D. Cal. Nov. 13, 2008) ..........................................................37

*Twin Brooks Corp. v. Walt Disney Corp.*,
   877 F. Supp. 496 (N.D. Cal. 1995),
   *rev'd on other grounds*, 83 F.3d 1162 (9th Cir. 1996) ..............................................23

*U.S. Fire Ins. Co. v. Sonitrol Mgmt. Corp.*,
   192 P.3d 543 (Colo. App. 2008) ...............................................................................48

*United States v. Aluminum Co.*,
   377 U.S. 271 (1964) ............................................................................................ 26, 27

*United States v. E.I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956) ......................................................................................26, 31, 33

*United States v. Empire Gas*,
   537 F.2d 296 (8th Cir. 1976) ....................................................................................26

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966) ...................................................................................................31

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) .............................................................................passim

*Vanderbeek v. Vernon Corp.*,
   50 P.3d 866 (Colo. 2002) ..........................................................................................48

*Verizon Comm'ns Inc. v. Law Off. of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ......................................................................................34, 35, 38

*W. Conv. Stores, Inc. v. Thielen*,
   2011 WL 866755 (D. Colo. 2011) ............................................................................49

*Waldbaum v. Worldvision Enters., Inc.*,
   No. 76 Civ. 3772, 1978 WL 956 (S.D.N.Y. Nov. 21, 1978) ....................................23

*Washburn v. Thomas,*
    37 P.3d 465 (Colo. App. 2001) ................................................................................48

*Wheat Ridge Urban Renewal Auth. v. Cornerstone Group, LLC,*
    176 P.3d 737 (Colo. 2007) .....................................................................................49


Statutes and Rules

15 U.S.C. § 2 .................................................................................................................31


Other Authorities

*Antitrust Law Developments* 225 (7th ed. 2012) .........................................................31

Colo. Jury Instr. – Civ. § 30:14 (2011) .......................................................................41

Colo. Jury Instr. – Civ. § 30:15 (2011) .......................................................................45

Marina Lao, *Unilateral Refusals to Sell or License Intellectual Property &*
    *the Antitrust Duty to Deal*, 9 Cornell J.L. & Pub. Pol'y 193, 204-05 (1999) ...........25

Restatement (Second) of Torts §§ 551(2)(b), (c) & (e) (1965) .....................................50

Simon Genevaz, *Against Immunity for Unilateral Refusals to Deal in Intellectual Property:*
    *Why Antitrust Law Should Not Distinguish Between IP & Other Property Rights,*
    19 Berkeley Tech. L.J. 741 (2004) .........................................................................25

# INTRODUCTION

Jeppesen is the world's dominant provider of aviation terminal charts. Several years ago, Jeppesen contracted with SOLIDFX to develop and sell software applications ("apps") to allow Jeppesen's customers to view Jeppesen's charts on mobile electronic devices. When SOLIDFX's investments and performance under the agreement established a potentially large market for SOLIDFX's apps, however, Jeppesen decided to leverage its monopoly in the market for terminal charts to capture the apps market exclusively for itself. In blatant breach of its contract with SOLIDFX and in violation of the antitrust laws, Jeppesen reversed course and now refuses to allow SOLIDFX or anyone else to develop apps for viewing terminal charts on mobile devices.

Jeppesen now asks this Court to grant summary judgment based on Jeppesen's purported copyright in its terminal charts, even though its own corporate representative testified that copyright had nothing to do with its exclusion of competitors from the apps market. It asks this Court to grant summary judgment on its alleged "pro-competitive" justifications for its conduct, despite its own unequivocal statements that its conduct was an "anticompetitive kneejerk reaction" intended to avoid competition. And it asks this Court to rule that the agreement between the parties did not include the iPad, even though at least four of its own employees – including the negotiators of the agreement – stated it did.

The record is laden with evidence of Jeppesen's domination of the markets for terminal charts and its anticompetitive conduct to achieve monopoly power in the apps market– including its bad faith breach of its agreement with SOLIDFX. To the extent Jeppesen believes it can explain away this bad conduct, it should do so to a jury. Its Motion should be denied.

**SOLIDFX's STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.      SOLIDFX is a small software company that creates software applications that access, organize, and use critical data.  (Affidavit of Dona Flamme ("Flamme Aff."), Ex. 1, ¶ 3.)

2.      SOLIDFX's two principals, Dona Flamme and Jeff McDonald, are both private pilots. (Flamme Dep., Ex. 2, at 96-97; McDonald Dep., Ex. 3, at 84-85.)

3.      Flamme obtained her bachelor's degree (electrical engineering and economics) and her Masters of Business Administration from Stanford University.  (Flamme Resume, Ex. 4.)

4.      Flamme has decades of experience in the high technology industry, including working with "e-readers" at Kodak where she led a division of 300 people that generated over $60 million in revenue.  (Flamme Dep., Ex. 2, at 632, 646-51.)

5.      McDonald received his Ph.D. in aeronautics and astronautics from Stanford University.  He has decades of experience in software development, including developing *MediaEngine* software for Kodak.  *MediaEngine* is deployed to over twenty million users worldwide as part of the Kodak *EasyShare* system.  (McDonald Resume, Ex. 5.)

**Defendant Jeppesen**

6.      Jeppesen is a subsidiary of The Boeing Company, the world's largest aerospace company. (Doc. 139, ¶ 3; http://www.boeing.com/companyoffices/aboutus/brief.html, Ex. 6.)

7.       "Since 1934, Jeppesen has predominately [sic] been a paper-based publisher of Navigational Charts," providing Jeppesen "with envious margins and near monopolistic market domination over the years."  (Ellerbrock e-mail, Ex. 7 at JS78137.)

8.      Jeppesen views itself as a data provider.  (*Id.*; Reagan Dep., Ex. 8, at 35.)

9.      Jeppesen is the "gold standard" with respect to its principal product – terminal charts. Jeppesen uses its own terminal chart format and produces complete and consistent terminal charts available for use throughout the world.  (JSMF 3.)

**Terminal Charts**

10.      Terminal charts are used by instrument-rated pilots to maneuver safely in and around airports and include airport approach procedure charts, various airport diagrams, and flight arrival and departure procedures.  (McDonald Aff., Ex. 10, ¶ 13.)

11.      Pilots flying under Instrument Flight Rules ("IFR") carry terminal charts.  (*Id.* ¶ 11.)

12.      Most commercial, scheduled, charter, and corporate flights are conducted under IFR regardless of weather conditions.  (*Id.* ¶ 12.)

**Jeppesen's Terminal Chart Business**

13.      Jeppesen produces, maintains, and updates a library of terminal charts for over 8,000 airports around the world.  (JSMF 4.)

14.      Jeppesen is the only provider of terminal charts with worldwide coverage.  (Lufthansa Dep., Ex. 11, at 45-46; Arnold Dep., Ex. 12, at 201), and it is the "industry standard product for an aircraft that is operated internationally."  (Schopp Dep., Ex. 13, at 161, 223.)

15.    To produce and maintain its worldwide terminal charts, Jeppesen enters into agreements with governments all over the world and collects raw data from Aeronautical Information Providers. It updates this information every 14 days.  Jeppesen employs over 1,000 people around the world to convert and process this raw data into its proprietary graphical chart format, at a cost of over $9 million per year.  (Abbott Dep., Ex. 15, at 396-414; Ex. 15E[2] [Dep. 651], at JS133274.28; Ellerbrock Dep., Ex. 16, at 222-23; Howard Dep., Ex. 14, at 93, 232.)

16.    Jeppesen's terminal charts are derived largely from public domain source material.  (Howard Dep., Ex. 14, at 328; Jeppesen's Supp. Resp., Ex. 18, at Interrog. No. 15.)

17.    Jeppesen does not have registered copyrights with respect to its terminal charts.  (Howard Dep., Ex. 14, at 230-32.)  Jeppesen's 30(b)(6) witness described the copyrighted elements of Jeppesen's terminal charts as follows: "The format, the fonts used, information produced by Jeppesen, way the chart has been displayed, the whole layout that is Jeppesen, any other information Jeppesen puts together." (*Id.* at 229.)

### Jeppesen's Terminal Chart Products

18.    Jeppesen recognizes three primary market segments in which it sells terminal charts – Commercial Aviation, Business Aviation, and General Aviation.  (*Id.* at 31.)

19.    Commercial Aviation includes commercial airlines.  Business Aviation includes flights for business purposes, such as corporate flight departments or charters.  General Aviation includes private pilots who fly primarily for their own personal use.  (*Id.*)

20.    With respect to Commercial Airlines, Jeppesen negotiates individual contracts that provide for delivery of terminal charts in paper or electronic format.  The electronic form of terminal charts for airlines is called TEFIS.  With respect to Business and General Aviation, Jeppesen provides a paper terminal chart product called Standard Airway Manual, and an electronic terminal chart product called JeppView.  (Abbott Dep., Ex. 15, at 20-21, 33-34; Jeppesen Global Reference Guide, Ex. 19, at JS21551, JS21716, JS21731.)

21.    Although Jeppesen offers products other than terminal charts, "terminal charts are 90 percent of what our customer [sic] really want from us."  (Buhl Dep., Ex. 20, at 135; Ex. 20A [Dep. Ex. 483] at JS61236.)

22.    In 2011, Jeppesen had revenues of $420,044,000 from its charting and navigational data products.  (Abbott Dep., Ex. 15, at 382; Ex. 15-A [Dep. Ex. 655] at JS136547.)

### The Terminal Charts Market

23.    Jeppesen views itself as having a monopoly with respect to terminal charts.  (Reagan Dep., Ex. 8, at 204-05; Ex. 8-A [Dep. Ex. 59] at JS24378 ("We don't have the monopoly in flight planning and weather that we enjoy in NavData and Charting."); Ex. 8-B [Dep. Ex. 58] at JS1078 ("use of the monopoly"); Ellerbrock e-mail, Ex. 7 at JS78137.)

24.    In 2010, Jeppesen had a greater than 72% market share worldwide with respect to its navigation and charting products across all market segments.  (Peck Dep., Ex. 21, at 237-38;

---

[2] Deposition exhibits that are referenced in cited deposition testimony are included behind lettered tabs following the testimony (e.g., the deposition of Michael Abbott is Ex. 15, and deposition exhibits about which he testified are Exs. 15A, 15B, etc.).

Jeppesen 2010 SLT LRBP Review, Ex. 21-A [Dep. Ex. 590], at JS2173.)

### Commercial Aviation

25.     Besides Jeppesen, there are only two private companies in the world that produce and sell terminal charts with any international coverage and standardized symbology – Lufthansa Systems, Inc., which produces Lido terminal charts, and Navtech, which produces Navtech terminal charts. (Jeppesen's Discovery Resp., Ex. 17, at Interrog. No. 9.)

26.     Jeppesen identifies Lufthansa as its biggest competitor in terminal charts.  (Ellerbrock Dep., Ex. 16, at 187-88.)  Lufthansa sells its terminal charts only in the Commercial Aviation market segment.  They cover approximately 2,300 airports.  (Lufthansa Dep., Ex. 11, at 47.)

27.     Lufthansa does not consider itself to have worldwide coverage with respect to terminal charts.  (*Id.* at 45-46, 121.)  It does not now (and does not intend to) offer terminal charts to the Business and General Aviation market segments because of the substantial barriers to entry into those markets, including obtaining worldwide terminal charts.  (*Id.* at 27-36, 341-44.)

28.     With respect to the Commercial Aviation market segment, in November 2010, Lufthansa had market share of 0% in Latin America, 8% in North America, 3% in Africa, 16 % in the Middle East, 4% in Asia and the Pacific, and 26% in Europe.  (*Id.* at 136-41; Lido in the Americas, Ex. 11A [Dep. Ex. 8], at LSY343.)

29.     Navtech also sells its terminal charts only in the Commercial Aviation market segment. (Buhl Dep., Ex. 20, at 229-30.)  Navtech does not have worldwide coverage that approaches Jeppesen's coverage, nor does it compete in the Americas.  (Lufthansa Dep., Ex. 11, at 66, 264-65.) Navtech's terminal charts cover approximately 1,380 airports.  (Ex. 22, NAVTECH6.)

30.     In 2011, Jeppesen described Navtech as competing on a "much smaller scale"; estimated Navtech's global market share in terminal charts to be 9%; and concluded that Navtech would struggle to compete with Jeppesen.  (Navtech Competitive Profile, Ex. 23, at JS137612-15.)

31.     Jeppesen has over 70% market share of the worldwide Commercial Aviation market, and over 90% of "large" Commercial Aviation customers.  (CA Market Share, Ex. 24, at JS132318.)

32.     There is only one commercial carrier in the United States that does not use Jeppesen for its terminal charts.  (Peck Dep., Ex. 21, at 144-45.)  That airline – FedEx – uses Lido for a portion of its operations, and Jeppesen for the remainder.  (Lufthansa Dep., Ex. 11, at 201.)

### Business Aviation

33.     In Business Aviation, there is no competition for Jeppesen's charts, and no threatened competition.  (*Id.* at 27-35, 161-67, 341-44; Schopp Dep., Ex. 13, at 223, 226-27.)

34.     Even for customers within the United States, Jeppesen could not identify a single Business Aviation customer that does not use Jeppesen charts.  (Peck Dep., Ex. 21, at 86, 88-89.)

35.     Jeppesen has 80-90% of the Business Aviation market.  (*Id.* at 127-29, 184-85; Ex. 21B [Dep. Ex. 576] at JS141635; Ex. 21C [Dep. Ex. 580]; McDonald Dep., Ex. 3, at 543-46.)

### General Aviation

36.     For General Aviation, Jeppesen is the only choice for terminal charts for pilots flying

internationally, and for pilots outside of the United States. (McDonald Dep., Ex. 3, at 132-33, 510-12; Foreflight Dep., Ex. 26, at 86-87, 175, 229-31; Pouille Aff., Ex. 27, ¶¶ 5-15.)

37.     Government agencies for some individual countries publish terminal charts in various forms. For example, the FAA publishes terminal charts ("NACO charts") that can be downloaded in PDF over the internet, or purchased in paper at minimal cost. (JSMF 14, 15.)

38.     Although certain information must be contained on all terminal charts, their format varies widely from country to country. (McDonald Aff., Ex. 10, ¶ 13.) "[T]here are some countries that do not make any government procedures available or perhaps even to the same standards as ICAO . . . . [C]onsistency of instrument procedures throughout the world, from each country's sources is a challenge." (Schopp Dep., Ex. 13, 163-64.) It is unrealistic for pilots flying internationally to source charts from individual countries because variances in chart format can affect the safety of the trip. (McDonald Dep., Ex. 3, at 558-62; Pouille Aff., Ex. 27, ¶¶ 5-15.)

39.     Jeppesen has 70% of the General Aviation market. (Peck Dep., Ex. 21, at 127; Ex. 21B [Dep. Ex. 576] at JS141635; Ex. 25 at JS60943; GA Market Assessment, Ex. 28, JS7168.)

### Pricing of Jeppesen's Terminal Charts

40.     NACO charts have been available electronically for free for several years. (JSMF 15.)

41.     Jeppesen's annual prices for its JeppView electronic chart subscriptions range from $887.00 for the full United States, up to $12,396.00 for worldwide coverage. (Abbott Dep., Ex. 15, at 428-30; Jeppesen 2012 Retail Catalog, Ex. 29, at 1, 14.)

42.     Lufthansa, Jeppesen's alleged largest competitor, prices its charts at only 50% of Jeppesen's products. (Abbott Dep., Ex. 15, at 379-80.)

43.     Jeppesen has continued to raise its prices and maintain or increase its revenues, even during one of the worst recessions in decades. (Abbott Dep., Ex. 15, at 357, 365; Phillips Supp'l. & Rebuttal Report, Ex. 30B, at 7, Figure 1; Ex. 15A, at JS136565.)

44.     Commercial Airline and Business Aviation customers with substantial bargaining power consistently complain about Jeppesen's exorbitant prices, but continue to purchase Jeppesen's terminal charts. (Ex. 30B, at 34-35, n.157.)

### Development of Apps Market for Mobile Devices

45.     Historically, pilots have carried heavy binders of paper charts. Laptop computer solutions have been tried, but their short battery life, display limitations, and ergonomics make them impractical and cumbersome in airplane cockpits. (McDonald Aff., Ex. 10, ¶ 15.)

46.     Through their personal experience in aviation, SOLIDFX's principals became aware of the difficulties posed by accessing terminal charts during flights. (*Id.* ¶ 14; Flamme Aff., Ex. 1, ¶ 8.)

47.     In 2008, SOLIDFX anticipated rapid development in the efficiency, battery life, and display technology of mobile computing devices and began developing software that would allow pilots to access terminal charts on these devices in the cockpit. (*Id.* ¶¶ 8-9, 17-22.)

48.     In 2008, there were few mobile devices on the market, and even fewer that supported third-party software development. When SOLIDFX began to develop software to display Jeppesen terminal charts, it used an e-book viewer manufactured by iRex Technologies BV ("iRex").

(Flamme Aff., Ex. 1, ¶ 12.)

## The Relationship Between Jeppesen and SOLIDFX

49.     In November 2008, Jeppesen contacted SOLIDFX about a business relationship in which SOLIDFX would develop software for pilots to access Jeppesen terminal charts on e-book viewers. (Ex. 35, SFX83341.)

50.     In December 2008, SOLIDFX demonstrated to Jeppesen SOLIDFX's prototype on an iRex e-book viewer.  (Ex. 36.)

51.     Jeppesen decided to partner with SOLIDFX because of SOLIDFX's "experience and expertise to bring Jeppesen electronic charts to another class of portable devices, making them more accessible to a greater number of pilots." (Ex. 37.)

52.     On May 25, 2009, SOLIDFX discussed with Jeppesen various hardware options, including those running an Apple operating system. (5/25/09 McDonald e-mail, Ex. 38, at SFX38900.)

53.     In August 2009, SOLIDFX and Jeppesen discussed a "9 [inch] Apple based tablet – suitability dependent" which was expected to be released in late 2009 or early 2010.  (8/27/09 SOLIDFX e-mail, Ex. 39, at SFX81862.)

54.     In November, SOLIDFX told Jeppesen that it was "not wedded to iRex" and was pursuing various options, including an "Apple OLED tablet." (Long e-mail, Ex. 40, at JS37857.)

55.     SOLIDFX and Jeppesen discussed that "[t]o fit into the Apple model – it would have to be a software model that can port to e-readers . . . .  This would be a software only option for the SolidFX."  (11/23/09 Notes, Ex. 41, at JS5613.)

## Negotiation of the Agreement

56.     Ultimately, the parties negotiated and executed a "License and Cooperation Agreement" that was effective December 31, 2009.  (Agmt., Ex. 42; Nguyen Dep., Ex. 43, at 81; Abbott Dep., Ex. 15, at 249-52.)

57.     Tim Howard and Sheryl Nguyen from Jeppesen negotiated the Agreement with SOLIDFX. (Abbott Dep., Ex. 15, at 276-77.)

58.     Jeppesen's first draft of the Agreement limited SOLIDFX to the iRex e-book viewer only. (Draft Agmt., Ex. 44, at JS66412; Nguyen Dep., Ex. 43, at 153-54.)

59.     SOLIDFX did not want the Agreement limited to the iRex hardware, as SOLIDFX understood that additional devices were or would become available during the initial 5-year term of the Agreement.  SOLIDFX sent a revised draft to Jeppesen that deleted specific references to iRex, and inserted the general term "e-book viewer." (Flamme Aff., Ex. 1, ¶ 23.)

60.     The general, non-industry term "e-book viewer" encompassed, but was broader than the industry terms of "e-book reader" or "e-reader." The term "e-book viewer" encompassed future devices that allowed for viewing of e-books that were suitable for the airplane cockpit. (*Id.* ¶¶ 23-24; Flamme Dep., Ex. 2, at 861-64.)

61.     The parties removed the references to iRex to "include a contemplation that there may be a potential for a future hardware provider." Nguyen wrote "generic" on the draft to reflect the same.

(Nguyen Dep., Ex. 43, at 120-22, 131-32, 153-54 (referring to Ex. 45, at JS37925-26)).)

62.     The final, executed version of the Agreement encompassed all suitable "e-book viewers" and was not limited to only the iRex device.  (Agmt. § 1.6; Flamme Aff., Ex. 1, ¶¶ 24-27.)

63.     The Agreement provided that Jeppesen and SOLIDFX would cooperate to allow SOLIDFX to develop and sell software that would allow pilots to access Jeppesen's terminal charts electronically.  (Agmt. §§ 1.4, 1.6, 2.1.)

64.     This included Jeppesen providing SOLIDFX with a Jeppesen Integration Toolkit ("JIT") which would allow SOLIDFX's software to access, utilize, and display "Jeppesen Data," which includes Jeppesen's terminal charts. (Agmt §§ 1.4, 1.5, Appx. 1.2.2.)

65.     Under the Agreement, the parties anticipated that SOLIDFX would profit through selling its software application solutions, and that Jeppesen would profit through selling additional terminal chart subscriptions to consumers who desire to view their charts on mobile devices.  (Flamme Aff., Ex. 1, ¶¶ 28, 29; Howard Dep., Ex. 14, at 145.)

66.     Jeppesen initially estimated that the Agreement would generate hundreds of thousand of dollars in additional revenue to Jeppesen from increased terminal chart subscriptions.  (Ex. 46.)

### SOLIDFX's Performance Under the Agreement

67.     Jeppesen provided SOLIDFX with JITs for use with several iRex models, and SOLIDFX began successfully selling its software with an iRex e-book viewer in July 2009.  Because the iRex hardware was not readily available in retail, SOLIDFX purchased the hardware, loaded its FXView software, and sold the combined hardware and software.  (McDonald Aff., Ex. 10, ¶ 26.)

68.     SOLIDFX diligently worked to make its software flexible so that it could quickly port to emerging hardware platforms.  (McDonald Dep., Ex. 3, at 291-94, 635-37.)

69.     SOLIDFX continued to investigate all emerging hardware platforms for cockpit suitability and to discuss these with Jeppesen.  (2/5/10 Long e-mail, Ex. 47, at SFX82438-39.)

70.     SOLIDFX received excellent feedback from consumers for its FXView software and high praise in the aviation industry media.  (Ex. 48, at OP31 (*Aviation Consumer* magazine: "best digital chart solution we've tried to date"); 4/10/10 Jeppesen e-mail, Ex. 49, at JS61987.)

### Jeppesen's Refusal to Cooperate with SOLIDFX on the iPad

71.     In January 2010, Apple announced the soon-to-be released iPad.  (JSMF 121.)

72.     Shortly thereafter, SOLIDFX registered as a developer for apps on the iPad, and continued to move forward to develop its app.  (Lyon Dep., Ex. 50, at 161-62.)

73.     Beginning in January 2010 forward, SOLIDFX requested that Jeppesen provide its JIT so that SOLIDFX could complete its app for the iPad so that customers could purchase the SOLIDFX app.  (MSJ Exs. 39, 44, 45, and 48.)

74.     On February 22, 2010, Jeppesen confirmed that the Agreement covered various e-book viewers, including the iPad:  "If the hardware changes from iRex to a different [K]indle or iPad, that would also be covered since the hardware is never called out by name [in the Agreement]."  (2/22/10 e-mail, Ex. 51, at SFX58145.)

75.     In response to SOLIDFX's continuous requests for the JIT, Jeppesen only told SOLIDFX to wait while Jeppesen determined its strategy for the iPad. (Howard Dep., Ex. 14, at 176.)

76.     Jeppesen's electronic chart format is written in a proprietary Jeppesen computer language called "The Captain's Language" ("TCL").  TCL describes how to draw Jeppesen charts electronically.  (McDonald Aff., Ex. 10, ¶ 18.)

77.     The purpose of the JIT is to allow third-party software to read TCL and draw the charts. (Ex. 19 at JS21722-25.)  Without the JIT, SOLIDFX and other third-parties cannot develop and sell software compatible with Jeppesen's charts.  (Howard Dep., Ex. 14, at 146; Long Dep., Ex. 52, at 60; Snow Dep., Ex. 53, at 46-47, 94.)

78.     Despite informing SOLIDFX that the Agreement included the JIT for the iPad, Jeppesen concealed its intent to prevent SOLIDFX from actually developing an app for the iPad or other e-book viewer while Jeppesen developed its own such app.  Examples include the following:

•     On February 18, Dean acknowledged to Long that the Agreement authorized SOLIDFX to develop an app for the iPad, but expressed concern that any effort by SOLIDFX could hurt Jeppesen's efforts to develop its own iPad app.  (Dean e-mail, Ex. 54, at JS14638.)

•     On February 23, Howard informed Dean that Jeppesen should not work with SOLIDFX until Jeppesen solidified its iPad strategy.  (Howard e-mail, Ex. 55, at JS13947.)

•     By April 15, Jeppesen had decided to deny SOLIDFX's request to develop an iPad app to display Jeppesen charts. (Howard e-mail, Ex. 56, at JS51886.)

79.     Jeppesen did nothing to communicate to SOLIDFX that it had changed its mind regarding SOLIDFX's right to develop an app to display Jeppesen charts on an iPad.  (Reagan Dep., Ex. 8, at 228; Howard Dep., Ex. 14, at 184-85, 192.)

80.     On May 14, 2010, Long acknowledged that Jeppesen had an obligation to communicate Jeppesen's decision to SOLIDFX: "I believe we owe them this type of response."  (Long e-mail, Ex. 57, at JS7606.)  Apostolopoulos agreed, but thought Jeppesen should "not say anything yet about Jepp providing our own iPAD [sic] app."  (Jeppesen e-mail, Ex. 58, at JS7601.)

### Jeppesen's Denial of the JIT for iPad

81.     On May 26, 2010, Jeppesen finally informed SOLIDFX that it would not allow others, including SOLIDFX, to have the JIT for the iPad.  Instead, Jeppesen would offer its own iPad app and "[d]irect competition with a Jeppesen offerings [sic] will generally be avoided."  (Howard e-mail, Ex. 59, at SFX82452.)  This statement was an accurate representation of how Jeppesen was going to handle mobile OEMs in the marketplace. (Buhl Dep., Ex. 20, 8-10.)

82.     The next day, May 27, 2010, Jeppesen announced its forthcoming iPad app that would be available to its subscribing customers for no additional charge.  (Ex. 60, at JS62525.)

83.     On July 7, 2010, Jeppesen circulated its "JIT e-Charts Licensing Policy for Third-party Application Developers for Mobile Devices," which explained that "Jeppesen has decided not to license the Jeppesen JIT e-Charts to third party application providers targeting Apple iPad/iPhone, Android-based, Palm-based or similar mobile devices" because "Jeppesen views mobile computing as a strategic platform for delivery of Jeppesen's information and services.  Our future plans for an integrated Jeppesen customer experience in the mobile computing market may conflict and/or

compete with third party solution providers resulting in a potentially undesirable market condition." (Ex. 61 at JS74622.)

84.     On September 21, 2010, Jeppesen explained its refusal to provide SOLIDFX with the JIT. Jeppesen initially "dismissed [the] iPad as [a] toy." It originally "had no qualms about [the] SOLIDFX multiplatform" strategy for providing access to the terminal charts. That changed, however, as the iPad grew in commercial popularity in early 2010, causing a "knee jerk anticompetitive reaction" at Jeppesen. (Exs. 62-65.)

85.     In April 2011, Long internally acknowledged that Jeppesen initially approved SOLIDFX building an app for the iPad and Android, but later reversed course when it decided to build such apps in house. (Long e-mail, Ex. 70, at JS76858.)

## Jeppesen Had No Legitimate Business Reason to Prevent SOLIDFX from Developing an App for the iPad

86.     Once the iPad was announced, Jeppesen was aware of the very high demand from pilots to have their Jeppesen charts available on the iPad. (Abbott Dep., Ex. 15, at 188.)

87.     SOLIDFX was prepared to release an iPad app for Jeppesen charts in April 2010. (3/14/10 e-mail, Ex. 66, at JS7348-49.)

88.     Jeppesen's customers requested that it make its charts available through other apps on the iPad, such as SOLIDFX, Foreflight, and WingX. (Ex. 49; Ex. 67, at 41158; Ex. 68, at JS9043.)

89.     Michelle Schopp, Director of Flight Technical Programs for Executive Jet Management, specifically requested that SOLIDFX write an iPad app for Jeppesen charts. (Ex. 49.)

90.     Beginning in February 2010, Jeff Buhl was tasked with developing Jeppesen's iPad strategy. (Buhl Dep., Ex. 20, at 94; Ex. 20B [Dep. Ex. 375], at JS7092.)

91.     In developing this strategy, Buhl was informed by numerous Jeppesen employees that Jeppesen lacked expertise in software development and should have a third-party develop an app for the iPad. (Buhl Dep., Ex. 20, at 99-100; Ex. 20C [Dep. Ex. 378], at JS7100.)

92.     Apostolopoulos, who managed delivery of Jeppesen data to mobile devices, wrote: "The consumer market changes very fast and new technologies/gadgets/ apps are introduced [sic] constantly. We are not equipped to handle this. So we need to consider a solution with the best speed to market. In my opinion the best solution is either working with OEMs for a Jeppesen or non Jeppesen branded application." (Ex. 20D [Dep. Ex. 363] at JS86383; Apostolopoulos Dep., Ex. 69, at 177-81; Buhl Dep., Ex. 20, at 41-44, 146; Ex. 20E [Dep. Ex. 328], at JS46328 ("Jeppesen is not well positioned currently to adopt a mobile computing strategy with little expertise in this area and few applications developed for this market.").)

93.     Jeppesen had to hire an outside contractor with iOS experience to develop its iPad app. (Buhl Dep., Ex. 20, at 81.)

94.     Jeppesen struggled to develop the app because it had no iOS experience. (*Id.* at 216-19, Ex. 20F [Ex. 499] at JS64010.)

95.     Partnering with SOLIDFX would have been a lower cost option for Jeppesen, and would have resulted in quicker time to market. (Buhl Dep., Ex. 20, at 61-62, 66-69, 86; Ex. 20E at

JS46336-37.)

96.     Buhl circulated the "iPad Strategy Document" in mid-April 2010.  (Ex. 20E.)  The document evaluated the considerations as to whether Jeppesen should develop an app in-house or work with a third party.  (*Id.* at JS46336-37.)  These considerations included cost, quality, and time to market. Time to market was a key consideration in how to approach app development.  (*Id.*; Abbott Dep., Ex. 15, at 195-96; Buhl Dep., Ex. 20, at 61-62.)

97.     Buhl determined that having SOLIDFX develop the app would have had advantages as far as time to market, being low cost, leveraging Jeppesen subscription revenues, and being a good fit with current Jeppesen business model.  (*Id.* at 67-68, 75-76; Ex. 20E.)

98.     Jeppesen believed a con to its developing the app in-house was that it would be slow to market and higher cost.  (Buhl Dep., Ex. 20, at 86-88; Ex. 20E.)

99.     Based on these considerations, Buhl recommended that Jeppesen work with a third-party to develop an iPad app.  (Buhl Dep., Ex. 20, at 89-90.)  This approach was approved by Jeppesen's senior leadership team.  (*Id.* at 128-30.)

100.    Shortly thereafter, Buhl raised his concerns about potential competitive threats to Jeppesen if third parties were allowed to develop apps.  (Ex. 20A, at JS61237.)

101.    Jeppesen decided to develop its own app to the exclusion of third parties.  (Reagan Dep., Ex. 8, at 261; Ex. 61 at JS74622.)

102.    Buhl drafted an "OEM Guidance Document," to guide communication of this decision to third parties.  The OEM Guidance Document recognized that "mobile computing platforms need to be more closely managed so that Jeppesen do [sic] not lose control over key markets and market strategies."  (Buhl Dep., Ex. 20, at 162-66, Ex. 20G [Dep. Ex. 324].)

103.    The Document instructed that "For the mobile-OEM marketplace, the primary considerations and questions are whether Jeppesen is going to be developing solutions to the targeted hardware platform, whether Jeppesen needs more penetration in a specific market space, or whether the solution is complimentary [sic] to a current Jeppesen offering.  Direct competition with Jeppesen offerings should be avoided."  (Ex. 20H at JS9229.)

104.    Ultimately, Jeppesen determined that it would exclude all third parties from developing apps for Jeppesen charts.  (Buhl Dep., Ex. 20, at 176-77; Ex. 61.)

105.    The purpose of excluding third parties from developing apps was to eliminate competition for Jeppesen's products.  (Apostolopoulos Dep., Ex. 69, at 165.)

106.    Abbott and Buhl discussed that this policy might be waived if there were areas where Jeppesen did not have or plan a competitive product.  (Buhl, Ex. 20, 178-79; Ex. 20I [Dep. Ex. 492]; Abbott Dep., Ex. 15, at 444-46.)

107.    Jeppesen has acknowledged that this policy has cost it short-term revenues.  In October 2010, Jeppesen acknowledged that it should support its customers on the SOLIDFX platform over Jeppesen's iPad apps because "truth be told, the SolidFX user generates greater income for Jeppesen."  (Ablanczy e-mail, Ex. 103, at JS9179.)

108.    In April 2011, SOLIDFX requested cooperation to develop an app for a Blackberry

Playbook e-book viewer.  (Long e-mail, Ex. 70, at JS76869.)  Kiley suggested that since Jeppesen might develop its own app, it should deny SOLIDFX's request in order to "maximize control, value, and [direct margin]."  In response, Reagan reiterated that Jeppesen's policy of excluding third-party app developers was an "isolationist approach," "was costing Jeppesen market share, revenue, and dilut[ing] [its] value;" and was causing Jeppesen to leave "large amounts of money on the table each year."  (Ex. 8C [Dep. Ex. 55], at JS40937-39.)

### *Copyright/Brand Protection Was Not a Reason that Jeppesen Denied the JIT to Third Parties.*

109.    Jeppesen routinely licenses its charts to third party OEMs, including SOLIDFX.  (Jeppesen's Third Discovery Resp., Ex. 71, at Interrog. No. 19.)

110.    Copyright protection of Jeppesen's terminal charts did not relate in any way to Jeppesen's decision to refuse to allow SOLIDFX and other OEMs to develop apps for mobile devices such as the iPad.  (Howard/Copyright 30(b)(6) Dep., Ex. 14, at 237-38.)

111.    Jeppesen has no approval process to review third-party display of Jeppesen's charts, and no formal process for monitoring the display of its terminal charts once they are actually in the market.  (Apostolopoulos Dep., Ex. 69, at 41-42; Howard Dep., Ex. 14, at 240.)

112.    Had Jeppesen allowed SOLIDFX to develop iPad apps, Jeppesen subscribers would have continued to purchase their terminal charts directly from Jeppesen and would purchase the software directly from SOLIDFX.  SOLIDFX's software would not give access to Jeppesen's terminal charts, unless the consumer had subscribed to the charts from Jeppesen.  Jeppesen would control the display and distribution of the charts, which are rendered directly from Jeppesen's TCL chart representation to customers' mobile devices.  (McDonald Aff., Ex. 10, ¶ 28.)

113.    If SOLIDFX used the JIT to integrate Jeppesen's charts, SOLIDFX's development of an iPad app would not adversely affect or violate Jeppesen's copyright in its terminal charts.  (Howard Dep., Ex. 19, at JS21724 ("The JIT . . . maintains the appearance of Jeppesen's charts."); Ex. 14, at 239.)

114.    SOLIDFX's work on the iRex did not relate in any way to Jeppesen's copyrights.  (*Id.*)

115.    The OEM Guidance document reflected no concerns related to the display of Jeppesen's charts in deciding to deny the JIT to third parties.  (Buhl Dep., Ex. 20, at 174.)

116.    Jeppesen would have had no issues in controlling the display of its charts if it had allowed SOLIDFX to develop an iPad app.  (*Id.* at 74-75, 140; Reagan Dep., Ex. 8, at 162; Ex. 8C; Howard Dep., Ex. 14, at 240.)

### *Uncertainty Regarding Apple Was Not a Reason Jeppesen Denied the JIT to Third Parties.*

117.    Tim Huegel was the decisionmaker regarding whether third parties would be permitted to develop apps for the iPad.  (Ex. 71, Interrog. 21.)

118.    Huegel spoke to no one from Apple prior to deciding not to allow third parties to develop iPad apps; could identify no particular concern regarding the Apple business model; and could identify no document that reflected Jeppesen's concern regarding the Apple business model.  (Huegel Dep., Ex. 74, at 51, 81; Ex. 74A [Dep. Ex. 324].)

119.     Buhl did not speak with anyone from Apple before Jeppesen decided to exclude third party app developers.  (Buhl Dep., Ex. 20, at 239-41.)

120.     No concerns related to Apple appeared in the iPad Strategy Document or the OEM Guidance Document.  (Exs. 20E, 20H; Buhl Dep., Ex. 20, at 174; Huegel Dep., Ex. 74, at 81.)

### *Cost of Support Was Not a Reason that Jeppesen Denied the JIT to Third Parties.*

121.     Jeppesen determined that having a third-party like SOLIDFX develop apps for Jeppesen terminal charts on mobile devices was its lowest cost option.  (SSMF 95-97.)

122.     Huegel did not speak with anyone with actual knowledge about the costs of integrating the JIT with a third-party application.  He did not know whether the same costs would be necessary for Jeppesen's in-house development of an app.  (Huegel Dep., Ex. 74, at 97-100.)

123.     Huegel did not know the number of man-hours that it would take to integrate the JIT onto third-party hardware or software, nor did he know whether such an effort, once accomplished, could be easily replicated.  (*Id.* at 101.)

124.     Jeppesen's support for SOLIDFX's iPad app would have been minimal.  (McDonald Dep., Ex. 3, at 221-22.)

125.     Huegel could not point to any contemporaneous business documents discussing the iPad decision that contained any of the justifications for developing the app in-house that he described in his deposition.  (Huegel Dep., Ex. 74, at 79-83, 158-59.)

### Jeppesen's Apps

126.     In July 2010, Jeppesen introduced its first iPad app, "Jeppesen Mobile TC."  (*Id.* at 44.)

127.     In response to questions from SOLIDFX, on or about June 3, 2010, Jeppesen stated that the app was only "free for now."  (Flamme Aff., Ex. 1, ¶ 46.)

128.     Jeppesen spent $1.3 million on hourly labor to develop its apps through September 2011.  (Abbott Dep., Ex. 15, at 206-08; Ex. 15B [Dep. Ex. 189]; 15C [Dep. Ex. 190]; 15D [Dep. Ex. 192].)  Jeppesen had to hire an outside contractor with the necessary expertise to develop apps for the iPad.  (Buhl Dep., Ex. 20, at 81.)

129.     Apps providing access to terminal charts provide a "value add over and above the charting component."  (Abbott Dep., Ex. 15, at 103-04; Foreflight Dep., Ex. 26, at 228.)

130.     Jeppesen's commercial customers pay $9.99 for each app downloaded through Apple's volume purchase program.  (Buhl Dep., Ex. 20, at 234.)

131.     Jeppesen's Business and General Aviation customers, who receive electronic charts through JeppView, receive four "sitekeys" with their JeppView chart subscriptions.  Each sitekey represents one point or device (such as a computer, avionics system, or iPad) to which they may download their Jeppesen charts.  If users require additional sitekeys, the subscription rate is increased by eighteen percent per sitekey.  (Abbott Dep., Ex. 15, at 182-83, 235-36.)

132.     Jeppesen continues to evaluate how it will price its apps in the future.  (*Id.* at 220-21, 424-26; Ex. 75 (lucrative customers will pay, noting app has value and is not "free"); Buhl Dep., Ex. 20, at 232-37; Ex. 76 at JS88199-201 (TEFIS price increase justified by inclusion of mobile app); Program

Update Web and Mobile Solutions, Ex. 77, at JS136457 (consolidated pricing model); Jeppesen Mobile Solutions, Ex. 78, at JS109934 (reflecting mobile application fee).)

133.    Jeppesen could substantially increase the price for its app without seeing a loss in its customer base.  (Phillips Dep., Ex. 79, at 139-41.)

134.    In July 2011, Jeppesen introduced a second iPad app for displaying terminal charts and other information – Jeppesen Mobile FD.  (MSJ Ex. 57.)  In June 2012, Jeppesen released an app for commercial airline use, Jeppesen Mobile FD Pro.  (Abbott Dep., Ex. 15, 413.)  In July 2012, Jeppesen released its first app for any device other than the iPad – Jeppesen Mobile TC for Android on the Samsung Galaxy.  (Ex. 80.)

135.    As of May 2012, Jeppesen's iPad apps had been downloaded more than 230,000 times. (Abbott Dep., Ex. 15, at 428.)

### The Apps Market

136.    Several companies have developed and sell a variety of apps that allow pilots to access terminal charts on a personal electronic device.  (Ex. 30A at 50.)

137.    With the exception of Jeppesen, Lufthansa, and Navtech, app providers do not create their own terminal charts.  SOLIDFX created apps to work with Jeppesen charts, and other app providers rely on NACO charts from the U.S. government.  These apps compete with each other on functionality.  (Lufthansa Dep., Ex. 11, at 259-60; Foreflight Dep., Ex. 26, at 38-39; Abbott Dep., Ex. 15 at 77.)

138.    Lufthansa has developed two iPad apps to work with its Lido charts – Lido/iRouteManual and Lido/iRouteManual Pro, but neither is available for operational use.  (Lufthansa Dep., Ex. 11, at 81-83.)  As of February 2011, Lido's apps had been downloaded 560 times.  (*Id.* at 275-77; Ex. 11B [Dep. Ex. 13].)

139.    Navtech developed an app called iCharts for iPad (Navtech) to work with its terminal charts. It has no users of its app.  (Ex. 81, at Navtech3.)

140.    SOLIDFX sold its FXView app to work with Jeppesen's charts for the FX8 and FX10 e-book viewers.  However, because the iRex hardware has been eclipsed by newer hardware and Jeppesen has refused to allow SOLIDFX to develop apps for any additional hardware platforms, its sales have dwindled to almost nothing.  (Flamme Aff., Ex. 1, ¶ 50.)

141.    There are a variety of apps that work in conjunction with NACO terminal charts.  These include ForeFlight HD, ForeFlight Pro, WingX Pro7 for iPad, WingX for Android, Flight Guide iEFB, Reader Plates, and EFB by GlobalNavSource ("NACO apps").  (JSMF 58.)

142.    Customers prefer the features or functionality of one app over another, although each app provides the same chart data.  (Arnold Dep., Ex. 12, at 126-27; Lufthansa Dep., Ex. 11, at 260.)

143.    Foreflight's app is regarded as one of the most successful of the NACO apps.  (JSMF 54.) Foreflight's app does not compete with Jeppesen's app.  (Foreflight Dep., Ex. 26, at 108-09.)

144.    Foreflight is the only app that displays charts published by any individual country other than the United States, and it offers only Canadian charts.  (Poullie Aff., Ex. 27, ¶¶ 13, 14; JSMF 56.)

145.    Foreflight cannot provide the airport coverage necessary to serve international customers.

(Foreflight Dep., Ex. 26, at 108-09, 202-03.)

146.    No commercial airline uses a NACO app.  (Peck Dep., Ex. 21, at 143.)

147.    NACO apps do not compete at all outside of the United States.  (Lufthansa Dep., Ex. 11, at 268-69; Ex. 11C [Dep. Ex. 4] at LSY304.)

148.    NACO apps are not an option for business aviation operators.  (Lufthansa Dep., Ex. 11, at 162-64; Schopp Dep., Ex. 13, at 160, 236-37 ("I knew that in order for [the iPad] to be a viable EFB solution, it would need to – somebody would need to develop an app for it that would display terminal charts, Jeppesen terminal charts on that hardware."); Peck Dep., Ex. 21, at 88-89.)

149.    General aviation pilots outside the United States cannot use a NACO app, or any app besides Jeppesen's.  (Pouille Aff., Ex. 27, ¶¶ 13-14.)

150.    Jeppesen's bundled price for its app and charts is ten times more expensive than the bundled price of NACO apps with NACO charts.  A subscription to JeppView for the continental United States (which includes Jeppesen's iPad app) is $887.00 per year.  A subscription to Foreflight for its app and the same geographical coverage with NACO charts is $74.99 per year.  (SSMF 41; Foreflight Dep., Ex. 26, at 42-43; Ex. 30A, at 50-51.)

151.    Jeppesen has more than 70% of the apps market.  (Ex. 30A, at 21; Ex. 30B, at 21-22.)

### Demand for Charts on Mobile Devices

152.    The price point of the iPad and other e-book viewers has driven "incredible demand" for their use as Electronic Flight Bags ("EFBs").  (Ex. 34, at OP62-63; Ex. 33, at OP75-77; Schopp Dep., Ex. 13, at 28-29, 233-36 ("I think every pilot that had a pulse saw the [iPad] and said I would like to see charts on this.").)

153.    Jeppesen views paper terminal charts as a dying product and viewed the introduction of the app as a "godsend" that significantly enhanced revenues from electronic charting services.  (Ex. 31, at JS55018; Ex. 32, at JS56037.)

154.    Accessing charts through an iPad app provides increased fuel savings, less risk of injury from carrying heavy paper charts, easier access to charts, better object details, increased productivity, and better pilot morale.  (Ex. 82, "Introduction of iPads into the Cockpit.")

155.    A majority of Jeppesen's commercial customers are exploring obtaining charts through mobile computing solutions involving the iPad or Android technology.  (Wede Dep., Ex. 83, at 174-77; Mobile Customer Onboarding, Ex. 84; Ex. 85 at OP45 (As of June 2011, over a hundred airlines had "expressed strong interest" in receiving Jeppesen's charts on an iPad.).)

156.    Airlines have made or are making substantial investments in order to use apps for viewing terminal charts.  (EFB Business Case, Ex. 86, SWA574; Ex. 87, ALASKA75; Wede Dep., Ex. 83, at 215; Ex. 88 at OP56; Ex. 33, at OP 75.)

157.    In February 2011, Executive Jet Management obtained FAA approval for use of Jeppesen's iPad app as the sole source of terminal chart data.  (MSJ Ex. 56.)

158.    Paper charts and non-app electronic charting products are not interchangeable with or otherwise substitutable for apps displaying Jeppesen's terminal charts. (Ex. 30A, at 19-20.)

**Barriers to Entry**

159.    The apps market has high entry barriers, including access to terminal charts and access to the installed consumer base available to a company like Jeppesen.  (*Id.* at 35-37.)

160.    Jeppesen acknowledges that its longevity in the industry and its name recognition are barriers to entry.  (Reagan Dep., Ex. 8, at 189-91; Ex. 30A, at 36-37.)

161.    Lufthansa and Navtech both acquired their terminal chart operations from pre-existing companies.  No company has entered the terminal charts business in the last several decades. (Lufthansa Dep., Ex. 11, at 206-07.)

162.    Lufthansa believes that pilots are first trained on Jeppesen charts, and that the bias in favor of such charts makes it difficult to compete.  (*Id.* at 56-57, 61-62, 243-44.)

163.    Jeppesen has relationships with authorities around the world, and obtains authorization from civil aviation authorities around the world.  (Ellerbrock Dep., Ex. 16, at 175-81.)

164.    There are substantial "switching costs" for an airline or business aviation operator to switch chart or app providers.  Operators must obtain regulatory approval for all of their operation specifications and must expend considerable resources training pilots on the new products. (Lufthansa Dep., Ex. 11, at 191-206, 243-44, 246, 338-39.)

165.    Jeppesen's terminal chart production and distribution process prevents competitor entry because of its substantial economies of scale.  (*Id.* at 191-92, 208-11.)

166.    A potential competitor to Jeppesen could not enter the market without expending tens of millions of dollars over a period of two to four years.  (*Id.* at 190-92, 343-44; Foreflight Dep., Ex. 26, at 132-34.)  Jeppesen can deter such potential competitors from making this expenditure because of its ability to control prices and its economies of scale.  (Ex. 30A, at 36-37.)

167.    Foreflight spent over a year incorporating Canadian charts, and the format is not even standardized with ForeFlight's provision of NACO charts.  (Foreflight Dep., Ex. 26, at 138-39.)

**Jeppesen Interfered with SOLIDFX's Prospective Business Relationships**

168.    Tailored terminal charts for commercial aviation customers are covered by the Agreement. (Agmt. § 1.3.1; Abbott Dep., Ex. 15, at 283; Howard Dep., Ex. 14, at 136-37.)

169.    Jeppesen's JIT 2.2. is a data set for tailored charts for commercial airlines, which SOLIDFX must have for its customers to access tailored terminal charts.  (*Id.* at 113, 160-61.)

170.    Jeppesen's 30(b)(6) representative on the Agreement's terms admitted that there is no customer commitment requirement in the Agreement.  (Abbott Dep., Ex. 15, 249-50; 283-84.)

171.    Jeppesen secretly decided not to support SOLIDFX's iRex work with commercial airlines. (Buhl e-mail, Ex. 89, at JS23094 (SOLIDFX cannot work with airlines); Abbott e-mail, Ex. 90, at JS8815-16; Dean e-mail, Ex. 91, at JS15042; Apostolopoulos e-mail, Ex. 92, at JS15870-71.) Jeppesen did not provide the necessary JIT to work with commercial airlines.  (Resp. to JSMF 199.)

172.    SOLIDFX could not obtain a customer commitment with a commercial airline without JIT 2.2 which would allow SOLIDFX to demonstrate a final solution.  (Flamme Aff., Ex. 1, ¶ 60; Abbott Dep., Ex. 15, at 456; Howard Dep., Ex. 14, at 262-63 ("Catch-22").)

173.    SOLIDFX had potential commercial customers (*e.g.*, Regional Airlines, ComAir, Mesaba, and SkyKing), and even though SOLIDFX created "greater income for Jeppesen," Jeppesen secretly dissuaded those customers from using SOLIDFX.  (Flamme Aff., Ex. 1, ¶¶ 54-64; Flamme e-mail, Ex. 93, at SFX71102; Flamme e-mail, Ex. 94, at SFX83291; Dequatremare e-mail, Ex. 95, at JS23169 (Regional); Valdovino e-mail, Ex. 96, at JS141112-13 (SkyKing); Duval e-mail, Ex. 97, at JS79091 (ComAir); Ablanczy e-mail, Ex. 103, at JS9179 ("greater income").)

174.    Further, Executive Jet Management and other potential customers expressed interest in SOLIDFX and the iPad.  (Schopp e-mail, Ex. 102, at SFX44993-95 ("but your [software] on [the iPad] would be powerful.  Not JeppView."); DeGrande e-mail, Ex. 49, at JS61987; Fillhart e-mail, Ex. 98, at JS41201; Hoffman e-mail, Ex. 99, at JS10743.)

175.    SOLIDFX has been damaged by Jeppesen's refusal to provide tailored data and iPad cooperation.  (Flamme Dep., Ex. 2, at 522-601; Harper Rpt., Ex. 101.)

### Jeppesen's Exclusion of Competitors Has Harmed Consumers

176.    Jeppesen continues to refuse to allow any third party to develop an app for its charts for any mobile device, which means if consumers wish to access worldwide charts on a mobile device, they have no choice but Jeppesen's apps.  (Ex. 30A, at 46; Pouille Aff., Ex. 27, ¶ 13.)

177.    Jeppesen's app development efforts, and its release of updates, have been poor and slow.  (Ex. 30A, at 47; Foreflight Dep., Ex. 26, at 80, 105-06; McDonald Dep., Ex. 3, at 642-47.)

178.    Customers have expressed interest in a SOLIDFX app on the iPad.  For example, Jeppesen's Fillhart stated, "I wanted to advise, and bring awareness that 3 customers within the first 5 minutes of conversation at the Regional Airline Association Convention wanted to know what the status was on the SOLIDFX and iPad platforms."  (Ex. 98, at JS41201.)  SOLIDFX's product has been praised as "fantastic" and "very well thought out and designed."  (Ex. 30A, at 47; Pouille Aff., Ex. 27, ¶ 11; Ex. 48.)

179.    In May 2010, Aviation Consumer magazine wrote: "the iPad and other devices may eclipse the FX8 in usefulness, but, even if it does, SOLIDFX's terrific software should find a home on that device as well."  (Ex. 48; Ex. 100, "Paperless Cockpit Redux: iPad a Best Bet For Now," *Aviation Consumer* (Dec. 2010) ("We'd like to see SOLIDFX offer an iPad solution themselves that took their clever organization to a more versatile platform.").)

180.    Numerous consumers want to access Jeppesen charts on mobile devices other than the iPad.  (Schopp Dep., Ex. 13, at 158; Ellerbrock Dep., Ex. 16, at 149-151; Ex. 30A, at 46-47.)

181.    Until July 2012, Jeppesen offered no app for any mobile platform besides the iPad.  (Buhl Dep., Ex. 20, at 84.)  SOLIDFX could have released an Android app by December 2010.  (McDonald Aff., Ex. 10, ¶ 36.)

182.    Consumers complain that, despite Jeppesen's high prices, there are always problems, and that Jeppesen needs "some competition bad to get [its] act together."  (Arsenault e-mail, Ex. 105, at JS15953-54.)

## RESPONSE TO JEPPESEN'S STATEMENT OF MATERIAL FACTS

1-4, 6, 13-15, 27, 48, 58, 66, 68-70, 75, 76, 78, 86, 96, 102, 105, 106, 108, 110, 112, 113, 117 (except the title), 118, 121, 122, 125-26, 130-32, 137-38, 154, 157-58, 172, 176, 183-84, 190, 197, 198: Admitted.

29, 32, 38, 50, 57, 109, 111, 115.  Denied, Jeppesen's citations do not support the proposition.

5, 9, 10, 11: Denied.  (SOLIDFX's Statement of Material Facts ("SSMF") 14-15, 38.)

7:         Denied.  (SSMF 16, 38, JSMF 11.)

8.         Denied.  (Phillips Dep., Ex. 79, at 22; SSMF 16, 17; Sec. I, *infra*)

12, 16, 17, 20-24: Denied.  (SSFM 14-15, 23-44.)

18.        Admitted, *but see* SSMF 32-39.

19.        Admitted that NAV CANADA and EUROCONTROL provides some charts; the remainder of this set of facts is denied as unsupported by the citation and evidence.

25, 26:  Denied.  (SSMF 33, 159-67.)

28.        Admitted that NavTech's documents indicate it has a chart library of approximately 1,500 airports, but the citation does not support 121 countries, which is denied.

30.        Admitted that Lido's representative so testified, but denied as to substance.  (SSMF 42.)

31.        Denied.  The cited document indicates Jeppesen believes, as a whole, in Jeppesen's worst case scenario, these competitors threaten less than $6 million, less than 1.5% of Jeppesen's navigation revenue.  (SSMF 22.)

33.        Admitted that SOLIDFX, after Jeppesen repeatedly breached the Agreement, argued Jeppesen should cooperate with them on some platform to enhance Jeppesen's offerings.

34.        Admitted, *but see* SSMF 159-67.

35.        Admitted that after Jeppesen's complete and total breach of the Agreement, SOLIDFX unsuccessfully attempted to mitigate its damages.

36.        Admitted.  SFX perceived that NACO charts were used by a different market of customers, and that numerous NACO apps were already available.

37.        Admitted, *but see* SSMF 23-39, 136-151.

39.        Denied, Jeppesen's citation does not support the proposition asserted.  (SSMF 23-39; Arnold Dep., Ex.12, at 225.)

40.        Denied.  No document supports this fact, and Peck was testifying to anecdotal numbers. (SSMF 43; Resp. to JSMF 22.)

41.        Denied, citation does not support the proposition asserted.  (*See also* Resp. to JSMF 40.)

42.        Denied.  (SSMF 32.)

43, 44: Admitted, *but see* SSMF 23-32.

45.        Admitted, *but see* SSMF 23-35, 159-67.

46.        Denied.  Jeppesen cannot identify a single specific customer it has lost.

47.        Denied.  Although Jeppesen's customers often express dissatisfaction with Jeppesen and discuss other options, they do not actually leave.  (SSMF 23-39, 44.)

49.        Denied.  (SSMF 159-167.)

51.     Admitted, *but see* SSMF 138-39.

52.     Admitted, *but see* SSMF 23-39, 138, 166.

53.     Denied that GlobalNavSource previously distributed government issued charts.  Admitted that such announcement was made.

54.     Admitted that ForeFlight is one of the most popular NACO apps.  Denied as to the remainder of the cited section.  Weihs refers to ForeFlight Mobile, which is considered a weather app.  (ForeFlight Dep., Ex. 26, 25; *see also* SSMF 143-151.)

55.     Denied.  (Weihs Dep., Ex. 26, at 168-72; *see also* SSMF 143-151.)

56.     Denied.  (SSMF 159-167.)

59.     Admitted, *but see* SSMF 23-39, 136-51.

60.     Denied.  Flamme considered prices of certain NACO apps (which are not competitors to Jeppesen's iPad app) because those are the only apps currently on the market that enable display of terminal charts except for the Jeppesen apps, which Flamme also considered.  (SSMF 136-51.)

61.     Denied.  Purchasers of SOLIDFX apps obtain charts from Jeppesen.

62.     Denied that subscription prices do not reflect purchase of the apps.  (SSMF 129.)

63.     Denied.  (SSMF 129.)

64.     Denied that the testimony supports the statement and see Resp. to JSMF 61.

65.     Denied.  (SSMF 152-58.)

67.     Admitted, except denied as to tablet.  (McDonald Aff., Ex. 10, ¶ 17.)

71.     Admitted, however, SOLIDFX did not limit itself to only e-ink.  (Resp. to JSMF 72.)

72, 99, 100, 134, 135:  Denied.  Prior to the December 31, 2009 Agreement, SOLIDFX made numerous references to Jeppesen regarding the device that would be named the Apple iPad and other devices that did not use e-ink technology.  (SSMF 52-55; Flamme Dep., Ex. 2, at 875.)

73.     Admitted, but *Survey* was never delivered to Jeppesen.  (Flamme Dep., Ex. 2, at 138-39; *see* Dec. 22, 2008 Flamme letter to Dean, Ex. 111, at SFX83417.)  The *Survey* also included non e-ink displays.  (Flamme Dep., Ex. 2, at 127:12 to 131:7.)

74.     Admitted that no tablet computers of the kind available in 2009 were included in the survey, because at that time they were Windows based, too bulky, and lacked suitably robust battery life.  (McDonald Dep., Ex. 3, at 22-25; 30-33.)

77, 142:  Admitted that Howard and Nguyen negotiated the Agreement. (SSMF 57.)

79.     Admitted that Jeppesen sent a draft Agreement on June 16, 2009, but denied that negotiations were complete by July 2009.  (Resp. to JSMF 81.)

80.     Admitted that the words in the Agreement § 1.6 did not change after July 23, 2009, *but see* Resp. to JSMF 82.

81, 82, 85:  Denied.  In July 2009, Flamme executed a prior draft of the Agreement which subsequently changed.  The effective date of the Agreement is December 31, 2009.  (SSMF 56.)

83-84.  Admitted, *but see* SSMF 45-52.

87-88.  Admitted, *but see* the next sentence of the citation at Flamme Dep., Ex. 2, at 57.

89, 136:  Denied.  The purpose of the Agreement was to cooperate to develop products for use by pilots in the cockpit.  (SSMF 63.)  Logic (and the covenant of good faith and fair dealing) require that a System must be suitable for cockpit use.  (*Id.* 53-55.)

90.     Denied.  (SSMF 60; John Dep., Ex. 106, at 29-30, 111-12; Snow Dep., Ex. 53, at 84-85; Shih Dep., Ex. 107, at 37-39 and Rebuttal Expert Disclosures, Ex. 108, at 3-4.)

91, 93, 94, 95, 107:  Denied.  (SSMF 58-62.)  Further, while e-book viewer is a broad term encompassing hardware on which one can view an e-book (Ex. 3, at 10-11, 524), Jeppesen presents inconsistent definitions of "e-book viewer."  (Ex. 15, at 249-50, 263, 274, 275; Ex. 83, at 70; Ex. 14, at 82-84, 121-122; Ex. 43, at 120; Ex. 52, at 17, 19, 62, 181; Ex. 8, at 46, 78-82; Ex. 53, at 79, 177; Ex. 106, at 41-44 ("e-book viewer includes the Nook, Kindle, and Kindle Fire"); Flamme Dep., Ex. 2, at 335; Ex. 109; Ex. 110.)

92.     Admitted, *but see* Myers Dep., Ex. 112, at 26-27, 64-65.

97.     Denied.  (Flamme Dep., Ex. 2, at 186; Resp. to JSMF 98.)

98.     Denied.  (Lyon Dep., Ex. 50, at 161-63.)

101.    Admitted except denied regarding the title "Requirement of Pre-Loading."

103, 104:  Denied.  (Howard Dep., Ex. 103, at 91-93; McDonald Dep., Ex. 3, at 201-03, 281-82.)

114.    Denied.  (Flamme Dep., Ex. 2, 158, 210-13.)

116.    Denied.  (*Compare* Ex. 113, FX8 Owner's Manual, *with* JSMF 110; Ex. 15 at 290; Ex. 43 at 201-02.)

119, 120.  Denied that the parties could not amend orally or by writing.  (SSMF 74.)

123.    Admitted that iPad does not employ e-ink, but denied as to the remainder as the citation does not support the statement.

124.    Denied.  In 2009 and 2010, the iPad was referred to as both an "e-reader," as well as a "tablet."  (*See* Resp. to JSMF 90.)  *See also* Exs. 115-125, eleven articles from 2009-12 referring to the anticipated or actual iPad as an "e-reader;" Ex. 132-37

127, 128:  Admitted, *but see* McDonald Dep., Ex. 3, at 40-42, 275.)

129.    Admitted, however, Elia has never seen the Agreement.  (Elia Dep., Ex. 126, at 39.)

133.    Denied as the reference pertains to a draft.

139.    Admitted, *but see* Resp. to 103.

140.    Admitted, but it was Jeppesen's request.  (Flamme Aff., Ex. 1, ¶ 38.)

141, 143, 145:  Denied.  While Ms. Nguyen stated as such in her deposition, SOLIDFX denies the substance of the statement.  (SSMF 74; Ex. 43, at 211.)

144.    Denied.  (Ex. 50, at 161-63; Ex. 127 (iRex "approval" e-mail).)

146, 169, 170:  Denied.  SOLIDFX did believe the Agreement included the iPad.  (Resp. to JSMF 147.)  McDonald testified that he had to try to work with Jeppesen, because "Jeppesen is a large company.  If they wanted to put us out of business, they could find many ways to do so."  (Ex. 3, at 352; Ex. 106, at 96, 97, 184-186, 244; SSMF 7, 25.)

147, 148, 149, 151, 152:  Admitted, *but see* Ex. 2, at 367, 369-371; Ex. 3, at 296; Ex. 106, at 272-74.

150.    Admitted, *but see* McDonald Aff., Ex. 10, ¶ 33.

153.    Denied.  (SSMF 81-85, 177.)

155, 156, 159, 160, 161, 162, 163, 164, 165, 166, 167:  Denied.  (SSMF 86-125.)

168.    Denied.  (SSMF 81.)

171.    Admitted, nor during the extensive discussions did Jeppesen ever ask.  (SSMF 74.)

173, 174:  Denied.  (SSMF 127-33.)

175.     Admitted as to the specific cite, but denied as to the remainder.  (SSMF 177.)

177.     Admitted, but denied as to the substance of the statement.  (SSMF 176-82.)

178.     Admitted, but denied as to the substance of the statement.  (SSMF 168-73.)

179.     Admitted except the release date was July 2011.

180, 181, 185, 186:  Denied.  (SSMF 127-33, 150, 153.)

182.     Denied.  Jeppesen has breached the Agreement by developing its own apps to the exclusion of SOLIDFX.  (SSMF 78-81.)

187.     Denied.  (Ex. 30A at 10, 33-34; SSMF 150.)

188.     Denied.  The citation concerns commercial airlines, and does not support that Jeppesen's base terminal charts are provided to the majority of Jeppesen's customers.

189.     SOLIDFX lacks sufficient information to either admit or deny this JSMF.  Further, "customer-owned data" is not supported by the citation.

191, 193:  Denied.  The citation does not support that statement.

192.     SOLIDFX lacks sufficient information, but has no reason to deny at this time.

194.     Admitted that SOLIDFX's solution worked with JSUM, denied to the extent Jeppesen implies SOLIDFX products could not be compatible with DDM.

195.     Denied.  (SSMF 98-99, 121-24; Ex. 53, at 22, 240-41(referring to Ex. 128), 276-77; Ex. 129, at JS15063.)

196.     Denied.  (Agmt. § 1.3.1; SSMF 168-75.)

199-202, 205-13:  Admitted that Jeppesen provided a "preliminary" JIT 2.2, but denied that Jeppesen provided the necessary JIT.  (Agmt. §§ 1.5.1, 1.5.2; Ex. 53, at 119-20; 137-38; 141-42; SSMF 168-75.)

203.     Denied.  There were commercial customers who expressed an interest in SOLIDFX's iRex product; however, when potential customers initially contacted Jeppesen, it internally decided it had not authorized the use of 2.2 data on a SOLIDFX device.  (Ex. 15, at 245, 285; Ex. 69, at 91, 169; Resp. to JSMF 195, 199.)

204.  Admitted, *but see* SSMF 170-75.

## ARGUMENT

## I.     COPYRIGHT LAW DOES NOT GIVE JEPPESEN ANTITRUST IMMUNITY.

The fundamental flaw with Jeppesen's copyright defense was summarized well by the D.C.

Circuit when it rejected the same argument as "border[ing] on the frivolous":

> [Microsoft] claims an absolute and unfettered right to use its intellectual property as it wishes: "[I]f intellectual property rights have been lawfully acquired," it says, then "their subsequent exercise cannot give rise to antitrust liability." . . .  That is no more correct than the proposition that use of one's personal property, such as a baseball bat, cannot give rise to tort liability.

*United States v. Microsoft Corp.*, 253 F.3d 34, 62 (D.C. Cir. 2001).  "Intellectual property rights do not confer a privilege to violate the antitrust laws." *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1329-30 (Fed. Cir. 2000) ("*Xerox*").  Thus, Jeppesen's claim that its copyright in terminal charts immunizes its conduct in the apps market is legally and factually flawed.

### A.    Jeppesen May Not Use Its Allegedly Copyrighted Terminal Charts to Extend Its Monopoly into the Separate Apps Market.

It is well-recognized that the limited monopoly bestowed by copyright does not permit the exploitation of intellectual property rights to stifle competition in a different market.[3]  Indeed, while protecting the copyrighted work, the public policy behind copyright law "forbids the use of the copyright to secure an exclusive right or limited monopoly *not* granted by the Copyright Office." *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 977 (4th Cir. 1990) (emphasis added) (use of copyright to "control competition in an area outside the copyright" is copyright misuse);  *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 793-94 (5th Cir. 1999) (same); *Gulfstream Aerospace Corp. v. Camp Sys. Int'l, Inc.*, 428 F. Supp. 2d 1369, 1380 (S.D. Ga. 2006) (applying fair use doctrine).  Specifically, copyright owners may not restrict access to a copyrighted work to control markets for compatible products outside the copyright's scope when compatibility requires such access.  *Alcatel*, 166 F.3d at 793-94 (copyright misuse to "prevent[] anyone from developing a competing [microprocessor card]" compatible with the copyrighted system); *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523-24 (9th Cir. 1993) ("attempt to monopolize the market [for video games compatible with the copyrighted system] by making it impossible for others to compete" violates purpose and letter of copyright law).  They also may not engage in tying or other exclusionary conduct in violation of the antitrust laws by using intellectual property rights to leverage a statutorily granted monopoly in one market into a separate, illegitimate monopoly.  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S.

---

[3]  Terminal charts and apps are separate products.  (Section III.A, *infra*.)

451, 479 n.29 (1992) ("*Kodak I*") ("[P]ower gained through some natural and legal advantage, such as a patent [or] copyright . . . , can give rise to [antitrust] liability if a seller exploits his dominant position in one market to expand his empire into the next."); *Image Tech. Servs., Inc. v. Eastman Kodak Co.* ("*Kodak II*"), 125 F.3d 1195, 1216 (9th Cir. 1997) ("Section 2 . . . condemns exclusionary conduct that extends natural monopolies into separate markets.").

Jeppesen has engaged in precisely this type of conduct.  By refusing to provide SOLIDFX – or anyone else – with information necessary to make an app compatible with Jeppesen's charts, Jeppesen has used its dominant power in the terminal charts market to illegally restrict competition in the market for apps that enable display of worldwide terminal charts.  *Kodak II*, 125 F.3d at 1216; *Alcatel*, 166 F.3d at 793-94; *Sega*, 977 F.2d at 1523-24.  Thus, any pilot wishing to access such charts on any mobile device *must* use Jeppesen's app.  Jeppesen has exploited its legal monopoly in terminal charts to secure an undeserved monopoly in the apps market, eliminating competitors who would offer a variety of superior, timelier products.  *Kodak I*, 504 U.S. at 479 n.29; *Kodak II*, 125 F.3d at 1216.  (SSMF 176-82.)

## B.     SOLIDFX's Claims Do Not Implicate Any Jeppesen Copyright Anyway.

Recognizing that it cannot use its copyright to "expand its empire into the next," Jeppesen argues that the apps are within its asserted copyright for terminal charts because an app is merely a means of display or a method of distribution.  Such apps, however, comprise their own separately copyrightable software, and Jeppesen offers no evidence that they are somehow within any copyright for charts.  Because the apps provide only a *means* for displaying terminal charts, they are excluded from Jeppesen's claimed copyright, the scope of which is unproven.[4]  While the Copyright

---

[4]  Jeppesen's "evidence" of copyright protection for its charts consists exclusively of its vague 30(b)(6) testimony. (SSMF 17.)  Moreover, because Jeppesen's charts consist largely of factual and functional elements (*id.* 10, 16), any copyright in its charts is "thin" and entitled to only "weak protection."  *See Sega Enters.*, 977 F.2d at 1524, 1526.  Nor is SOLIDFX estopped from challenging Jeppesen's purported copyright based on licensee estoppel, which does not apply

Act grants the right to display or distribute copyrighted works, it does not grant the right to control the market for devices – like the apps at issue here – that *enable* display of the copyrighted work. *See, e.g., Waldbaum v. Worldvision Enters., Inc.*, No. 76 Civ. 3772, 1978 WL 956, at *6 (S.D.N.Y. Nov. 21, 1978) ("using the economic power of the copyrighted [films] to force the plaintiff to purchase a commodity such as film projectors" violates antitrust laws). SOLIDFX does not seek to exercise Jeppesen's copyright by displaying or distributing Jeppesen's charts. Instead, it seeks to develop apps that let Jeppesen's customers – who pay Jeppesen for chart subscriptions – access their charts on mobile devices. (SSMF 112.) Jeppesen controls the display of the charts, which are rendered directly from Jeppesen's TCL format to customers' mobile devices. (*Id.* 113, 116.) As Jeppesen testified, SOLIDFX's app does not have "anything to do with [Jeppesen's] copyright." (*Id.* 110, 114.)[5]

### C.     Evidence of Jeppesen's Anticompetitive Misuse Demonstrates that Its Copyright Defense Is Pretextual and Precludes Summary Judgment.

Even if Jeppesen's copyright were implicated here, Jeppesen's copyright defense still fails because it is a pretextual, post hoc excuse for admittedly anticompetitive conduct. The evidence shows that Jeppesen withdrew access to the JIT solely to limit competition, not to protect Jeppesen's copyright. (*Id.* 86-116.) In response, Jeppesen relies on a single Federal Circuit case – *Xerox* – to argue that its "subjective motive" is irrelevant because the right to exclude others from its copyrighted work is protected by copyright law. Thus, Jeppesen asserts that because it could refuse to provide access to its charts based on copyright, it is immune from antitrust liability, even if, as it has admitted, copyright had nothing to do with its decision. (*Id.* 110; Section IV.B.1, *infra*.)

---

to intellectual property licenses. *Twin Brooks Corp. v. Walt Disney Corp.*, 877 F. Supp. 496, 500 (N.D. Cal. 1995), *rev'd on other grounds*, 83 F.3d 1162 (9th Cir. 1996).

[5]  SOLIDFX does not seek access to Jeppesen's charts. (First Am Compl., Doc. 56, ¶ 21.) SOLIDFX seeks access to the information necessary for its app to interpret Jeppesen's chart definition language, assuming the app is used by a Jeppesen subscriber. (*Id.*) Pursuant to the Agreement, this ability was provided through the JIT, which Jeppesen does not argue is subject to copyright protection. (SSMF 64.)

Contrary to Jeppesen's position, however, an antitrust defendant's alleged business justification must be legitimate, not merely theoretical. *See Kodak I*, 504 U.S. at 438 n.32 (the right to refuse "exists only if there are legitimate competitive reasons for the refusal"). Thus, evidence demonstrating that an asserted business justification is simply pretext for anticompetitive behavior is sufficient to preclude summary judgment. *See id.* at 484 (reversing summary judgment because plaintiffs "presented evidence from which [the jury] could conclude that Kodak's [asserted business justification for its refusal to deal] is pretextual").

This rule applies equally to intellectual property rationalizations. There is no "powerful irrebuttable presumption [that] a unilateral refusal to license a copyright can never constitute exclusionary conduct." *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1184 (1st Cir. 1994); *Microsoft*, 253 F.3d at 62-64 (rejecting copyright as a legitimate business justification for anticompetitive licensing designed to limit competition, not protect copyright). Although such a refusal is presumptively lawful, the presumption may be "rebutted by evidence of pretext," as "[n]either the aims of intellectual property law, nor the antitrust laws justify allowing a monopolist to rely upon a pretextual business justification to mask anticompetitive conduct." *Kodak II*, 125 F.3d at 1219 (upholding jury verdict against defendant when evidence showed that intellectual property "played no part in [the defendant's] decision to act"); *cf. Data Gen.*, 36 F.3d at 1187 n.64 (recognizing that presumption may be rebutted when "imposing antitrust liability is unlikely to frustrate the objectives of the Copyright Act").[6]

In light of this, it is evident that Jeppesen's claim that its purported exercise of copyright is immune from antitrust liability is "a radical departure" from the Supreme Court's antitrust law. *See*

---

[6] To the extent that *Xerox* "predicted" Tenth Circuit law, it said only that the Tenth Circuit would follow *Data General*, which recognized that a unilateral refusal to license a copyright can violate the antitrust laws and adopted a rebuttable presumption that the exercise of intellectual property rights is a legitimate business justification for exclusionary conduct. *Xerox*, 203 F.3d at 1329; *Data Gen.*, 36 F.3d at 1184.

*Kodak I*, 504 U.S. at 479-80 n.29.  Even *Xerox* – on which Jeppesen relies for its immunity defense –

recognizes that "the property right granted by copyright law cannot be used with impunity to extend

[monopoly] power beyond what Congress intended." 203 F.3d at 1328.[7]  Thus, Jeppesen is not

entitled to summary judgment on its copyright defense.

## II.   SOLIDFX HAS PROPERLY DEFINED THE RELEVANT MARKETS.

Jeppesen asserts that SOLIDFX has improperly defined the relevant markets narrowly "to

create the appearance of antitrust injury."  (MSJ 25.)  Although narrow market definitions may

matter in many antitrust cases, this is not one of them.  SOLIDFX's First Amended Complaint

properly defines the relevant markets and Jeppesen's monopoly power therein.  (SSMF 18-39, 135-

151, 159-167.)  Even if the markets are defined as broadly as possible, however, Jeppesen still has

market power, as pleaded in the Second Amended Complaint.[8]

### A.   The First Amended Complaint Adequately Defines the Relevant Markets.

In its First Amended Complaint ("Complaint"), SOLIDFX properly defined two relevant

product markets:  the "terminal charts market" ("worldwide terminal charts with standardized

symbology") (Doc. 56, ¶ 52), and the "apps market" ("apps that access, utilize, and display

worldwide terminal charts on commercially feasible e-book viewers").  (*Id.* ¶ 55.)

With regard to the terminal charts market, Jeppesen suggests that SOLIDFX improperly

pled a market consisting only of Jeppesen terminal charts.  (MSJ 25.)  Not so.  SOLIDFX's relevant

product market for "worldwide terminal charts with standardized symbology" includes any

---

[7]  Jeppesen's interpretation of *Xerox* as offering blanket immunity for the exercise of intellectual property rights has been widely criticized as directly contradicting established law.  If so construed, the *Xerox* rule would transform intellectual property rights into "vehicle[s] for asserting monopolistic control over [separate] markets" – a result that courts have repeatedly rejected.  *See* Marina Lao, *Unilateral Refusals to Sell or License Intellectual Property & the Antitrust Duty to Deal*, 9 Cornell J.L. & Pub. Pol'y 193, 204-05 (1999) (*Xerox* "directly contradicts" *Kodak I*); Simon Genevaz, *Against Immunity for Unilateral Refusals to Deal in Intellectual Property: Why Antitrust Law Should Not Distinguish Between IP & Other Property Rights*, 19 Berkeley Tech. L.J. 741, 783 (2004) ("[T]he plain language of the law has been obscured and distorted by the *Xerox* rule.").

[8]  SOLIDFX's Second Amended Complaint was accepted by the Court for filing on August 9, 2012.

competitor that produces such charts, and the Complaint acknowledges such competitors may exist.

(Doc. 56, ¶ 54 ("Jeppesen has a market share of well over 70% in the Terminal Charts Market.").)

Similarly, SOLIDFX does not define the apps market to include only Jeppesen's apps.  (*Id.* ¶¶ 55-

57.)  The facts may show that Jeppesen has little competition in these markets, but that does not

mean they are improperly defined as a matter of law.[9]

Jeppesen also asserts that the terminal charts market should include NACO charts and

foreign government charts that only cover their own airports. (MSJ 26-27.)[10]  The evidence is

contrary:

- *Customers do not see NACO and other government charts as "reasonably interchangeable" with worldwide terminal charts that have consistent symbology.*  Few pilots use Jeppesen and NACO charts interchangeably.  No customers in the Commercial or Business Aviation markets use NACO charts at all, or any app besides Jeppesen's.  (SSMF 23-44, 136-51.)  *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956) (relevant market consists of "products that have reasonable interchangeability for the purposes for which they are produced – price, use and qualities considered").

- *No producer or supplier sees them as interchangeable.*  The leading provider of NACO apps, Foreflight, does not view itself as a competitor, (SSMF 143, 145), and there are no firms willing to enter the market for worldwide charts, (*id.* 14-15, 27, 33) (or the market for apps that display worldwide terminal charts, *id.* 166.)  *Rebel Oil v. Atl. Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995) ("extent to which producers of one product would be willing to shift their resources to producing another product" indicates whether products are in the same market); *Nobody in Particular Presents, Inc. v. Clear Channel Comm'ns, Inc.* ("*NIPP*"), 311 F. Supp. 2d 1048, 1081 (D. Colo. 2004).

- *Jeppesen charges significantly more than NACO and foreign governments without customers switching.*  (SSMF 40-41.)  In spite of its extremely high relative prices – and complaints about its prices – Jeppesen has continued to raise its prices and maintain or increase its revenues, even during a severe recession, demonstrating a lack of meaningful alternatives.  (*Id.* 43.)  *See, e.g.*, *United States v. Aluminum Co.* ("*ALCOA*"), 377 U.S. 271, 275-76 (1964); *United States v. Empire Gas*, 537 F.2d 296, 303 (8th Cir. 1976).[11]

[9] Even if the market definition was only Jeppesen products, such definition still would not fail as a matter of law.  *Kodak I*, 504 U.S. at 482 ("one brand of a product can constitute a separate market") (citing cases).  In particular, "a single brand of a product or service may constitute a relevant market . . . where the commodity is unique, and therefore not interchangeable with other products."  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 439 (3d Cir. 1997).  The determination must be made "after a factual inquiry into the 'commercial realities' faced by consumers."  *Kodak I*, 504 U.S. at 482; (SSMF 23-39, 136-51.)

[10] Jeppesen argues that there are not separate terminal charts and apps markets, but that if there are, then the apps market must include NACO apps and apps displaying charts from foreign governments.  (MSJ 27.)  As discussed in Section III.A, *infra*, the evidence shows that charts and apps are separate products.  Further, there is no evidence of any apps that display foreign government charts besides the Canadian charts offered by Foreflight.  (SSMF 144.)

[11] Jeppesen relies heavily on SOLIDFX's expert for proof that NACO charts should be included in the terminal charts market, and that NACO apps should be in the relevant apps market.  (MSJ 26.)  Jeppesen ignores, however, the sections of Dr. Phillips' report addressing the poor substitutability of NACO charts and apps (Ex. 30A at 14-15; Ex. 30B, at 11,

Finally, Jeppesen argues that because some customers may switch from Jeppesen to NACO, they must be in the same market. (MSJ 26.) That argument is repeatedly rejected. *ALCOA*, 377 U.S. at 275-76 (limited customer switching irrelevant when most would not); *FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1032 (D.C. Cir. 2008) ("legal error [to assume] market definition must depend on marginal consumers."); *NIPP*, 311 F. Supp. 2d at 1090 ("That the outer edge of a market's boundaries are disputed does not mean the market is legally flawed for purposes of a motion for summary judgment."). Thus, the evidence is more than sufficient to deny summary judgment on this fact-intensive issue. *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951, 975 (10th Cir. 1990); *NIPP*, 311 F. Supp. 2d at 1075.[12]

### B.   The Second Amended Complaint Defines the Broadest Possible Markets.

Even if Jeppesen is correct that all terminal charts and apps should be considered in the respective relevant markets, it is of no moment. SOLIDFX recently filed its Second Amended Complaint to plead the broadest product markets possible. (Doc. 158, ¶¶ 53, 58.) These markets have been endorsed by Jeppesen's own expert (Arnold Dep., Ex. 12, at 192-95), and they are favorable to Jeppesen's position in this litigation. (Ex. 30C, at 1.) Because Jeppesen's entire argument is predicated on SOLIDFX's supposed exclusion of competitors from the relevant market, SOLIDFX's alternative pleading of the broader relevant markets definitively eliminates any possible grounds for summary judgment on market definitions.

---

13-14, 16-18) and ignores the point of Dr. Phillips' opinion – even if all products are included within the relevant product market, Jeppesen nevertheless has monopoly power. (Ex. 30C, at 1-3.)

[12]   The record also indicates that there may be "submarkets," which is a fact question for the jury. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962); *NIPP*, 311 F. Supp. 2d at 1090 (recognizing jury could find submarket for rock concerts despite "the difficulty of categorizing . . . artists as rock or not"); *Whole Foods*, 548 F.3d at 1038-39 ("[A] core group of particularly dedicated, 'distinct customers,' paying 'distinct prices,' may constitute a recognizable submarket . . . because their particular circumstances dictate that a product is the only realistic choice, or because they find a particular product uniquely attractive.") (internal citations and quotations omitted). Thus, Jeppesen's core customers can constitute a relevant market or "submarket." The aviation industry further recognizes certain market segments (Commercial, Business, and General Aviation), which may constitute "submarkets" in which Jeppesen has monopoly power. (Doc. 158, ¶¶ 56 & 61; Ex. 30C, at 2-3.)

## III.   JEPPESEN IS NOT ENTITLED TO SUMMARY JUDGMENT ON TYING.

"There are four elements to a *per se* tying violation: (1) the tying and tied goods are two separate products; (2) the defendant has market power in the tying product market; (3) the defendant affords consumers no choice but to purchase the tied product from it; and (4) the tying arrangement forecloses a substantial volume of commerce." *Microsoft*, 253 F.3d at 85.[13]   Contrary to Jeppesen's argument, the record supports the first and third elements of this claim.

### A.   Charts and Apps Are Separate Products.

Summary judgment on "separate products" is inappropriate if a fact issue exists as to whether "there is sufficient consumer demand so that it is efficient for a firm to provide [terminal charts] separately from [apps]." *Kodak I*, 504 U.S. at 462.  The evidence of this demand is ample:

- SOLIDFX's app has been and is currently sold independently of Jeppesen's charts. (SSMF 65). *Kodak I*, 504 U.S. at 462-63, 486 (affirming reversal of summary judgment based on evidence of separate sales); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 22 (1984) (evidence that surgery and anesthesia were billed and chosen separately indicated they were separate products).

- Jeppesen's customers have expressly requested the ability to view Jeppesen's charts through an app developed by SOLIDFX and others. (SSMF 88, 178-79). *Jefferson Parish*, 466 U.S. at 22 (the fact that hospital patients requested specific anesthesiologists was evidence that surgery and anesthesia were separate).

- Jeppesen itself offers different apps for accessing its terminal charts.  (SSMF 134). *Parsons v. Bright House Networks, L.L.C.*, No. 2:09-cv-0267, 2010 WL 5094258, *5 (N.D. Ala. Feb, 23, 2010) ("[D]efendant's customers may select cable boxes with different features, further suggesting . . . that cable consumers view the set-top box as a separate product" from the cable service itself.).

- Several companies sell different apps that work with NACO charts. (SSMF 141). *Kodak I*, 504 U.S. at 462 (development of "entire high-technology service industry is evidence of the efficiency of a . . . market for service [separate from parts].").

Jeppesen argues that apps and terminal charts are not separate because apps have "no use or value" without charts.  (MSJ 29-30.)  The Supreme Court repeatedly has rejected that fallacy.  *Kodak I*, 504 U.S. at 463 ("We have often found arrangements involving functionally linked products at

---

[13] Even if all elements are not established, however, a plaintiff may still prove a violation under the "rule of reason" analysis by showing that the tying arrangement is an unreasonable restraint of trade in the tied product market (apps), which is an inherently factual determination. *Microsoft*, 253 F.3d at 85 (rule of reason analysis involves an "inquiry into the actual effect of [the defendant's] conduct on competition in the tied good market").

least one of which is useless without the other to be prohibited tying devices.") (quoting *Jefferson Parish*, 466 U.S. at 19 n.30).  Jeppesen also urges that terminal charts and apps are not separate products because "the latter is just a means of displaying the former."  (MSJ 29.)  This confuses the display of terminal charts with the software that *enables* such display on a mobile device.  Terminal charts and apps serve two distinct functions, one to guide pilots and the other to allow them to access and use charts on a particular viewing platform.  (SSMF 10, 129, 142.)  Means of displaying an item is separate from the object displayed.  *See Mot. Picture Patents Co. v. Univ. Film Mfg. Co.*, 243 U.S. 502, 508, 518 (1917) (indicating film and projector are separate products); *In re Cox Enters., Inc.*, 09-ML-2048, 2010 WL 5136047, at *3 (W.D. Okla. Jan. 19, 2010) (holding that cable service is separate from the set-top cable box which is required to permit viewing).

**B.      Customers Desiring to View Jeppesen's Terminal Charts on a Personal Electronic Device Are Forced to Use Jeppesen's App and No Other.**

Contrary to Jeppesen's argument, there is sufficient evidence of coercion.  "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or *might have preferred to purchase elsewhere on different terms*."  *Jefferson Parish*, 466 U.S. at 12 (emphasis added).  This is exactly what Jeppesen has done:  unlawfully foreclosed "[d]irect competition with a Jeppesen offerings [sic]" (SSMF 81), eliminating any alternatives to its app.  Thus, consumers "cannot choose to buy the tied product [*i.e.*, an app for accessing worldwide terminal charts] from a competing seller."  *Heartland Payment Sys., Inc. v. Micros Sys., Inc.*, 3:07-cv-5629, 2008 WL 4510260, at *10 (D.N.J. Sept. 29, 2008).  By "coerc[ing] the abdication of buyers' independent judgment . . . and insulat[ing] [its app] from the competitive stresses of the open market," Jeppesen has produced the precise anticompetitive result underlying the prohibition on

tying. *Jefferson Parish*, 466 U.S. at 12-13.[14]

Nevertheless, Jeppesen argues that (i) its charts are available in other forms (*e.g.*, paper or other electronic forms) and (ii) its apps are available "without cost." Neither argument has merit.

First, Jeppesen's claim that users of worldwide terminal charts are not forced to take its app because they can get charts in another form misses the point. The overwhelming industry shift toward apps as a means of accessing charts shows that such options are not feasible or desirable alternatives to apps. (SSMF 152-58). At the least, major fact issues on this point preclude summary judgment. *See Cascade Health Sol'ns v. PeaceHealth*, 515 F.3d 883, 914-16 (9th Cir. 2008); *Parsons*, 2010 WL 5094258, at *5; *Cox Enters.*, 2010 WL 5136047, at *3.

Second, Jeppesen's claim that its apps are available "without cost" is both untrue and irrelevant. Jeppesen's commercial customers are charged $9.99 per app download through Apple's Volume Purchase Program. (SSMF 130.) Customers who download Jeppesen's apps from iTunes also pay for Jeppesen's app because it counts as one of the customer's four "sitekeys" and costs an additional eighteen percent if added as a fifth sitekey. (*Id.* 131.) This creates a fact issue as to whether the is truly free. *See Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 63 F.3d 1540, 1548 (10th Cir. 1995) (tying claim exists if costs of two products are bundled, "even if [the tied product] is touted as being free").

Moreover, the Sherman Act is "concerned with competitive consequences, not labels." *Booklocker.com, Inc. v. Amazon.com, Inc.*, 650 F. Supp. 2d 89, 100 (D. Me. 2009). Even if Jeppesen's apps were free, that would not negate the anticompetitive consequences of its tying – the fact that pilots are "forced to *use* rather than *purchase* [Jeppesen's app] . . . still works an unlawful extension of

---

[14] *See also Heartland*, 2008 WL 4510260, at *10 ("Tying arrangements are unlawful [because] the coerced buyer *cannot choose to buy the tied product from a competing seller* . . . ." (emphasis in original; internal quotations and modification omitted)); *Downs v. Insight Comm'ns Co.*, No. 3:09-cv-93, 2010 WL 2228295, at *3 (W.D. Ky. June 3, 2010) (the maintenance of a monopoly so as to prevent others from selling the product in question "is precisely the sort of thing that the antitrust laws are meant to avoid").

[Jeppesen's] economic power in one market to another," even if allegedly free. *Heartland*, 2008 WL 4510260, at *10 (internal quotes and citation omitted); *Jefferson Parish*, 466 U.S. at 412; *NIPP*, 311 F. Supp. 2d at 1096 (tying unlawful where radio air time was given away for free and the other service, concert venues, was purchased by consumers).

## IV.     JEPPESEN HAS MONOPOLIZED THE APPS MARKET.

Illegal monopolization is:  (1) possession of monopoly power in a relevant market and (2) anticompetitive conduct that contributes to the acquisition or preservation of such power. 15 U.S.C. § 2; *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).  Both exist here.[15]

### A.     Jeppesen Possesses Monopoly Power in the Apps Market.

Monopoly power is the "power to control prices or exclude competition." *du Pont*, 351 U.S. at 391; *NIPP*, 311 F. Supp. 2d at 1099.[16]  Substantial direct and indirect evidence indicates Jeppesen's monopoly power in the apps market. *Am. Tobacco Co. v. United States*, 328 U.S. 781, 789 (1946) (exclusion of some competitors is direct evidence of monopoly power); *Microsoft*, 253 F.3d at 51-57 (describing direct and indirect evidence of monopoly power).

First, – and most simply – by denying the JIT, Jeppesen effectively has excluded all competitors from participation in the apps market.  Jeppesen denied the JIT to all third parties for the express purpose of avoiding competition. (SSMF 81, 84, 100-05.)  Because apps must work in conjunction with charts (JSMF 64), and because Jeppesen dominates the terminal charts market (SSMF 23-39), denial of access to the JIT effectively excludes competition in the apps market.

Second, and as a result, Jeppesen has virtually 100% of the apps market.  (*Id.* 136-51.)  Market share

---

[15]  Importantly, Jeppesen does not directly challenge SOLIDFX's claim for *attempted* monopolization, which does not require proof of market power in the relevant market, only a dangerous probability of the defendant achieving such monopoly power if left unchecked. *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993).

[16]  The Supreme Court and other circuits hold that monopoly power is *either* the power to control prices *or* the power to exclude competition. *du Pont*, 351 U.S. at 392; *Antitrust Law Developments* 225 n.3 (7th ed. 2012).  Although the Tenth Circuit nominally requires both, *Rural Tel. Serv. Co. v. Feist Publ'ns*, 957 F.2d 765, 768 n.2 (10th Cir. 1992), the two factors are intimately entwined, and one is unlikely to exist without the other, *du Pont*, 351 U.S. at 392.  Here, there is substantial evidence of both.

is strong evidence and a reliable measure of market power. *Microsoft*, 253 F.3d at 51; *Shoppin'Bag of Pueblo, Inc. v. Dillon Co.*, 783 F.2d 159, 162 (10th Cir. 1986); *NIPP*, 311 F. Supp. 2d at 1099, 1102; *Colo. Inter. Gas Co. v. Nat. Gas Pipeline Co.*, 885 F. 2d 683, 694 n.18 (10th Cir. 1989) (70% market share sufficient for jury to infer monopoly power). Third, Jeppesen's market dominance is secured by significant entry barriers – namely, the inability to duplicate Jeppesen's JIT, which prevents competitors like SOLIDFX from entering the market. *See, e.g., Microsoft*, 253 F.3d at 61 (licensing restrictions effectively prevented OEMs from competing with Microsoft). At the very least, such denial requires potential apps competitors to simultaneously enter the terminal charts market, which is virtually impossible. (SSMF 159-67); *Reazin*, 899 F.2d at 968 (high capital costs and entrenched buyer preferences are among many types of entry barriers); *Amer. Cncl. Of Cert. Podiatric Phys. & Surgeons v. Amer. Bd. Of Podiatric Surgery, Inc.*, 185 F. 3d 606, 623 (6th Cir. 1999) (reputation as barrier).

Jeppesen argues that because its charts are based on publicly available information, anyone can enter the terminal charts market (and presumably the apps market thereafter). (MSJ 42.) In addition to overlooking the massive barriers to entering that market, the argument is not supported by law. The mere fact that there could be "some" possible entrants is not determinative; rather, the relative success and strength of such entrants must be considered. *Reazin*, 899 F. 2d 951, 971 (200 entrants insufficient to rebut barriers to entry where no other entrant approached defendant's dominance). Jeppesen's largest, best capitalized, and most successful possible "competitor" testified that it is unable and unwilling to enter the market for worldwide terminal charts. (SSMF 27, 33.) In fact, no company has started producing its own terminal charts in the last three decades. (*Id.* 161.)

Jeppesen next argues that, because it does not charge for apps, it must not have monopoly power. (MSJ 32.) First, Jeppesen actually does charge for its app. (Section III.B, *supra*.) Further, regardless of the current price, Jeppesen is continually discussing future pricing for its apps. (SSMF

132.)  In fact, when viewed as part of Jeppesen's bundle of products that includes charts *and* apps,

there is evidence that Jeppesen actually charges supra-competitive prices.  (*Id.* 150.)  Jeppesen has

the power to exclude competitors from the apps market and set prices without market constraint.

Lido and Navtech do not offer an app for operational use and do not have the coverage necessary to

compete for Jeppesen's customer base; therefore, they do not constrain its prices.  (*Id.* 25-32, 138-

39.)  And NACO apps cannot be used by customers requiring coverage outside the United States.

(*Id.* 147.)  Accordingly, no competitors can constrain Jeppesen's pricing for apps, regardless of

Jeppesen's current price.  This ability to charge supra-competitive prices without constraint is further

evidence of monopoly power.  *du Pont,* 351 U.S. at 392; *Bd. of Reg. of U. of Okl. v. NCAA*, 707 F. 2d

1147, 1158-59 (10th Cir. 1983); *Microsoft*, 253 F.3d at 51.  Thus, Jeppesen has monopoly power in the

apps market, based on its exclusion of competitors, huge market share, entry barriers, control over

price, or all combined.

### B.    Jeppesen Has Engaged in Anticompetitive Conduct.

#### 1.    Jeppesen's Refusal to Deal Is Anticompetitive.

Although businesses generally may refuse to deal with their competitors, that "right is

neither absolute nor exempt from regulation," especially for monopolists.  *Aspen Skiing Co. v. Aspen*

*Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985) (quoting *Lorain Journal Co. v. United States*, 342 U.S.

143, 155 (1951)).  A monopolist's unilateral refusal to deal constitutes actionable anticompetitive

conduct when, as here, it "terminate[s] a [voluntary and] profitable relationship without any

economic justification other than an anticompetitive one."  *Four Corners Nephrology Assocs. v. Mercy*

*Med. Ctr.*, 582 F.3d 1216, 1225 (10th Cir. 2009) (internal quotations omitted); *accord Aspen Skiing*, 472

U.S. at 601-11 (defendant with lawfully-obtained monopoly violated Sherman Act by unilaterally

abandoning, without a legitimate business reason, a joint product offered with competitor); *Am. Cen.*

*E. Tex. Gas Co. v. Union Pac. Res. Group Inc.*, 93 F. App'x 1, 7-8 (5th Cir. 2004) (monopolist's refusal to deal violated Section 2 when it "acted in bad faith" to "prevent [the plaintiff] from competing" without valid business justification).  Such monopolistic conduct, particularly when combined with a willingness to forego short-term profits in the process, is an objective indication that the defendant was "prompted not by competitive zeal but by anticompetitive malice."  *Verizon Comm'ns Inc. v. Law Off. of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004); *Aspen Skiing*, 472 U.S. at 610-11.

Jeppesen's conduct falls squarely within the recognized parameters of a monopolist's unlawful refusal to deal.  Like *Aspen Skiing*, Jeppesen abandoned a voluntary and profitable prior course of dealing with SOLIDFX, as evidenced by a contract and extensive business dealings that arose in a competitive market.  (SSMF 45-49, 65-66.)  It was Jeppesen that first approached SOLIDFX with interest in partnering to develop a product that would serve the needs of Jeppesen's customers.  (*Id.* 49.)  SOLIDFX's app received rave reviews and – as anticipated – resulted in additional terminal chart subscriptions for Jeppesen.  (*Id.* 70, 89, 178-79.)  Following the release of the FX8 and FX10, Jeppesen and SOLIDFX continued to work on and discuss numerous other hardware platforms, including the Apple tablet that would ultimately become the iPad.  (*Id.* 52-55, 68-69.)  Once the iPad was announced, customers recommended to Jeppesen that SOLIDFX develop an iPad app for Jeppesen's terminal charts.  (*Id.* 89, 178-79.)

Then, although it initially anticipated continuing to work with SOLIDFX to develop an app for the iPad and other platforms (*id.* 84-85), Jeppesen – in a self-described "anticompetitive kneejerk reaction" – reversed course when the iPad soared in popularity.  (*Id.* 85.)  At that point, Jeppesen ceased cooperating with SOLIDFX (and all others) to avoid "[d]irect competition with Jeppesen offerings."  (*Id.* 81.)  As in *Aspen Skiing*, Jeppesen's about-face "reveal[s] a distinctly anticompetitive bent," undermining its *post hoc* justifications.  *Trinko*, 540 U.S. at 409; *NIPP*, 311 F. Supp. 2d at 1106-

08 (refusal to deal with *all* competitors "injured competition" and demonstrated "intent to monopolize").

Finally, the record is clear that Jeppesen had no legitimate business reason for its conduct. First, Jeppesen's "willing[ness] to forsake short-term profits to achieve an anticompetitive end" demonstrates the lack of any business justification. *Trinko*, 540 U.S. at 409. Despite customer demand for charts on the iPad, SOLIDFX's ability to develop and release a quality app months before Jeppesen and to continue to release timely new apps for emerging platforms, and Jeppesen's own acknowledgment that time-to-market can be a critical advantage in technology markets, Jeppesen opted for the less timely and more costly option of developing its own app, thereby forego-ing the short-term profits it could have earned through new chart subscriptions coinciding with the purchase of SOLIDFX's app. (SSMF 107-08.) Second, Jeppesen's communications regarding its exclusionary policy clearly reflect its "anticompetitive malice." (SSMF 81, 83, 84, 100-03, 105.)

Third, the evidence contradicts the "pro-competitive reasons" Jeppesen now offers of (1) protecting its brand and intellectual property and (2) minimizing support and integration costs. (MSJ 36.) As to the first of these justifications, Jeppesen's own 30(b)(6) witness testified that copyright was not a factor in its decision to preclude developers from making an app compatible with Jeppesen's e-chart data. (SSMF 110.) This concern is unsupported by any contemporaneous documents and was never communicated to SOLIDFX. (*Id.* 109-16.) The concern is further belied by Jeppesen's own conduct in regularly licensing its JIT to OEMs – its refusal to deal applies only to mobile devices, which Jeppesen views as a "strategic platform." (*Id.* 83, 109.) Jeppesen further acknowledged that the JIT itself ensures that any charts displayed by virtue of an app would necessarily be displayed correctly. (*Id.* 77, 113.)[17]

---

[17] Moreover, denial of the JIT does not advance the purposes of copyright protection. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349 (1991)). To the contrary, permitting SOLIDFX and others to develop apps to allow Jeppesen's

Jeppesen's second alleged justification – minimizing support and integration costs – fares similarly. The evidence demonstrates that outsourcing an app to a third-party developer like SOLIDFX would have been a lower cost option. (SSMF 97-98, 121.) Not only were the support needs for SOLIDFX's app minimal, (*id.* 124), but the Jeppesen decisionmaker on the issue admitted that he was uninformed as to the amount of such costs. (*Id.* 122-23.)[18]

Jeppesen relies on *Four Corners* and *Christy Sports* to avoid liability for its refusal to deal. Both of those cases, however, lacked the key facts supporting a refusal to deal theory that are present here – existence of a prior profitable business relationship and the forsaking of short-term profits. *Four Corners*, 582 F.3d at 1225 (defendant expected to increase, not forsake, short-term profits); *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1197 (10th Cir. 2009) (defendant sought to end an unprofitable relationship and to increase short-term profitability).[19] Here, where these factors are present, and Jeppesen's pro-competitive justifications are heavily contradicted by the record, summary judgment must be denied. *Aspen Skiing*, 472 U.S. at 2857; *Kodak I*, 504 U.S. at 483 (reversing summary judgment because plaintiffs "presented evidence from which [the jury] could conclude that Kodak's [asserted business justification for its refusal to deal] is pretextual"); *Creative Copier Servs. v. Xerox Corp.*, 344 F. Supp. 2d 858, 865 (D. Conn. 2004) (whether refusal to deal is pro-competitive is a fact question); *Safeway Inc. v. Abbott Labs.*, 761 F. Supp. 2d 874, 894-95 (N.D. Cal. 2011) (denying summary judgment where defendant unilaterally terminated a voluntary course of

---

customers to more easily and conveniently access its charts on mobile devices would enhance the availability and value of Jeppesen's charts. This is the reason Jeppesen partnered with SOLIDFX in the first place. By allowing different apps to work with its charts, Jeppesen would be able to sell its charts to even more potential customers. (*See* Section I.C, *supra.*)

[18] Jeppesen's Motion also raises a concern about Apple's business model as a justification. No such concern, however, is reflected in any of Jeppesen's contemporaneous documentation, nor could any Jeppesen witness articulate any coherent explanation of this purported justification. (SSMF 117-20.)

[19] Additionally, *Christy Sports* relied heavily on the fact that there was robust competition in the upstream ski resort market, such that lack of competition in the downstream ski rental market did not pose the same risks to competition. *Christy Sports*, 555 F.3d at 1195. By contrast, there is no robust competition in the terminal charts market, resulting in consumer harm in the downstream apps market. (SSMF 23-39.)

dealing); *M&M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 167-68 (4th Cir. 1992) (reversing district court's grant of summary judgment where defendant was willing to forsake short-term benefits in the hopes of monopolizing the relevant market).

> **2.** Jeppesen Has Engaged in Unlawful Monopoly Leveraging.

Jeppesen also has engaged in the unlawful leveraging of its monopoly power over terminal charts to monopolize the apps market. Such illegal leveraging exists when a monopolist uses its monopoly power in one market, in an anticompetitive manner, to create a dangerous probability of monopolizing a second market. *Kodak I*, 504 U.S. at 479 & n.29; *Multistate*, 63 F.3d at 1550-51; *Tele Atlas N.V. v. NAVTEQ Corp.*, 2008 WL 4911230, at *2-3 (N.D. Cal. Nov. 13, 2008). As indicated above, Jeppesen does not meaningfully dispute that it has monopoly power in the terminal charts market, and there is evidence of anticompetitive misuse of that power and the dangerous probability of in monopolizing the apps market.

In addition to its anticompetitive refusal to deal discussed above, Jeppesen has used its market power in the terminal charts market in anticompetitive tying and bundling arrangements to monopolize the apps market. As under Section 1 of the Sherman Act, tying also may violate Section 2 when used by a monopolist in the tying market (terminal charts) to monopolize the tied product market (apps). Such use of market power in the upstream market to foreclose consumer choice in the downstream market (Section III, *supra*) is anticompetitive when used to acquire or maintain a monopoly in the second market. *Microsoft*, 253 F.3d at 96; *Multistate*, 63 F.3d at 1550; *Tele Atlas*, 2008 WL 4911230, at *2-3.[20]

---

[20] Another type of anticompetitive leveraging engaged in by Jeppesen is the "bundling" of a product for which it faces little or no competition (terminal charts) with a second product (apps) to avoid competition in the second market. *LePage's, Inc. v. 3M*, 324 F.3d 141, 154-59 (3d Cir. 2003); *Safeway, Inc.*, 761 F. Supp. at 891-892. Courts are especially concerned about the anticompetitive nature of such bundling when, as here, the monopolist prices the second product below an appropriate measure of cost. *See Ortho Diagnostic Systems v. Abbott Labs.*, 920 F. Supp. 455, 469 (S.D.N.Y. 1996). In this case, Jeppesen claims not to charge anything for its apps, which is either not true (*see* Section III.B, *supra*) or certainly below its cost, making the bundling of charts and apps an anticompetitive effort to extend its monopoly to

Finally, the third element of leveraging is satisfied here because Jeppesen's anticompetitive conduct already has yielded monopoly power in the apps market. (*See* Section IV.A, *supra*.) Even if Jeppesen were able to establish that it currently lacks monopoly power in the Apps market – which it cannot do – the record still demonstrates at least a dangerous probability of Jeppesen monopolizing the apps market. (*Id.*)

**3.**      Jeppesen Has Denied Competitors Access to an Essential Facility.

There are four elements to an essential facilities claim: "(1) control of an essential facility by a monopolist; (2) a competitor's inability to practically or reasonably to duplicate the facility; (3) the denial of the use of the essential facility to a competitor; and (4) the feasibility of providing the facility." *NIPP*, 311 F. Supp. 2d at 1110. Jeppesen argues only that its JIT is not essential.[21]

The record, however, demonstrates that access to Jeppesen's JIT is essential for a software developer to compete in the apps market because it enables apps to read the language of Jeppesen's worldwide terminal charts. (SSMF 81-83, 136-151, 176.)[22] Contrary to Jeppesen's argument that the JIT is not essential because developers can create apps for other charts, it is not required that there literally be no alternatives in order for a facility to be "essential," just that access is needed to "meaningfully compete." *NIPP*, 311 F. Supp. 2d at 1111-12 (essential facility need not be

---

[21] foreclose apps competition. *Id.; LePage's*, 324 F.3d at 154-59. This conduct guaranteed consumers would use Jeppesen's apps regardless of quality, and it unlawfully prevented third parties from competing in the apps market. (SSMF 83, 104-107, 150-51, 176-82); *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1065 (3d Cir. 1975) (affirming district court finding of anticompetitive bundling); *Kinetic Concepts v. Hillenbrand Indus.*, 262 F. Supp. 2d 722, 725 (W.D. Tex. 2003) (defendant engaged in anticompetitive bundling); *Avery Dennison Corp. v. ACCO Brands*, 2000 U.S. Dist. LEXIS 3938, at *56 (C.D. Cal. 2000) (denying summary judgment because jury could find bundling anticompetitive).

[21] Jeppesen also suggests that the Tenth Circuit views the essential facilities doctrine with "skepticism" based on the Supreme Court's dicta in *Trinko*. (MSJ 36.) *Trinko* expressly refused to reject the doctrine, however, 540 U.S. at 410-11, and this Court has continued to apply the doctrine post-*Trinko*. *NIPP*, 311 F. Supp. 2d at 1114.

[22] Jeppesen's argument that intellectual property cannot be an essential facility is contrary to the principle discussed in Section I, *supra*, that such property rights do not confer a privilege to violate antitrust laws, a proposition Jeppesen's cases also support. *Applera Corp. v. MJ Research, Inc.*, 349 F. Supp. 2d 338, 347 (D. Conn. 2004) (patent holder may not use dominant position in one market to expand into next). Jeppesen's other cases do not contradict that proposition. *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 235 F. Supp. 2d 1269, 1285 (M.D. Fla. 2002) (defendant earned monopoly power, and did not forsake short-term profits); *Eatoni Ergonomics, Inc. v. Research in Motion Corp.*, 826 F. Supp. 2d 705, 710 (S.D.N.Y. 2011), *aff'd*, 2012 WL 2348443 (2d Cir. June 21, 2012) (plaintiff's own complaint admitted that it had successfully used an alternate facility).

indispensable, but its denial must impose a severe handicap on potential market entrants); *TCA Bldg. Co. v. Nw. Res. Co.*, 873 F. Supp. 29, 39 (S.D. Tex. 1995) (same). SOLIDFX has made this showing. Denial of access to the JIT precludes meaningful competition in the downstream market for apps displaying such terminal charts. (SSMF 81-83, 136-151, 176.) *Alaska Airlines v. United Airlines*, 948 F.2d 536, 544-45 (9th Cir. 1991) (facility is essential if "control of the facility carries with it the power to eliminate competition in the downstream market"); *NIPP*, 311 F. Supp. 2d at 1111 (where alternate forms of advertising were available, a fact question existed regarding whether radio advertising was essential for meaningful competition).[23]

**4.**     The Totality of Jeppesen's Conduct Is Anticompetitive.

It is well settled that a defendant's anticompetitive conduct should not be viewed compartmentally, but considered as a whole. *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1522 n. 18 (10th Cir. 1984), *aff'd*, 472 U.S. 585 (citing *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). When viewed as a whole, the combined evidence of Jeppesen's refusal to deal, leveraging, tying, bundling, interference with customer relationships and denial of an essential facility is sufficient for a jury to conclude that it has engaged in anticompetitive conduct in monopolizing the apps market. *Mishawaka v. Am. Elec. Power Co.*, 616 F.2d 976, 986 (7th Cir. 1980) ("It is the mix of the various ingredients . . . in a monopoly broth that produces the unsavory flavor.").

# V.     SOLIDFX HAS SUFFERED ANTITRUST INJURY.

Jeppesen's argument that SOLIDFX has not suffered "antitrust injury" over-simplifies and misapplies that concept. Jeppesen makes it sound as if that doctrine means *only consumers* may bring

---

[23] To the extent Jeppesen argues that SOLIDFX could reasonably enter the terminal charts market, that proposition is contradicted by both the facts and law. *See* Section IV.A, *supra* (outlining barriers to entry into the terminal charts market); (SSMF 159-67); *NIPP*, 311 F. Supp. 2d at 1111; *Fishman v. Estate of Wirtz*, 807 F.2d 520, 540 (7th Cir. 1986) (finding an essential facility where expenditure required to enter second market was unreasonable).

antitrust suits, which its own citations show is not true.  As Jeppesen's principal case makes clear, it is well settled that *competitors* also may do so if their injury "stems from a competition-*reducing* aspect or effect of the defendants' behavior."  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (lack of antitrust injury where defendant's conduct *increase*d competition).  Although direct consumer harm is one measure of antitrust injury, harm to the competitive process itself – *e.g.*, elimination of competitors or a reduction in the amount of competition or consumer choice – also is well accepted evidence of antitrust injury sufficient to confer standing on an eliminated or harmed competitor like SOLIDFX.  *Id.*; *Palmyra Park Hosp. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1303 (11th Cir. 2010) (hospital's injury from tying arrangement that eliminated it from tied services market is "precisely the type of harm that we allow plaintiffs to vindicate through the antitrust laws").  Here, SOLIDFX has suffered antitrust injury from Jeppesen's elimination of SOLIDFX and others from the market, which reduced the overall level of competition and consumer choice.  (SSMF 176-182.)  That is exactly what the antitrust laws were intended to prevent.  *Palmyra*, 604 F.3d at 1303*; see also Doctor's Hosp. v. Se. Med. Alliance*, 123 F.3d 301, 305 (5th Cir. 1997) (exclusion from healthcare plan as participating provider with resulting reduction of patient choice constituted antitrust injury to plaintiff hospital).  Thus, competitors like SOLIDFX that have been eliminated have suffered classic "antitrust injury" to the detriment of competition and consumer choice.

## VI.    JEPPESEN CANNOT WIN SUMMARY JUDGMENT ON THE CONTRACT.

The Agreement's plain language and Jeppesen's documents confirm that the Agreement includes the iPad and other devices.[24]  If this Court does not grant SOLIDFX's Motion for Partial

---

[24] Jeppesen cannot escape the indisputable evidence that, prior to the effective date of the Agreement, the parties discussed a software-only solution for an Apple device that would later be announced as an "iPad" and then at least three Jeppesen representatives – including Jeppesen's Contract Specialist who negotiated the Agreement – confirmed that the Agreement covered the iPad.  (SSMF 74, 78, 85.)

Summary Judgment,[25] then at a minimum, a jury must decide these issues.[26]

### A.     The Agreement's Four Corners Include Non-iRex Viewers Like The iPad.

####     1.     The term "e-book viewer"

Pursuant to the Agreement, Jeppesen and SOLIDFX are required to "cooperate to host Jeppesen Data on SOLIDFX Systems," which allows SOLIDFX to use its software solution "that works in conjunction with an e-book viewer" to "access, utilize and display Jeppesen Data . . . ." (Agmt., §§ 1.6, 2.1.)  The plain and ordinary meaning[27] of "e-book viewer" includes an iPad and other devices that allow one to view an electronic book.  (SSMF 60.)

Jeppesen contends that this common sense definition would improperly sweep in a broad class of devices (*e.g.*, mobile phones and desktop computers), and also emphasizes that SOLIDFX's CEO stated that "merely being able to view a book on a device is not enough to make it part of the [A]greement."[28]  (MSJ 40.)  Of course such a device must be suitable for use in the cockpit as the parties intended these devices for use in the aviation industry.  (SSMF 51, 63.)  In order to avoid an absurd result, "e-book viewer" does not include devices that are unsuitable to display terminal charts for use in the cockpit (*e.g.*, desktops), but does include devices like the iPad, which are suitable for the cockpit as shown by Jeppesen's own iPad app used in cockpits.

---

[25]  SOLIDFX separately moved for summary judgment as to certain breach of contract claims regarding non-iRex e-book viewers and tailored data.  *See* "SFX MSJ," filed April 2, 2012 [Doc. 108], and Reply Brief in Support of its Motion for Partial Summary Judgment ("SFX MSJ Reply"), filed August 8, 2012 [Doc. 159] and incorporated herein by reference.

[26]  SOLIDFX withdrew its breach of contract claim concerning European VFR charts as set forth in the Second Amended Complaint [Doc. 162].  However, the other breaches of contract, including failure to provide customer service, must be decided by a jury.  (Exs. 130, 131.)

[27]  The court "should not allow a hyper-technical reading of the contract to defeat the intention of the parties."  Colo. Jury Instr. – Civ. § 30:14 intro. note C (2011) (citing *Ad Two Inc. v. City of Denver*, 9 P.3d 373, 377 (Colo. 2000)).

[28]  Rejecting this common-sense definition, Jeppesen proposes a definition of "e-book viewer" that includes various restrictions (nowhere in the Agreement) including: (1) devices designed for the principal purpose of reading electronic books, including Amazon Kindle (MSJ at 40); (2) black & white display with "e-ink" technology (*id.* at 20); and (3) less computing power than laptops and tablet computers.  (*Id.* at 40.)  This Court should reject Jeppesen's proposed definition, which directly contradicts its own construction of the term "e-book viewer" prior to the dispute (SSMF 74, 78, 85), and the testimony of its own 30(b)(6) representative and witnesses (Resp. to JSMF 91).

**2.**     Other terms in the Agreement.

The other terms of the Agreement confirm that the parties intended SOLIDFX to work with various "relationship<u>s</u>," "system<u>s</u>," and "product<u>s</u>," and method<u>s</u> of "loading." (SSMF 49-66; Agmt., Recital, § 2.1, Appx. 1.1.3.) The parties understood that they would be cooperating on a number of devices over the long-term Agreement.[29] However, Jeppesen's arguments regarding other terms of the Agreement do not support its position as to "e-book viewer." While the third recital refers to certain hardware, the parties did not intend to limit themselves to only the iRex devices, which is why references to "iRex" were removed. (SSMF 58-62.)

Similarly unpersuasive, Jeppesen argues against itself, regarding the term "System"[30] and Appendix § 1.3.1. Jeppesen's flawed argument that "System" must be only a hardware-software combination is undermined by the plain language of Section 1.6, which defines "System" as "[t]he <u>SOLIDFX data management solution</u> *that works in conjunction with* an e-book viewer." (*Id.*, § 1.6 (emphasis added).)[31] The plain meaning of "System" is SOLIDFX's software-only solution, which was confirmed by Jeppesen's Contract Specialist. (SSMF 74.) The parties were supposed to "work together" in good faith to load the Jeppesen Data into the System.[32] (*Id.*, Appx. § 1.3.1.)[33]

---

[29] For this long-term contract, the parties wanted flexibility to allow devices other than the iRex. (SSMF 52-55, 58-63.)

[30] To avoid the undisputed discussions of Apple products in 2009, Jeppesen asserts that the definition of "System" was finalized in July 2009 (MSJ at 41). At the same time, Jeppesen argues that "System" is determined by Appendix § 1.3.1, which was added after July 2009. (JSMF 20; MSJ. at 41-42). Neither argument succeeds because the relevant timeframe is December 31, 2009, the effective date of the Agreement. *Randall & Blake, Inc. v. Metro Wastewater Reclam. Dist.*, 77 P.3d 804, 806 (Colo. App. 2003) ("A court's duty is to interpret a contract in a manner that effectuates the manifest intention of the parties *at the time the contract was signed.*") (emphasis added). At that time, the parties had discussed non-iRex products (such as the Apple product that would later be announced as the iPad) and software-only solutions. The parties understood that the "System" was not limited to only hardware/software combinations, as evidenced by their providing software-only systems to iRex customers without pre-loading and actively discussed consumer off-the-shelf products that would be more amenable to a software-only solution. (SSMF 52-55; Ex. 1, § 33.)

[31] Jeppesen relies on the premise that delivery can only mean physical delivery, an assumption that ignores a huge sector of e-commerce where delivery of products occurs by the customer electronically downloading the product. In any event, SOLIDFX could have preloaded the System and charts prior to delivery (however the Court defines "deliver") had Jeppesen provided it with the JIT and required cooperation. (Resp. to JSMF 103.)

[32] The parties' course of conduct similarly demonstrates that Section 1.3.1 did not prohibit SOLIDFX from delivering software-only solutions to customers. The parties allowed SOLIDFX to send software-only solutions to customers who previously purchased iRex devices, and Jeppesen never raised any concerns about pre-loading in its discussions with SOLIDFX until well after this litigation was filed. (Ex. 1 ¶ 33; Resp. to JSMF 171.)

Moreover, Jeppesen's preloading argument is baseless as preloading has nothing to do with the type

of hardware, but is rather the preferred method of chart delivery for devices that are not widely

available to consumers in the retail market.  (SSMF 67; Resp. to JSMF 103.)

**B.    Extrinsic Evidence Confirms that the Agreement Includes the iPad.**

The extrinsic evidence – including Jeppesen's own e-mails – confirm that the Agreement

unambiguously includes the iPad and other non-iRex mobile devices.

**1.    Drafts of the Agreement and Discussions Were Not Limited to iRex.**

First, the parties intentionally removed Jeppesen's proposed iRex restrictions, and agreed to

the generic term of "e-book viewer."  (SSMF 59-63.)[34]  Second, prior to the effective date of the

Agreement of December 31, 2009, the parties specifically discussed various devices including the

Apple device that would become known as the "iPad" in May, August, and November of 2009.

(SSMF 51-55.)[35]

**2.    The Parties' Course of Dealing Confirms that the iPad is Covered**

The course of dealing by the parties confirms that the Agreement includes the iPad.  Three

of Jeppesen's representatives – including its negotiator of the Agreement – confirmed that the

Agreement included "software only" solutions on non-iRex e-book viewers such as the iPad.[36]

- The parties continued discussions of the iPad and other emerging hardware, and Jeppesen sought to confirm that these devices were covered by the Agreement.  (SSMF 73, 74, Ex. 1 ¶¶ 36-38.)
- February 17, 2010: Nguyen (Jeppesen's contract specialist who negotiated the Agreement)

[33] Assuming arguendo that this Court accepts Jeppesen's position regarding Appendix 1.3.1, which Jeppesen asserts was added for SOLIDFX's sole benefit, SOLIDFX may waive that section as it sees fit.  See, e.g., Lehman v. Williamson, 533 P.2d 63, 65-66 (Colo. App. 1975).

[34] Nguyen even wrote the term "generic" on her draft Agreement acknowledging that there could be other hardware devices covered by the Agreement and recognizing that it was not limited to the iRex.  (SSMF 61.)

[35] Although Jeppesen admits the effective date of the Agreement is December 31, 2009, it asserts that the definition of "System" was finalized earlier in 2009 prior to Apple discussions. Whether or not the Court considers the Apple product discussions in August-November 2009 as pre- or post-contract evidence, the result is the same.  This extrinsic evidence shows that the parties intended and/or confirmed that the Agreement included the iPad.

[36] Courts may consider the course of dealing to evaluate disputed contract terms.  Echo, 267 F.3d at 1086 (party's construction post-execution of the contract should be considered by the court in eliminating any ambiguity).

confirmed that the iPad was covered by the Agreement:

> In response to questions as to whether the iPad and "software only" solutions were covered by the Agreement, Nguyen stated that amendment to the Agreement was unnecessary because **"[i]f the hardware changes from iRex to a different [K]indle or iPad, that would also be covered since the hardware is never called out by name."** (SSMF 74.)

- February 18, 2010: Jeppesen forwarded this confirmation to SOLIDFX, which Jeppesen never modified. (SSMF 74.)

- February 18, 2010: Jeppesen's Dean acknowledges that "SOLIDFX has authorization via the contract to develop applications using JIT eCharts for the iPad," but such efforts could undermine Jeppesen efforts "to develop something in-house." (SSMF 78.)

- April 19, 2011: Long internally acknowledged that Jeppesen initially approved SOLIDFX building an app for the iPad and Android, but later reversed course when it decided to build such apps in house. (SSMF 85.)

All of the extrinsic evidence confirms that the Agreement unambiguously includes the iPad.

Jeppesen's attempt to equate the non-industry term "e-book viewer" (in the Agreement) with the industry term "e-book reader" or "e-reader"[37] (not in the Agreement) is unsupportable. (SSMF 58-62.) Further, even if "e-book viewer" were equivalent to "e-reader," Jeppesen itself and others referred to the iPad (prior and subsequent to its January 2010 announcement) as both an "e-reader," as well as a "tablet." (Resp. to JSMF 124.) Moreover, SOLIDFX's February 2009 "E-Book Reader Market Survey" supports SOLIDFX's position as the parties previously used the term "e-reader" in early 2009, and chose not to use such term in the Agreement. (Resp. to JSMF 73.)

Finally, SOLIDFX's requests for cooperation (rather than threaten litigation) are not admissions that the Agreement did not include the iPad or tailored data. In the face of Jeppesen's inaction (after it confirmed the iPad), SOLIDFX had two choices – threaten Jeppesen and likely lose its business, or try to find a way to cooperate.[38] (Resp. to JSMF 146.)

### C.   Jeppesen Wrongfully Refused to Provide Tailored Data for Commercial Customers.

Jeppesen does not dispute that the Agreement plainly includes tailored data and JIT 2.2 for

---

[37] SOLIDFX refers to "e-reader" to collectively mean "e-book reader" and "e-reader."

[38] Contrary to Jeppesen's arguments that SOLIDFX did not rely on its representations, SOLIDFX spent months developing a software solution for the iPad and other devices. (SSMF 175.)

use by commercial customers.  (Agmt. §§ 1.3, 1.3.1; SSMF 168.)  Jeppesen deceptively states that it did provide SOLIDFX the JIT 2.2; however, Jeppesen's software engineer admitted that Jeppesen only provided a "preliminary data specification" and did not provide the complete JIT 2.2 data so SOLIDFX could actually work with commercial airlines.  (Resp. to JSMF 199.)

Jeppesen then argues that it would have produced the JIT 2.2 (contrary to its claims that it did produce it), only if SOLIDFX had a commercial contract in place.  This condition precedent is nowhere in the Agreement, and should be rejected as such condition would create a "Catch-22" because SOLIDFX must be able to show a potential customer the solution before a customer would agree to enter into a contract.  (SSMF 172); *City of Denver v. Adolf Coors Co.*, 813 F. Supp. 1476, 1479-80 (D. Colo. 1993).  Jeppesen's excuses are meant to cover up its secret, internal decision not to authorize the use of tailored data on a SOLIDFX device.  (SSMF 168-74.)  Jeppesen actively dissuaded potential commercial airlines (such as Comair and Mesaba) not to use the SOLIDFX iRex device.  (*Id.* 173.)  Only after Jeppesen denied the iPad app did it reconsider giving SOLIDFX JIT 2.2, but then imposed a contract requirement (which was a Catch-22 and offered only after Jeppesen was sure it had diverted commercial interest away from SOLIDFX to its iPad app).

### D.    Jeppesen Acted in Bad Faith and Damaged SOLIDFX.

There is no dispute that Jeppesen acted in bad faith.  Jeppesen acknowledged that the Agreement covered the iPad and other devices, but ignored the Agreement to avoid competition with SOLIDFX.  Further, Jeppesen withheld JIT 2.2, preventing SOLIDFX from working with commercial airlines.  *See* Colo. Jury Instr. – Civ. § 30:15 n.11 (good faith performance doctrine protects the weaker party from the stronger party with control of performance).[39]

Similarly, there is no dispute that Jeppesen damaged SOLIDFX, as it effectively destroyed

---

[39]  Jeppesen is indisputably the stronger party, as Jeppesen had control and even describes itself as a monopolist in the industry.  (SSMF 6-7.)

SOLIDFX's business by refusing to cooperate with it on any viable hardware platform and by preventing it from working with commercial airlines.[40] (SSMF 168-175.) SOLIDFX spent months developing an app for non-iRex devices like the iPad in reliance on the Agreement and Jeppesen's representations. (Ex. 1 ¶ 40.) SOLIDFX's damages calculations from Flamme and its expert will allow a jury to determine the amount of these damages. (SSMF 175.)[41]

### E.   The Agreement Does Not Exclude SOLIDFX's Damages.

#### 1.   The Plain Terms and Evidence Support SOLIDFX's Position.

Section 8.2 is titled "EXCLUSION OF CONSEQUENTIAL AND OTHER DAMAGES," and states in part:

> NEITHER PARTY WILL HAVE ANY OBLIGATION OR LIABILITY WHATSOEVER, WHETHER ARISING IN CONTRACT (INCLUDING WARRANTY), TORT (WHETHER OR NOT ARISING FROM THE NEGLIGENCE OF EITHER PARTY), STRICT LIABILITY OR OTHERWISE, FOR LOSS OF USE, REVENUE OR PROFIT; OR FOR ANY OTHER INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY, PUNITIVE, OR OTHER DAMAGES **WITH RESPECT TO THE JEPPESEN DATA, THE JIT, AND OTHER PRODUCTS AND SERVICES PROVIDED HEREUNDER**

(JSMF 110 (emphasis added).) Section 8.2, therefore, unambiguously limits damages with respect to the products and services provided, as in the case of defects.[42] It does not apply to Jeppesen's total failure to provide products and services as required by the Agreement.[43]

Moreover, while the Agreement pertains to "consequential and other damages," it does not

---

[40] Jeppesen incorrectly argues that it should not be liable for part of SOLIDFX's damages because Jeppesen claims they are for projects that Jeppesen was never aware of - in fact, those projects were discussed before Jeppesen's breach of the Agreement, the related damages were reasonably contemplated at the time of Jeppesen's breach, and a jury is entitled to weigh the testimony of the parties on this point. (SSMF 175.)

[41] Not only is the fact of SOLIDFX's damages clear, its principal and expert have testified as to the specifics of SOLIDFX's damages. (Resp. to JSMF 107); *State Office Sys., Inc. v. Olivetti Corp.*, 762 F.2d 843, 846 (10th Cir. 1985) (business owner can testify about lost profits).

[42] In JSMF 110, Jeppesen acknowledges there is a single exculpatory clause, but then contradictorily argues that the court should consider two separate clauses. (MSJ 44-46; JSMF 110, 111.) Section 8.2 ends with a comma and is directly followed by 8.2.1, 8.2.2 and 8.2.3. These sections are clearly not meant to be read as separate provisions.

[43] Jeppesen incorrectly argues that Section 8.2 is "virtually identical" to the exculpatory clause found in SOLIDFX's FX8 Owner's Manual, and attaches the wrong excerpt for this proposition. (*Compare* MSJ Ex. 33 *with* Ex. 113.) While the SOLIDFX Owner's Manual is not directly on point, it should be noted that the limit on consequential damages concerns damages "resulting from the use, misuse, or inability to use the product or from defects in the product." (*Id.* at 66.) Similarly, Section 8.2 constrains itself to the products that Jeppesen actually provides – not to its refusal to perform the Agreement altogether.

purport to limit SOLIDFX's right to recover lost profits as <u>direct</u> <u>damages</u>.[44]  *See Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1156 (10th Cir. 2007) (contract's exclusion of consequential damages did not prevent recovery of lost profits as direct damages).  Further, interpreting the Agreement to exclude lost profits that are direct damages (along with virtually all other possible damages) is inconsistent with the Agreement's purpose, which does not require payments between the parties.[45]  (SSMF 65 .)  Importantly, "[e]xculpatory agreements are construed strictly against the party seeking to limit liability."  *Hamill v. Cheley Colo. Camps, Inc.*, 262 P.3d 945, 948 (Colo. App. 2011).  Under Jeppesen's theory, it could purposefully breach the contract and never pay a dime. (Resp. to JSMF 116.)[46]  Jeppesen's extreme legal position is not supported by the plain terms of the Agreement, and must be rejected.

Even if this Court considers extrinsic evidence, such evidence shows that SOLIDFX understood that the damages limitation did not pertain to this situation where Jeppesen blatantly disregarded the Agreement and took the "e-book viewer" app opportunity for itself.  (Resp. to JSMF 114.)  It is highly disputed that Jeppesen waived any customary licensing fee in exchange for liability limitations.  (*Id.*)  In fact, SOLIDFX understood that the liability limitations did not pertain to Jeppesen's deliberate violation of the Agreement.  (Ex. 1 ¶ 29.)

**2.**       The Damages Limitation Is, at a Minimum, a Jury Question.

Under Colorado law, exculpatory and limitation-of-liability clauses are not enforceable if they relieve parties from their own willful, wanton, reckless, or intentional conduct.  *U.S. Fire Ins. Co.*

---

[44] Jeppesen has not – and cannot – argue that the damages limitations in the contract bar any relief with respect to the antitrust claims.  *In re Am. Express Merch.s' Litig.*, 634 F.3d 187, 197 (2d Cir. 2011).

[45] "Agreements attempting to exculpate a party's from that party's own negligence have long been disfavored," and "[t]he inquiry should be whether the intent of the parties was to extinguish liability and whether the intent was clearly and unambiguously expressed."  *Heil Valley Ranch, Inc. v. Simkin*, 784 P.2d 781,783-85 (Colo. 1990).

[46] Rather than any payments to each other, the Agreement contemplates that the benefit to SOLIDFX will be from the sale of its apps to third parties, and the benefit to Jeppesen will be from additional subscribers to its chart services.  In light of this purpose, an exclusion of direct damages of lost revenue or profits would be inconsistent with the Agreement's purpose.  *Level 3 Commc'ns., LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008).

*v. Sonitrol Mgmt. Corp.*, 192 P.3d 543, 548 (Colo. App. 2008); *Rhino Fund, LLLP v. Hutchins*, 215 P.3d 1186, 1191 (Colo. App. 2008); *B&B Livery, Inc. v. Riehl*, 960 P.2d 134, 138-39 (Colo. 1998); *Core-Mark Midcontinent, Inc. v. Sonitrol Corp.*, __ P.3d __, 2012 WL 2994956, *5-6 (Colo. App. Jul. 19, 2012). Jeppesen's cases either (1) support SOLIDFX's position;[47] (2) involve clauses that specifically address the risk at issue;[48] or (3) are inapposite.[49]

Once Jeppesen realized the value of the apps market, it misrepresented and/or concealed material facts in order to gain a competitive advantage over SOLIDFX (section VI.A, B, *infra*), and willfully refused to support SOLIDFX with the iRex product (section VI.C, *infra*). This is willful or intentional conduct sufficient to negate the Agreement's exculpatory provisions. *See, e.g., U.S. Fire Ins.,* 192 P.3d at 548 (exculpatory clause and existence of willful conduct is a jury question). Jeppesen's attempt to preclude SOLIDFX's claims for damages must be rejected.[50]

## VII. SOLIDFX'S REMAINING CLAIMS MUST BE DECIDED BY A JURY.

### A. SOLIDFX's Estoppel and Tort Claims May Be Tried in the Alternative.

Alternate theories of tort and contract liability are appropriate where, as here, the scope of the contract is disputed. *Level 3*, 535 F.3d at 1163 (remanding tort and contract theories to the jury where fact questions remained as to contract's scope); *Rhino Fund*, 215 P.3d at 1193 ("economic loss rule does not apply where the defendant owes the plaintiff a duty of care that is independent of any

---

[47] *See Rhino Fund,* 215 P.3d 1186 (rejects exculpatory clause); *Vanderbeek v. Vernon Corp.*, 50 P.3d 866, 870-872 (Colo. 2002) (allowing party reasonably contemplated damages).

[48] *Mincin v. Vail Holdings, Inc.*, 308 F.3d 1105, 1107, 1113 (10th Cir. 2002) (upholding unambiguous mountain biking exculpatory clause where plaintiff expressly assumed risk of "man-made objects" and "variations in terrain"); *Rich Floors, LLC v. Jaylon, inc.*, 2010 WL 1332944, *6 (D. Colo. 2010) (lease provision stating "Landlord shall not be responsible for any interruption in utility services"); *Heil Valley*, 784 P.2d at 782 ("Riding a horse involves risk of physical injury to any individual undertaking that such activities").

[49] *City of Denver v. Dist. Ct.*, 939 P.2d 1353, 1361 (Colo. 1997) (concerns ADR clause); *ADT Sec. Servs., Inc. v. Envision Tele., Inc.*, 2008 WL 5064268 (D. Colo. Nov. 21, 2008) (unpublished case applying Washington statute).

[50] Jeppesen also argues that specific performance and exemplary damages are foreclosed by the Agreement. Nothing in the Agreement clearly precludes specific performance as a remedy. *Cf. Washburn v. Thomas*, 37 P.3d 465, 468 (Colo. App. 2001) (barring specific performance where provision explicitly barred specific performance as a remedy). Further, the resolution of whether exemplary damages are precluded by the Agreement also involves resolutions of questions of fact including the scope and enforceability of the damages limitation.

contractual duty"). Jeppesen's cases are distinguishable because they involve circumstances where the contract at issue undisputedly gave rise to the duty allegedly breached in the tort claims,[51] or the court did not bar claims based on the economic loss rule.[52]

If a jury agrees with Jeppesen that the Agreement does not require e-book viewer cooperation or tailored data, then Jeppesen's misrepresentations regarding the iPad and provision of JIT 2.2 are not related to a duty created by the contract. Therefore, SOLIDFX's claims are permissible.[53] *Marquardt v. Perry*, 200 P.3d 1126, 1131 (Colo. App. 2008); *H&H*, 812 P.2d at 662; *Level 3*, 535 F.3d at 1163.

The evidence shows that Jeppesen purposefully encouraged SOLIDFX's app work and dealings with commercial airlines while Jeppesen secretly intended not to allow such work. (SSMF 71-85, 158-175); *Brody v. Bock*, 897 P.2d 769, 776 (Colo. 1995) (statement concerning a future act coupled with a present intention not to perform that act constitutes sufficient grounds for a misrepresentation claim). SOLIDFX relied on such misrepresentations by continuing its work on apps and with commercial airlines (Section VI.C, *supra*). From these facts, a reasonable jury could infer each of the elements necessary to prove SOLIDFX's misrepresentation and concealment claims, including intent. *See Kopeikin v. Merch. Mort. & Trust Corp.*, 679 P.2d 599, 601 (Colo. 1984) ("fraud may be inferred from circumstantial evidence").[54]

---

[51] *W. Conv. Stores, Inc. v. Thielen*, 2011 WL 866755, *6 (D. Colo. 2011) ("duty to communicate that he did not have the money to pay for the RINs as contracted" arose from contractual duty to pay for RINs).

[52] *Wheat Ridge Urban Renewal Auth. v. Cornerstone Group, LLC*, 176 P.3d 737 (Colo. 2007) (finding court lacked constitutional authority to order specific performance of condemnation agreement); *Marquardt*, 200 P.3d at 1128 (after jury found no contract, court ruled for plaintiff on promissory estoppel claim based on the same facts); *H&H Dist., Inc. v. BBC Int'l, Inc.*, 812 P.2d 659, 662 (Colo. App. 1990) (upholding jury's fraud finding after jury was instructed to determine if duty breached was independent from contract).

[53] Jeppesen cryptically claims a contract with a "no oral modification" provision cannot be modified by oral agreement. (MSJ 47.) This claim is both irrelevant and incorrect. *Rich Floors, LLC v. Jaylon, Inc.*, 2010 WL 1332944 (D. Colo. 2010) ("subsequent oral agreement between the parties *may* modify a provision of an earlier written contract, even in the face of a provision in the original contract that modifications must be in writing").

[54] To succeed on a claim for fraudulent concealment, SOLIDFX must show that Jeppesen breached a "duty to disclose material information . . . that in equity or good conscience should be disclosed." *Level 3*, 535 F.3d at 1163-64. This duty is triggered where disclosure is necessary to prevent prior statements from misleading or in circumstances where a party

**B.      Jeppesen Tortiously Interfered with SOLIDFX's Prospective Customers.**

The evidence creates an issue of fact that Jeppesen intentionally interfered with prospective business relations as to both the (1) iRex and (2) other non-iRex e-book viewers including the iPad. With respect to the iRex, Jeppesen actively dissuaded potential commercial airlines, such as Comair and Mesaba, from working with SOLIDFX.  *See* Section VI.C, *infra*.  With respect to SOLIDFX's potential iPad app customers, Jeppesen knew and did not support potential customers such as NetJets, EJM, and other customers who expressly told Jeppesen that they were interested in SOLIDFX.[55]  (SSMF 174.)  Contrary to Jeppesen's argument (MSJ 50), the evidence shows that there was the "reasonable prospect of having a business relationship."[56]  Further, there is a mass of evidence from which a jury could find that Jeppesen's actions were intended to prevent commercial airlines and other customers from working with SOLIDFX.  Finally, Jeppesen's reference to its alleged copyright has nothing whatsoever to do with SOLIDFX's intentional interference with prospective business relations cause of action as Jeppesen has admitted that copyright had nothing to do with its actions.  (SSMF 110.)

---

knows "facts basic to the transaction" that, given the circumstances, the other party "would reasonably expect . . . disclosure."  *Id.; see also* Restatement (Second) of Torts §§ 551(2)(b), (c) & (e) (1965).  Here, Jeppesen's representations regarding its interpretation of the Agreement while it secretly developed its own app were undoubtedly "statement[s] capable of misleading," *id.*, and "facts basic to the transaction" that SOLIDFX would reasonably expect to be disclosed.

[55]  In fact, Jeppesen continues to maintain EJM and NetJets as its own app customers.  (JSMF 176.)

[56]  To succeed on its intentional interference claim, "it is not necessary [for SOLIDFX] to identify a specific customer relationship *or* a specific customer."  *Pers. Dep't, Inc. v. Prof's Staff Leasing Corp.*, 297 Fed. App'x 773, 777 (10th Cir. 2008.).

Dated: August 15, 2012

_s/ Shannon Stevenson_
Kenzo S. Kawanabe
Shannon Wells Stevenson
John A. Francis
Natalie West
Matthew Baisley
DAVIS GRAHAM & STUBBS LLP
1550 17th Street, Suite 500
Denver, CO  80202
Tel: (303) 892-9400
 Fax: (303) 893-1379

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2012, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based upon the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Robert N. Miller
Stephanie E. Dunn
Perkins Coie LLP
1900 16th Street, Suite 1400
Denver, CO 80202-5255
Tel: 303.291.2300
Fax: 303.291.2400
Email: sdunn@perkinscoie.com
Email: rmiller@perkinscoie.com
Attorneys for Defendant

Craig S. Primis
John O'Quinn
Gregory L. Skidmore
Michael A. Glick
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005-5793
Phone: 202-879-5000
Email: craig.primis@kirkland.com
Email: john.oquinn@kirkland.com
Email: greg.skidmore@kirkland.com
Email: michael.glick@kirkland.com
Attorneys for Defendant

*s/ Brigid Bungum*
Brigid Bungum