**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 11-cv-01468-WJM-BNB

SOLIDFX, LLC,

      Plaintiff,

v.

JEPPESEN SANDERSON, INC.,

      Defendant.

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

---

      Plaintiff SolidFX, LLC ("Plaintiff") brings this action against Defendant Jeppesen

Sanderson, Inc. ("Defendant") alleging violations of the Sherman Antitrust Act, 15

U.S.C. §§ 1 *et seq*., as well as common law contract and quasi-contract claims.  (Sec.

Am. Compl. ("SAC") (ECF No. 158) pp. 20-37.)  Before the Court are the following

motions: (1) Plaintiff's Partial Motion for Summary Judgment (ECF No. 96); and (2)

Defendant's Motion for Summary Judgment (ECF No. 130).  For the reasons set forth

below, Plaintiff's Motion is denied, and Defendant's Motion is granted in part and denied

in part.

**I.  LEGAL STANDARD**

Summary judgment is appropriate only if there is no genuine issue of material fact and

the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co.,*

*Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).  Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury, or conversely, is so one-sided that one party must prevail as a matter of law.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132 (10th Cir. 2000); *Carey v. U.S. Postal Service*, 812 F.2d 621, 623 (10th Cir. 1987).

A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party.  *Anderson*, 477 U.S. at 248. The Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *Houston v. Nat'l General Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II.  FACTUAL BACKGROUND

The relevant facts[1], viewed in the light most favorable to the non-movant, are as follows.

Defendant Jeppesen is a subsidiary of the Boeing Company and is a creator and seller of terminal charts ("Terminal Charts" or "Charts") that graphically represent details of airports and their surroundings; it has been in this business since 1934.  (ECF No. 128[2] ¶¶ 1, 3; ECF No. 164 ¶ 6.)  Defendant's Charts are produced using publically

---

[1] The parties' briefing includes over 600 numbered paragraphs of "undisputed" facts, many of which are, in fact, hotly disputed.  In this Order, the Court sets forth only the facts that are pertinent to its analysis of the issues.

[2] Because there are cross-motions for summary judgment and nearly four hundred exhibits attached thereto, for ease of reference, the Court will cite to the parties' briefs for record support.

2

available information which it compiles into a unique proprietary format that includes

Defendant's own symbology, colors, fonts, and distinctive layout.  (*Id*. ¶¶ 5-6.)

Defendant's Terminal Charts are copyrighted.  (*Id*. ¶ 8.)

Plaintiff SolidFX is a small software company that creates software applications

to access, organize, and use critical data.  (ECF No. 164 ¶ 1.)  Both principals of

SolidFX are private pilots with substantial experience and training in the technology

field.  (*Id*. ¶¶ 2-5.)

Historically, pilots have carried heavy binders of paper terminal charts.  (ECF No.

164 ¶ 45.)  Over the past 15 years, charts have increasingly been distributed

electronically, but limitations have existed due to the electronic devices' (such as laptop

computers) limited battery life, awkwardness, and efficiency.  (ECF No. 128 ¶ 4; 164 ¶

45.)  In 2008, Plaintiff anticipated rapid development in the efficiency, battery life, and

display technology of mobile computing devices and began developing software that

would allow pilots to access terminal charts on these devices in the cockpit.  (ECF No.

164 ¶ 47.)  At that time, there were few mobile devices on the market that would

support third-party software development.  (*Id*. ¶ 48.)

In November 2008, Defendant contacted Plaintiff about forming a business

relationship in which Plaintiff would develop software for pilots to access Defendant's

Terminal Charts on e-book viewers.  (*Id*. ¶ 49.)  Plaintiff began developing software to

display Defendant's Charts on an e-book viewer manufactured by iRex Technologies

("iRex").  (*Id*. ¶ 48.)  Plaintiff touted the advantages of using an e-book viewer for

displaying Defendant's Terminal Charts because the e-ink technology required limited

battery usage and was visible in bright sunlight, as was required for use in a cockpit. (ECF No. 128 ¶ 71.)

In April 2009, Plaintiff demonstrated its iRex prototype to Defendant at an aviation convention.  (ECF No. 128 ¶ 76.)  The parties then agreed to move forward with their relationship and began negotiating a licensing agreement ("Agreement").  (*Id*. ¶ 77.)  The first draft of the Agreement specifically referenced the iRex device and limited Plaintiff's licensing rights to that device only.  (ECF No. 164 ¶ 58.)  Plaintiff sent a revised draft to Defendant that, in relevant part, used the more general term "e-book viewer".  (*Id*. ¶ 59.)

On December 31, 2009, the final version of the Agreement was executed by the parties.  (*Id*. ¶ 56.)  The relevant portions of the Agreement are discussed in the Analysis section below.  However, the Agreement generally gave Plaintiff a license to develop a "data management reader solution" that works in conjunction with an e-book viewer to access, use, and display Jeppesen's copyrighted Terminal Charts.  (Agmt. (ECF No. 128-2) § 1.6.)  In addition to the Terminal Charts, the Agreement gave Plaintiff a license to use Defendant's copyrighted Jeppesen Integration Toolkits ("JIT") which are proprietary products that allow the integration of the Terminal Charts in third party systems.  (*Id*. § 1.5.)  The term of the Agreement was for a period of five years, and was renewable.  (*Id*. § 5.)

Under the Agreement, Defendant was to provide Plaintiff with the JIT and technical support for the development of the software necessary to display the Terminal Charts on an e-book viewer.  (Agmt. App. § 1.2.2.)  Plaintiff was not permitted to alter

the Terminal Charts in any manner.  (*Id*. § 1.2.2.2.)  Plaintiff was responsible for the design and development of the "System" (the definition of which will be discussed later) and was required to install the most current worldwide database of Defendant's Terminal Charts onto every "System" prior to its delivery to the customer.  (*Id*. §§ 1.1.1 & 1.3.1.)

Defendant provided Plaintiff with the JIT for use with several different iRex models and Plaintiff began selling the devices in July 2009.[3]  (ECF No. 164 ¶ 67.)  The iRex device was not widely available in the retail market so Plaintiff would purchase the device, load its software, and sell the combined hardware and software to the consumer.  (*Id*.)  Plaintiff received excellent feedback from its customers and high praise in the aviation industry.  (*Id*. ¶ 70.)

In January 2010, Apple announced the soon-to-be released iPad.  (*Id*. ¶ 71.)  The iPad does not employ e-ink technology; rather, it features an LED-backlit color display.  (ECF No. 128 ¶ 123.)  The iPad can be used to view and read e-books, but it also has the capacity to browse the web, play games, send e-mail, watch videos, listen to music, and take photographs.  (*Id*. ¶ 122.)  Because of its functionality, the iPad is typically referred to as a tablet computer.  (*Id*. ¶ 124.)

Shortly after the iPad was announced, Plaintiff registered with Apple as a developer for apps on the iPad.  (ECF No. 164 ¶ 72.)  In January 2010, Plaintiff requested the JIT from Defendant so that Plaintiff could develop an app for the iPad.

---

[3]  It appears Plaintiff began selling the devices before the Agreement was fully executed. However, the record shows that the material provisions of the Agreement had been negotiated and agreed upon before July 2009.  (ECF No. 128 ¶ 79.)

(*Id*. ¶ 73.)  Plaintiff proposed the development of a "software only" solution for the iPad that would not involve pre-loading Defendant's Terminal Charts prior to the purchase of the iPad.  (ECF No. 128 ¶ 139.)  At that time, Defendant's representative indicated that they believed such "software only" solution would fall within the ambit of the December 31, 2009 Agreement.  (*Id*. ¶ 140; ECF No. 164 ¶ 74.)

Despite this understanding, Defendant refused to provide Plaintiff the JIT necessary to develop an iPad app because it was determining its own strategy for the iPad.  (ECF No. 164 ¶ 75.)  Between February and May 2010, Plaintiff repeatedly informed Defendant that it was moving forward with plans to develop an iPad app that would display Defendant's Terminal Charts.  (ECF No. 128 ¶¶ 147-51.)  Defendant did not inform Plaintiff that it had changed its position on the scope of coverage of the Agreement, and that it was now taking the position that the iPad app did not fall within the ambit of the Agreement.  (ECF No. 164 ¶ 79.)

On May 26, 2010, Defendant informed Plaintiff that it would not allow others, including Plaintiff, to have the JIT for the iPad.  (*Id*. ¶ 81.)  Defendant announced its own iPad app on May 27, 2010.  (*Id*. ¶ 82.)  In July 2010, Defendant launched its "Mobile TC" app in the Apple Store for the iPad.  (ECF No. 128 ¶ 172.)  Mobile TC is available for free download and, to use the app, a purchaser must have a corresponding subscription to Defendant's Terminal Charts.  (*Id*. ¶¶ 173-74.)  In February 2011, Defendant released a second iPad app—Jeppesen Mobile FD—which includes *en route* charts and other features in addition to the capabilities included in the Mobile TC app.  (*Id*. ¶ 179.)  The Jeppesen Mobile FD app is also offered to

6

subscribers for free in the Apple store.  (*Id*. ¶ 180.)

Defendant does not attribute any revenue to its apps and has no plans to begin charging for their download.  (*Id*. ¶¶ 173, 180-81.)  The subscription price for Defendant's terminal charts increased only nominally between 2010 and 20011 and did not increase in 2012.  (*Id*. ¶ 185.)  As of May 2012, Defendant's apps had been downloaded more than 230,000 times.  (ECF No. 164 ¶ 135.)  Defendant continues to offer its Terminal Charts in paper form, on Windows-based computers via its JeppView system, by CD-ROM, via built-in panel systems in airplanes, or through Plaintiff's iRex products.  (ECF No. 128 ¶ 184.)

The parties' Agreement also contemplates that Defendant will support Plaintiff's development of the iRex device for commercial customers using Defendant's tailored terminal charts.  (Agmt. § 1.3.1.)  The data set necessary for Plaintiff to develop a workable iRex device marketable to commercial customers is called JIT 2.2.  (ECF No. 164 ¶ 169.)  Defendant provided Plaintiff with an "evaluation set" of JIT 2.2 with which Plaintiff was able to develop a prototype of the iRex for commercial customers.  (ECF No. 128 ¶¶ 199-200.)  Defendant estimated that development of the full version of JIT 2.2 would require about 2 ½ months of effort.  (*Id*. ¶ 196.)  Defendant would not spend these resources until Plaintiff had a commercial customer that had committed to purchasing the iRex device.  (*Id*. § 203.)  Despite interest from a number of commercial airlines, Plaintiff was unable to obtain a customer commitment without a fully functioning prototype.  (ECF No. 164 ¶¶ 172-74.)

### III.  ANALYSIS

This case involves essentially three categories of claims: (1) those arising out of the Sherman Act and alleging antitrust violations; (2) common law contract claims; and (3) common law tort and quasi-contract claims arising out of the December 31, 2009 Agreement.  The Court will discuss each category of claims below.

**A.    Sherman Act Claims**

Plaintiff brings six Sherman Act claims: (1) *Per Se* Illegal Tying in violation of Section 1; (2) Illegal Tying under the Rule of Reason in violation of Section 1; (3) Monopolization in violation of Section 2; (4) Attempted Monopolization in violation of Section 2; (5) Monopolization of the Combined Market for Terminal Charts and Apps in violation of Section 2; and (6) Attempted Monopolization of the Combined Market for Terminal Charts and Apps in violation of Section 2.  (SAC pp. 23-32.)  Defendant moves for summary judgment on all six antitrust claims.  The Court will discuss the Section 1 and Section 2 claims separately below.

1.    <u>Section 1—Illegal Tying</u>

Plaintiff's Section 1 claims both involve allegations that Defendant "uses its monopoly power in the Terminal Charts Market to force consumers in the Apps Market to choose a product in that Downstream Market that those consumers would not choose in a competitive market."  (SAC ¶ 105.)

Section 1 of the Sherman Act provides, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal."  15 U.S.C. § 1.  A tying

8

arrangement is an agreement by a party to sell one product—the "tying product"—only on condition that the buyer also purchase a second product—the "tied product"—or at least agree not to buy that product from another supplier.  *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 461-62 (1992) (citing *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958)).

The elements of a Section 1 tying[4] claim, are "(1) two separate products, (2) a tie—or conditioning of the sale of one product on the purchase of another, (3) sufficient economic power in the tying product market, and (4) a substantial volume of commerce affected in the tied product market."  *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof. Publ's.*, 63 F.3d 1540, 1546 (10th Cir. 1995).  Because the Court finds that Plaintiff has not shown a genuine dispute of fact as to the second prong, which is an essential element of a tying claim, the Court will address only this element.

For an illegal tie-in to exist, "purchases of the tying product must be conditioned upon purchases of a distinct tied product."  *Fox Motors, Inc. v. Mazda Distribs., Inc.*, 806 F.2d 953, 957 (10th Cir. 1986).  While not dispositive, it is notable that Defendant gives its app away for free.[5]  That is, Defendant does not require anyone to <u>purchase</u> its

---

[4]  Though Plaintiff brings a tying claim under both the *per se* analysis and the rule of reason analysis, the test for these claims appears to be the same.  *United States v. Microsoft Corp.*, 87 F.Supp.2d 30, 47 (D.D.C. 2000) (noting that the four elements of an unlawful tying claim are the same regardless of whether the arrangement is subjected to the *per se* or the rule of reason analysis).  Neither party has drawn a distinction between the two in its papers and, applying the law to the facts of this case, the Court has been unable to discern any meaningful distinction here between the *per se* and the rule of reason analysis.

[5]  There is evidence that commercial customers are required to purchase the app for $9.99 through Apple's volume purchase program.  (Buhl Dep. at 234.)  However, this amount was imposed by Apple and has since been rescinded.  (ECF No. 180-95.)  Thus, the Court

app in order to utilize the app to view the Terminal Charts on an iPad or other similar device.  There is also no evidence showing that Defendant has raised the prices of its Terminal Charts subscription to reflect the cost of its app.  *Compare Multistate Legal Studies*, 63 F.3d at 1548 (where cost of tying product was raised $50 after tied product was introduced, a jury could infer that the tied product was not "free").

More significantly, however, Plaintiff has failed to show that Defendant requires a purchaser of its Terminal Charts subscription to also "purchase" its app.  Instead, the record shows that any purchaser can obtain the Terminal Charts in hard copy/paper format, by CD-ROM, on a Windows-based tablet, laptop or desktop computer, or on an IRex device purchased from Plaintiff.  (Phillips Dep. at 231-32; McDonald Dep. at 490-92.)  Only if the purchaser wants to view the Charts on an iPad is he or she required to download Defendant's app.

Additionally, there is no evidence that Defendant disadvantages its customers in any way if they choose to access the Terminal Charts in some format other than through its app.  *Compare Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 914-16 (9th Cir. 2008) (finding that there was a tying arrangement where a customer who chose not to use the tied product would have to pay more for the tying product).  The record plainly shows that a purchaser can download the Terminal Charts to up to four devices (such as a computer, avionic system, or an iPad) before having to pay any additional subscription rate.  (Abbot Dep. at 182-83; 235-36.)

The cases cited by Plaintiff in support of its argument that there was a tying

_____

finds no evidence showing that Defendant has charged or is currently charging a fee for its app.

agreement in this case are inapposite.  In all of these cases, the seller refused to sell the tying product without the tied product.  *See Heartland Payment Sys., Inc. v. MICROS Sys.*, 2008 WL 4510260, *8 (D.N.J. Sept. 29, 2008) (tying arrangement existed when defendant would only sell its MICROS POS machine with a certain processor); *Parsons v. Bright House Networks LLC*, 2010 WL 5094258, *5 (N.D. Ala. Feb. 23, 2010) (finding a tying arrangement when cable company would not allow a subscription unless the subscriber also rented a cable box from the company); *In re Cox Enter., Inc.*, 2010 WL 5136047, *3 (W.D. Okla. Jan. 19, 2010) (same).  In this case, Defendant continues to sell its Terminal Charts subscription to purchasers that do not have its app.

Because Plaintiff has not shown that a purchaser was required to obtain the tied product—Defendant's app—in order to be able to purchase the tying product—the Terminal Charts subscription—it has failed to show that there was a tying arrangement in this case.  *See Eastman Kodak*, 504 U.S. at 461-62 ("A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.") (internal quotation omitted).

Because the Court has found no dispute of fact as to whether there was a tying arrangement—which is an essential element of a Section 1 claim—Plaintiff has failed to meet its summary judgment burden.  Therefore, Defendant's Motion for Summary Judgment is granted in so far as it seeks summary judgment on Plaintiff's Section 1 claim.

2.      Section 2—Monopolization Claims

Section 2 of the Sherman Act prohibits monopolization or attempted

monopolization of any part of interstate trade or commerce.  15 U.S.C. § 2.  "The

offense of monopoly under § 2 of the Sherman Act has two elements: (1) the

possession of monopoly power in the relevant market and (2) the willful acquisition or

maintenance of that power as distinguished from growth or development as a

consequence of a superior product, business acumen, or historic accident."  *United*

*States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

For purposes of summary judgment, the Court assumes that Defendant has

monopoly power in the relevant market and, therefore, that Plaintiff has established the

first element of its monopolization claim.  Thus, the Court's analysis will focus solely on

the second element.  "The second element of a § 2 claim is the use of monopoly power

'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'"

*Eastman Kodak*, 504 U.S. at 482-83.  This is generally referred to as anti-competitive or

predatory behavior.

"'Anticompetitive conduct' can come in too many different forms, and is too

dependent upon context, for any court or commentator ever to have enumerated all the

varieties."  *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087

(D.C. Cir. 1998).  In this case, Plaintiff alleges that Defendant engaged in anti-

competitive behavior by refusing to enter into an agreement with Plaintiff to develop an

app and by refusing to provide access to an essential facility.  Each of these theories

will be discussed below.

a.    *Refusal to Deal*

Plaintiff alleges that Defendant's refusal to license its Terminal Charts constitutes anti-competitive behavior.  (ECF No. 164 at 33-34.)  A refusal to deal may be one of the mechanisms by which a monopolist maintains its power.  *Rural Tel. Serv. Co., Inc. v. Feist*, 957 F.2d 765, 768 (10th Cir. 1992).  In determining whether a monopolist which has refused to deal with a competitor has acted lawfully or in violation of § 2, the Court applies a two-part test: (1) the effects of the monopolist's conduct; and (2) the monopolist's motivation.  *Id*.  To prevail on this claim, Plaintiff must show that Defendant's conduct was "intended to or did have some anti-competitive effect beyond the loss of its own business."  *Id*.  "[A]s a general matter a firm can refuse to deal with its competitor.  But such a right is not absolute; it exists only if there are legitimate competitive reasons for the refusal."  *Eastman Kodak*, 504 U.S. at 483 n.32.

Defendant contends that it has a legitimate basis for its refusal to license its Terminal Charts to Plaintiff, *i.e.*, it was properly exercising its right to refuse to license its copyrighted work.  (ECF No. 128 at 31-33.)  "Intellectual property rights do not confer a privilege to violate the antitrust laws."  *In re Indep. Serv. Orgs. Antitrust Litig. CSU, LLC v. Xerox Corp.*, 203 F.3d 1322, 1325 (Fed. Cir. 2000) (hereafter "*Xerox*").  But it also true that antitrust laws do not negate the intellectual property holder's right to exclude others from intellectual property.  *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1362 (Fed. Cir. 1999).

The most sweeping analysis of the interplay between the rights conferred by the Copyright Act on a holder of a copyright and the prohibition on anticompetitive behavior

13

established by the Sherman Act is *Data General Corportation v. Grumman Systems Support Corporation*, 36 F.3d 1147, 1182 (1st Cir. 1994). In *Data General*, the First Circuit noted that the Copyright Act grants a copyright owner the exclusive right to distribute the protected work by "transfer of ownership, or by rental, lease, or lending." *Id.* (citing 17 U.S.C. § 106). By enacting the Copyright Act, "Congress itself made an empirical assumption that allowing copyright holders to collect license fees and exclude others from using their works creates a system of incentives that promotes consumer welfare in the long term by encouraging investment in the creation of desirable artistic and functional works of expression." *Data Gen.*, 36 F.3d at 1186-87. However, because the Copyright Act does not purport to limit the Sherman Act, the First Circuit determined that they must be read harmoniously. Thus, the First Circuit held that "while exclusionary conduct can include a monopolist's unilateral refusal to license a copyright, an author's desire to exclude others from use of its copyrighted work is a presumptively valid business justification for any immediate harm to consumers." *Data Gen.*, 36 F.3d at 1187.

The Tenth Circuit has neither explicitly adopted nor rejected the First Circuit's reasoning. However, in an opinion in which the Federal Circuit was predicting how the Tenth Circuit would rule, it adopted the reasoning in *Data General*. *See Xerox*, 203 F.3d at 1328-29 ("We believe the First Circuit's approach is more consistent with both the antitrust and the copyright laws and is the standard that would most likely be followed by the Tenth Circuit."); *see also Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 686 (4th Cir. 1992) (holding that the Sherman Act "does not entitle a

purchaser to buy a product that the seller does not wish to offer for sale."); *In re Educ. Testing Serv. Praxis Principles of Learning*, 429 F. Supp. 2d 752, 759 (E.D. La. 2005) (failure to release its copyrighted testing materials to competitors was not exclusionary conduct).

Based on this case law, the Court finds that Defendant's assertion of its copyright is a presumptively valid justification for refusing to license its Terminal Charts and/or JIT to Plaintiff. Plaintiff contends that this justification still does not entitle Defendant to summary judgment because it is pretextual and Defendant's true motivation for refusing to license its Terminal Charts had nothing to do with its copyright.[6]  (ECF No. 164 at 35-36.)   The Court agrees with Plaintiff that an antitrust defendant's business justification must be legitimate to protect it from an antitrust violation. *Kodak*, 504 U.S. at 438 n.32.  However, the case law holds that assertion of one's copyright interests is *per se* legitimate. *Xerox*, 203 F.3d at 1329; *Data Gen.*, 36 F.3d at 1187.  The only exception to the presumption recognized by the Federal Circuit was if the holder of the copyright protection had come into such right in an unlawful manner. *Xerox*, 203 F.3d at 1329.  There is no allegation that Defendant obtained its copyright in its Terminal Charts in any unlawful manner; rather, it is undisputed that Defendant's prowess in the terminal charts market is the result of years of experience in

---

[6] The viability of the pretext argument in the Tenth Circuit is in significant dispute.  The case relied on by the Plaintiff in support of this contention was rejected by the Federal Circuit in *Xerox* and has otherwise been criticized. *See Xerox*, 203 F.3d at 128; *Schor v. Abbott Labs.*, 457 F.3d 608, 613-14 (7th Cir. 2006).  On the other hand, the Federal Circuit (predicting how the Tenth Circuit would rule) has held that a copyright holder's presumption of a valid business judgment can be overcome only by a showing that the copyright was obtained in violation of the law or that the copyright holder exceeded the scope of the copyright. *Xerox*, 203 F.3d at 129.

the industry.  (ECF No. 128 ¶¶ 1-4.)  Thus, the Court finds that Plaintiff has failed to introduce any evidence that rebuts Defendant's legitimate business justification—its copyright in the Terminal Charts and/or the JIT—for its refusal to license such works to Plaintiff.

Plaintiff also argues that Defendant's copyright in its Terminal Charts is not implicated at all in this case because Plaintiff's app is a separately copyrightable software that does not fall within the copyright for the Charts.  (ECF No. 164 at 34-35.)  Specifically, Plaintiff contends: "Because the apps provide only a *means* for displaying terminal charts, they are excluded from Jeppesen's claimed copyright."  (*Id*. at 34.)  However, it is undisputed that, in order to develop its app, Plaintiff needs access to Defendant's JIT, for which Defendant also holds a copyright.  (ECF No. 164 ¶ 113.)  Additionally, Defendant's copyright grants it the exclusive right to "display" or authorize the "display" of its copyrighted Terminal Charts.  *See* 17 U.S.C. § 106.  It is undisputed that the sole purpose of Plaintiff's app is to provide Defendant's customers with a means of "displaying" Defendant's Terminal Charts on their mobile devices.  (ECF No. 164 at 35.)  Because Defendant has the right to control the display of its copyrighted Terminal Charts, as well as the right to control the use of its copyrighted JIT, Plaintiff's argument that its app does not implicate Defendant's copyrights is not persuasive.

Moreover, even if the refusal to deal did not invoke Defendant's copyright, the outcome would be the same.  Typically, unilateral refusals to deal are lawful.  *See Trinko*, 540 U.S. at 408 ("[A]s a general matter, the Sherman Act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he

16

will deal.").  "The Sherman Act does not force [a company] to assist a competitor in eating away its own customer base."  *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1197 (10th Cir. 2009).  Even if a company has an ongoing relationship with a competitor and later changes course, so long as a business proffers some business reason for its decision, such decision is not precluded by the Sherman Act (though it may give rise to liability under a contract or tort theory).  *Id*. at 1196; *see also Four Corners Nephrology Assoc., P.C. v. Mercy Med. Ctr.*, 582 F.3d 1216, 1225 (10th Cir. 2009) (courts should impose a duty to deal "very cautiously because of the uncertain virtue of forced sharing and the difficulty identifying and remedying anticompetitive conduct by a single firm.") (quoting *Trinko*, 540 U.S. at 408).  Thus, absent some showing that Defendant's reason for refusing to deal with Plaintiff was actually anticompetitive, Plaintiff cannot prevail on its Section 2 claim.

To avoid this case law, Plaintiff argues that Defendant's refusal to enter into a licensing agreement falls under the ambit of unlawful conduct created by *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).  Specifically, Plaintiff contends that, because the parties were previously engaged in a cooperative and profitable venture, from which Defendant unilaterally withdrew, Defendant's conduct was anti-competitive.  However, the Court finds this argument unpersuasive.  The Supreme Court has recognized that *Aspen Skiing* was an exceptional case that lies "at or near the outer boundary of § 2 liability."  *Verizon Commc'ns, Inc. v. Trinko*, 540 U.S. 398, 409 (2004).  Unlike the relationship in *Aspen Skiing*, the parties here had been in business together for less than one year when the issue regarding the development of

an iPad app arose.  *See Eatoni Ergonomics v. Research in Motion Corp.*, 826 F. Supp.

2d 705 (S.D.N.Y. 2011) (*Aspen Skiing* did not apply where parties' relationship was less

than a year).  Additionally, and of greater importance here, *Aspen Skiing* did not involve

a party's copyright, nor was the subject matter of the dispute there intellectual property

owned by one of the parties.  Thus, the Court finds that this case does not fall within the

narrow purview of *Aspen Skiing* and that Plaintiff has not shown that Defendant's

refusal to license its Terminal Charts and/or JIT was anticompetitive.

In sum, the Court finds that Plaintiff has failed to establish a genuine dispute of

fact as to whether Defendant's refusal to deal constituted anticompetitive conduct.

Thus, summary judgment is appropriate on Plaintiff's theory that Defendant's refusal to

deal was an antitrust violation.

> b.      *Refusal to provide access to an essential facility*

Plaintiff also argues that Defendant engaged in anticompetitive behavior by

failing to provide Plaintiff access to an essential facility.  (ECF No. 164 at 50-51.)

Specifically, Plaintiff contends that access to the JIT is "essential for a software

developer to compete in the apps market because it enables apps to read the language

of Jeppesen's worldwide terminal charts."  (*Id*. at 50.)

The Court notes that the viability of the "essential facilities" theory of

anticompetitive conduct has been questioned by both the Supreme Court and the Tenth

Circuit.  *See Trinko*, 540 U.S. at 410-11 (noting that the Court has "never recognized

such a doctrine" and "[t]o the extent respondent's 'essential facilities' argument is

distinct from its general § 2 argument, we reject it"); *Four Corners*, 582 F.3d at 1222

(noting the Supreme Court's skepticism about the "essential facilities doctrine").

However, even assuming the doctrine applies in this circuit, Plaintiff has not shown that

it applies in this case.

None of the cases cited by Plaintiff in support of its essential facility theory

involve intellectual property.  As one court has noted: "To find a patent an 'essential

facility' to which [the patentee] must provide access would subvert the plain meaning

and purpose of the Patent Act."  *Applera Corp. v. MJ Research, Inc.*, 349 F. Supp. 2d

338, 348 (D. Conn. 2004); *see also Morris Commc'ns Corp. v. PGA Tour, Inc.*, 235 F.

Supp. 2d 1269, 1285 (M.D. Fla. 2002) ("This Court can find no case to indicate that

access to proprietary information, not in the public domain, is an essential facility. . . .

Many competitors would compete more efficiently with access to proprietary

information, but a court's role is not to force access to proprietary information in the

name of competition, as that would reduce incentive to innovate and ultimately harm

consumers.").  The same reasoning would apply to the rights granted a copyright holder

by the Copyright Act.

Defendant also contends that its JIT and/or Terminal Charts are not an essential

facility because there are other companies that produce similar products.  The Court

agrees.  To prevail on an essential facilities claim, Plaintiff must allege "more than

inconvenience, or even some economic loss; it must allege that an alternative to the

facility is not feasible."  *Eatoni Ergonomics, Inc. v. Research in Motion*, 486 F. App'x

186, 190 (2d Cir. 2012).  The record shows that its Terminal Charts are developed from

public data and that there are other companies that create Terminal Charts.  (ECF No.

128 ¶ 5.)  The fact that Defendant's Charts are the "industry standard" does not mean

that they are "essential" for purposes of antitrust law.  *See Data Gen. Corp. v. Gumman Sys. Support*, 761 F. Supp. 2d 185, 192 (D. Mass. 1991) ("[A] better mousetrap is not necessarily an essential facility.").  Thus, the Court finds that Plaintiff has failed to show that Defendant's copyrighted Terminal Charts and/or its JIT based thereon are essential facilities.  *See Corsearch, Inc. v. Thomson & Thomson*, 792 F. Supp. 305, 333 (S.D.N.Y 1992) (copyrighted database is not an essential facility because it is based on public records and can be duplicated).

c.   *Conclusion*

In sum, to survive summary judgment on its § 2 claim, Plaintiff must show a genuine dispute of fact as to whether Defendant's monopoly in the relevant market was the result of "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *Grinnell Corp.*, 384 U.S. at 570-71.  As discussed above, the Court finds that Plaintiff has not shown that Defendant's refusal to deal with Plaintiff was anticompetitive conduct.  The Court also finds that Plaintiff has failed to establish that the essential facility doctrine applies.  Rather, the record shows that Defendant's prowess in the Terminal Charts market is the result of years of hard work and that its refusal to license its Terminal Charts and JIT are proper uses of its exclusive authority to license its copyrighted material.  Accordingly, the Court grants Defendant's Motion for Summary Judgment with respect to Plaintiff's Monopolization Claims.

3.   Section 2—Attempted Monopolization

Plaintiff also brings claims under § 2 of the Sherman Act alleging that Defendant attempted to monopolize the market for terminal charts and apps.  (SAC ¶¶ 130-134;

20

140-143.)  In this circuit, a plaintiff bringing an attempted monopolization claim must allege the following:  (1) that the defendant has engaged in predatory or anti-competitive conduct; (2) with a specific intent to monopolize; and (3) a "dangerous probability" of achieving monopoly power.  *Christy Sports*, 555 F.3d at 1992.  The third element of an attempted monopolization claim requires consideration of "the relevant market and the defendant's ability to lessen or destroy competition in that market."  *Id*.

In the briefing, the parties do not distinguish between Plaintiff's monopolization claims (discussed above) and the attempted monopolization claims.  For the reason discussed above, the Court finds that Plaintiff has failed to show that Defendant engaged in any predatory or anticompetitive conduct with the intent to monopolize.  Specifically, the Court finds that Defendant's refusal to license its copyrighted Terminal Charts and/or JIT was not anticompetitive.  Moreover, to the extent Defendant's refusal to license its copyrighted material could be characterized as anticompetitive, Plaintiff has failed to show that Defendant had the specific intent to monopolize when it refused to license its work.  Rather, the record shows that Defendant validly asserted its rights under the Copyright Act.  Accordingly, the Court grants summary judgment to Defendant on Plaintiff's attempted monopolization claims.

4.    Conclusion—Sherman Act Claims

For the reasons discussed above, the Court finds that Plaintiff has failed to meet its burden on summary judgment with respect to all of its claims brought under the Sherman Act.  As such, the Court grants Defendant's Motion for Summary Judgment on all Sherman Act claims.

**B.     Breach of Contract**

It has long been the law in Colorado that a party attempting to recover on a claim for breach of contract must prove the following elements:  (1) the existence of a contract, *Denver & Rio Grande R.R. Co. v. Iles*, 53 P. 222, 224 (Colo. 1898); (2) performance by the plaintiff or some justification for nonperformance, *Lombard v. Overland Ditch & Reservoir Co.*, 92 P. 695, 696 (Colo. 1907); (3) failure to perform the contract by the defendant, *Denver & Rio Grande R.R. Co.*, 53 P. at 223; and (4) resulting damages to the plaintiff, *Western Union Tel. Co. v. Trinidad Bean & Elevator Co.*, 267 P. 1068, 1069 (Colo. 1928).

There is no dispute with respect to the first two elements of the breach of contract claims.  The parties entered into an enforceable Agreement and there is no allegation that Plaintiff failed to perform its obligations under that Agreement.  However, the parties dispute whether Defendant failed to perform its obligations under the Agreement and whether Plaintiff suffered any damages as a result of any such breach.

Whether there was a breach of contract in this case turns on the Court's interpretation of a few key provisions in the Agreement.  Under Colorado law, the purpose of contract interpretation is to ascertain the intent of the parties by ensuring that contracts are construed "consistently with the well-established principles of interpretation."  *East Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 973 (Colo. 2005).  As a starting point, courts examine the contractual terms in an attempt to determine the parties' intent.  *Id.; see also Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146,1154 (10th Cir. 2008); *Pirkey v. Hosp. Corp. of Am.*, 483

F. Supp. 770 (D. Colo. 1980).

Courts must examine the contract as a whole and attempt to determine the intent by reference to all of the contract's terms and provisions without viewing clauses or phrases in isolation. *Level 3 Commc'ns*, 535 F.3d at 1154; *East Ridge*, 109 P.3d at 973. When construing a contract, courts must not "view clauses or phrases in isolation." *East Ridge*, 109 P.3d at 974-75. The Court must construe a contract in a manner that avoids an absurd result and should avoid any interpretation that would be inconsistent with the purpose of the contract. *Atmel Corp. v. Vitesse Semiconductor Corp.*, 30 P.3d 789, 793 (Colo. App. 2001).

When a contractual term "unambiguously resolves the parties' dispute, the interpreting court's task is over" because "in the absence of an ambiguity a written contract cannot be varied by extrinsic evidence." *Level 3 Commc'ns*, 535 F.3d at 1154. On the other hand, when a contract has been determined to be ambiguous, "the meaning of its terms is generally an issue of fact to be determined in the same manner as other factual issues." *East Ridge*, 109 P.3d at 974.

A contract is ambiguous if it is "fairly susceptible" to more than one interpretation. *Level 3 Commc'ns*, 535 F.3d at 1154; *see also East Ridge*, 109 P.3d at 974-75. In determining whether an ambiguity exists, the court may look to the meaning of words with "reference to all contractual provisions and the nature of the transaction which forms the contract's subject matter." *In re Marriage of Thompson*, 802 P.2d 1189 (Colo. App. 1990); *May v. United States*, 756 P.2d 362, 369 (Colo. 1998). Whether a contract is ambiguous is a question of law. *Level 3 Commc'ns*, 535 F.3d at 1155.

The parties have filed cross-motions for summary judgment on these claims each arguing that its interpretation of the Agreement is correct as a matter of law. Plaintiffs have alleged two separate breach of contract claims: (1) that Defendant's refusal to allow Plaintiff access to the JIT for purposes of developing an app for the iPad was a breach of contract; and (2) that Defendant's refusal to provide JIT 2.2 was a breach of the Agreement.  The Court will address each of these claims in turn below.

1.      Refusal to Allow Access to Plaintiff's Terminal Chart and/or JIT

Plaintiff claims that Defendant breached the Agreement when it refused to allow Plaintiff access to the Terminal Charts and/or the JIT for purposes of developing an app for the iPad.  (SAC ¶ 81.)  Defendant contends that the iPad did not fall within the scope of the Agreement and, therefore, its refusal to permit Plaintiff access to its Charts and/or JIT for purposes of developing an iPad app was not a breach of the Agreement. (ECF No. 128 at 48.)

a.      *Plain Language of the Agreement*

The Agreement defines the relevant "System" as "[t]he SOLIDFX data management reader solution that works in conjunction with an e-book viewer, as modified to access, utilize and display Jeppesen Data, which solution is designed, developed, manufactured and marketed by SOLIDFX."  (Agmt. § 1.6.)  Plaintiff contends that the "System" was intended to be broader than the IRex e-reader and to encompass a software-based solution such as an iPad app.  (ECF No. 94 at 21.) Defendant contends that the "System" is defined in such a way that the parties could not have intended to include a device such as an iPad.  (ECF No. 128 at 48-49.)  The Court finds that both parties' interpretations are reasonable and, therefore, that an

24

ambiguity exists in the plain language of the Agreement.

The plain language of the Agreement states that the "System" is a "data management reader solution" which could certainly encompass a software-only solution such as an app.  Moreover, to the extent the definition of "System" envisions an actual hardware device, that device is described only as "an e-book viewer".  It is undisputed that a user can view an e-book on an iPad or similar device.  Thus, nothing in the plain language of the definition of the term "System" precludes Plaintiff's proposed understanding.

Defendant contends that Plaintiff's interpretation is not reasonable because it ignores the requirement that "[p]rior to delivery of any System to a Customer, SOLIDFX shall install the most current worldwide database for the Jeppesen Data in every System."  (Agmt. App. 1 § 1.3.1.)  Defendant contends that, under the Apple/iPad model, there is no way for Plaintiff to load the most current version of the Terminal Charts onto the iPad before it is delivered to the customer.  (ECF No. 128 at 50.) However, Defendant's argument ignores the possibility that the "System" is a software-only solution.  If the "System" is an iPad app, which the "Customer" downloads from the Apple store, it is possible that such "System" could be loaded with the "most current worldwide database for the Jeppesen Data" before it is delivered (*i.e.* downloaded) by the customer.  While these arguments could certainly persuade a juror that the parties did not intend the term "System" to include an iPad, the Court disagrees with Defendant that the requirement that the Data be downloaded to the System before the System is delivered to the Customer makes Plaintiff's proposed interpretation of the "System" unreasonable.

However, the Court also finds that Defendant's interpretation of the plain language of the term "System" is reasonable.  Defendant contends that the iPad is not an "e-book viewer" simply because a user can read an e-book on it any more than the iPad is a digital camera just because it can be used to take digital photos.  (ECF No. 128 at 49.)  The Court agrees that a reasonable person interpreting the phrase "System" in the Agreement could find that the plain language does not encompass an iPad because an iPad is not an e-book viewer.

Defendant also points out that Apple had not announced the iPad at the time that the Agreement was executed and, therefore, the parties could not have intended the iPad to fall within the definition of the term "System".  (ECF No. 128 at 49.) Defendant contends that, because the Agreement explicitly references the fact that Plaintiff had a "cooperation agreement with a hardware supplier" and that the Jeppesen Data would be displayed on that hardware supplier's e-book hardware (*see* Agmt. Recitals), the Agreement plainly applies only to that hardware supplier and its hardware.  (ECF No. 128 at 50.)  It is undisputed that, at the time the Agreement was executed, Plaintiff's hardware supplier and the e-book hardware was iRex and its e-reader, not Apple and the iPad.  (*Id.* ¶¶ 96-98.)  Based on all of these arguments, the Court finds that Defendant's contention that the Agreement was not intended to encompass the iPad is reasonable.

Because the Court finds that the definition of "System" in the Agreement is reasonably susceptible to more than one interpretation, it is ambiguous.  *Level 3 Commc'ns*, 535 F.3d at 1154.  Thus, the Court may look at the extrinsic evidence to determine whether the Agreement can be interpreted as a matter of law.  *Id.* at 1154-

26

55.

        b.    *Extrinsic Evidence*

The parties contend that the extrinsic evidence supports each of their positions.

The Court finds that there is significant extrinsic evidence that supports both Plaintiff's

interpretation of the Agreement and Defendant's interpretation and, therefore, the

parties' intent must be decided by a jury.  *See East Ridge*, 109 P.3d at 974.

In support of Plaintiff's contention that the "System" was intended to include a

device such as the iPad, there is extrinsic evidence showing that the parties revised the

Agreement to be more broad in scope.  That is, the record shows that initial drafts of

the Agreement specifically referenced the iRex device, and that, before executing the

Agreement, the parties made the language more general to include only references to

"ebook hardware" and "an e-book viewer".  (ECF No. 94 ¶ 31.)  The Agreement is also

for a period of five years.  (Agmt. § 5.)  Anyone with experience in the technology realm

would understand that a five year contract would reasonably encompass more than one

type of device because a five year old electronics device is often obsolete.  Thus, the

extrinsic evidence shows that Plaintiff's interpretation of the "System" as encompassing

more than the iRex device, including the iPad or similar devices, is reasonable.

The extrinsic evidence also shows that Defendant's contention that the iPad is

not encompassed in the "System" is reasonable.  It is undisputed that the Agreement

was executed on December 31, 2009 and that Apple had not yet announced the iPad.

(ECF No. 128 ¶ 121.)  Moreover, the iPad was ground-breaking technology.  At the time

the Agreement was executed, all "e-book viewers" utilized e-ink technology and were

solely used for reading e-books.  (ECF No. 164 ¶ 56; 127 ¶ 31.)  There is also evidence

that Plaintiff's representatives understood the iPad to be a different type of device (specifically, a tablet computer) and not an e-book viewer.  (ECF No. 128 ¶¶ 125-129.) Thus, a reasonable juror could find that the parties could not have intended for the Agreement to encompass the unknown iPad device.

Finally, there is evidence in the record that the parties each understood the Agreement in the manner that the opposing party contends.  "Colorado has long recognized the rule that in construing a contract, the courts will follow the construction placed upon it by the parties themselves."  *East Ridge*, 109 P.3d at 974.  The record shows that Defendant's representatives understood the Agreement to encompass the iPad and made such representations to Plaintiff before Defendant decided to produce its own iPad app.  (ECF No. 94 ¶¶ 58, 62.)  The record also shows that Plaintiff's representatives believed that they needed to broaden the scope of the Agreement before they could develop an app for the iPad.  (ECF No. 127 ¶ 82.)  The fact that representatives from both parties understood the Agreement in the manner that the opposing party promotes is further indication that the parties' intent is ambiguous.

As here, and when ambiguity does exist, the meaning of a term is generally an issue of fact that must be decided by the jury.  *Anderson v. Eby*, 998 F.2d 858, 865 (10th Cir. 1993) (quoting *Palipchak v. Kent Constr. Co.*, 554 P.2d 718, 719 (Colo. App. 1976)).  Because the plain meaning of the Agreement is ambiguous and the extrinsic evidence supports both parties' contention as to their intent when entering into the Agreement, the meaning of the Agreement cannot be determined as a matter of law. The parties' cross-motions for summary judgment are denied as to Plaintiff's claim that Defendant's refusal to permit Plaintiff access to the Terminal Charts and/or JIT for

purposes of developing an iPad app was a breach of contract.

    2.   <u>Failure to Provide JIT 2.2</u>

Plaintiff also contends that Defendant breached the Agreement by failing to provide Plaintiff with a fully-operational version of JIT 2.2 so that it could develop a functioning iRex device for the purpose of attracting commercial customers.  (SAC ¶ 81.)  As set forth above, JIT 2.2 is a data set for tailored terminal charts specifically made for commercial airlines.  (ECF No. 164 ¶ 169.)  Because Defendant would not provide a full version of the JIT 2.2, Plaintiff was unable to develop a fully-functional prototype of its iRex product to market to commercial customers.  (*Id*.)

The parties have both moved for summary judgment with respect to whether or not Defendant breached the Agreement by failing to provide the JIT 2.2.  Defendant has also moved for summary judgment on whether Plaintiff has shown that it suffered any damages as a result of any such breach.  The Court will address these contentions in turn below.

    a.   *Whether There Was a Breach of the Agreement*

The Agreement provides that Plaintiff shall have a license to:

> (i) use, view and test the Jeppesen Data; (ii) to the extent authorized herein and in Appendix 1, to use the JIT to develop an interface between the System and the Jeppesen Data which will allow the Jeppesen Data to be accessed, retrieved, rendered and/or displayed on the System; (iii) to integrate such interface developed hereunder into the System, and to distribute the System, to Customers, and (iv) to load the Jeppesen Data into the System prior to delivery to the Customer.

(Agmt. § 3.1.1.)  "Jeppesen Data" is defined to include "[a]n electronic database of Jeppesen standard and/or tailored terminal aeronautical charts in a Jeppesen

proprietary graphic format." (*Id*. § 1.3.1.)  A "Customer" is defined as "The owner or operator of a System utilizing the Jeppesen Data Service defined herein." (*Id*. § 1.2.)

The parties do not dispute that Defendant met its obligation under subsection i as it provided a version of the JIT 2.2 toolkit that was sufficient for Plaintiff to use, view and test the Jeppesen Data for commercial carriers.  Subsection iv is also not implicated by this claim.  The relevant clauses of this section are subsection ii and iii.

Defendant admits that it only provided a "preliminary data specification" for JIT 2.2.  (ECF No. 127 ¶¶ 100-104; ECF No. 94 ¶ 84.)  However, Defendant contends that the failure to provide a fully-operational version of the JIT 2.2 toolkit was not a breach of the Agreement because Plaintiff never had a "Customer" for the tailored charts.  (ECF No. 127 at 37.)  Plaintiff contends that Defendant was obligated to produce the full version of the JIT 2.2 so that Plaintiff could develop a functioning prototype and attract a "Customer".  (ECF No. 94 at 30-31.)

The Court finds that both parties' positions are supported by the plain language of the Agreement.  The plain language of Section 3.1.1(ii) provides that Plaintiff is permitted to "develop an interface" between the iRex device and the tailored terminal charts that allows the tailored charts to be "accessed, retrieved, rendered and/or displayed on the System." (Amgt. § 3.1.1(ii).)  This language could, as Plaintiff suggests, require that Defendant provide a fully-functional version of JIT 2.2 so that Plaintiff could develop a fully operational version of its iRex device for the purpose of attracting commercial customers.  However, the plain language does not require that the "interface" which Plaintiff is permitted to develop be fully functional.  Rather, nothing in the plain language prohibits Defendant from providing a version of JIT 2.2 that only

allows for the development of a prototype, so long as that prototype can either access, retrieve, render or display the tailored terminal charts on the iRex device. (*See id.*) There is no allegation that the "preliminary data specification" provided by Defendant did not allow Plaintiff to develop a prototype that met this standard.

Because the plain language of the Agreement is reasonably susceptible to more than one interpretation, it is ambiguous and the Court must look to the extrinsic evidence to determine whether the Agreement can be interpreted as a matter of law. The Court finds that there is extrinsic evidence to support both parties' positions on this claim and, therefore, the jury must decide the issue.

In support of Plaintiff's contention that the failure to provide a fully-functioning version of JIT 2.2 was a breach of contract, the record shows that Defendant understood that its failure to provide the full version of JIT 2.2 put Plaintiff in a "Catch - 22", which is evidence of bad faith on the part of Defendant. (ECF No. 164 ¶ 172.) The record also shows that Defendant changed its position on whether the Agreement covered commercial airlines after it decided to develop its own iPad app. (*Id*. ¶ 171.)

On the other hand, the record shows that Plaintiff was able to develop a working prototype and use this prototype to attract interest from commercial customers. (ECF No. 127 ¶¶ 100-103.) There is also extrinsic evidence showing that Defendant repeatedly informed Plaintiff that, when it had a commercial customer that had committed to buying the iRex device, it would provide a fully-functional version of JIT 2.2. (*Id*. ¶¶ 104-05.) Finally, extrinsic evidence shows that the parties agreed to be "reasonable" in developing their products and with respect to costs and that developing a fully functional version of JIT 2.2 would have required at least 2.5 months of man-

31

hours.  (*Id.* ¶ 95.)  This evidence supports Defendant's contention that the Agreement was not intended to require it to provide a fully-functional version of JIT 2.2 until Plaintiff had a "Customer" for the product.

        b.     *Whether Plaintiff Suffered any Damages as a Result of the Breach*

Defendant also moves for summary judgment based on the argument that Plaintiff has failed to show a genuine dispute of fact as to whether it suffered any actual damages as a result of Defendant's alleged failure to provide sufficient access to JIT 2.2.  (ECF No. 128 at 52-53.)  Specifically, Defendant contends that all of the commercial customers that were interested in the iRex device decided not to do business with Plaintiff for reasons unrelated to Plaintiff's inability to develop a fully functioning prototype.  (*Id.*)

However, there is also evidence in the record that Plaintiff had serious talks with at least two airlines about the iRex device.  (ECF No. 94 ¶¶ 85-87, 93-96.)  There is evidence, too, from which a jury could find that these transactions did not go through because Defendant failed to provide JIT 2.2 and/or made representations to the potential customers that it was not going to support Plaintiff's endeavors to attract business from commercial carriers.  (*Id.* ¶¶ 88, 97-98, 101-02.)  While a reasonable juror could certainly find that these customers' decisions regarding doing business with Plaintiff had nothing to do with the failure to have a fully functioning prototype, a reasonable juror could also find the opposite.  Thus, the Court must allow a jury to decide whether Plaintiff has proven that it suffered damages as a result of Defendant's breach of the Agreement.

       c.    *Conclusion*

Because the terms of the Agreement are ambiguous, a jury must determine whether Defendant's actions constituted a breach.  Additionally, there is sufficient evidence in the record to permit a reasonable juror to conclude that Defendant's actions caused Plaintiff damages.  Accordingly, the parties' cross-motions for summary judgment are denied on Plaintiff's claim that Defendant breached the Agreement by failing to provide a fully-functional version of JIT 2.2 before Plaintiff had a commercial customer.

    3.   <u>Limitation on Damages</u>

Defendant also moves for summary judgment on the damages available to Plaintiff if it prevails on either of its breach of contract claims.  (ECF No. 128 at 53-54.) Specifically, Defendant contends that the Agreement does not permit Plaintiff to recover for "lost profits" as part of its damages.  (*Id.*)

The relevant portion of the Agreement provides:

> 8.2   **<u>EXCLUSION OF CONSEQUENTIAL AND OTHER DAMAGES.</u>**  EXCEPT TO THE EXTENT OF THE INDEMNIFICATION OBLIGATIONS SET FORTH IN SECTION 9, NEITHER PARTY WILL HAVE ANY OBLIGATION OR LIABILITY WHATSOEVER, WHETHER ARISING IN CONTRACT (INCLUDING WARRANT), TORT (WHETHER OR NOT ARISING FROM THE NEGLIGENCE OF EITHER PARTY), STRICT LIABILITY OR OTHERWISE,
>
> 8.2.1  FOR LOSS OF USE, REVENUE, OR PROFIT; OR
>
> 8.2.2  FOR ANY OTHER INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY, PUNITIVE, OR OTHER DAMAGES WITH RESPECT TO THE JEPPESEN DATA, THE JIT, AND OTHER PRODUCTS AND SERVICES PROVIDED HEREUNDER; AND

8.2.3   ANY NONCONFORMANCE OR DEFECT IN
THE JEPPESEN DATA, THE JIT, OR OTHER
THINGS PROVIDED UNDER THIS
AGREEMENT.

. . .

8.4 <u>Effect of Limitation</u>.  The parties acknowledge that the
limitations set forth in this Section are integral to the amount
of fees specified in the Agreement, and recognize that were
Jeppesen to assume any further liability beyond that set
forth herein, such fees could be substantially higher.

(Agmt. § 8.)  Defendant contends that the plain language of § 8.2.1 provides that

Plaintiff cannot recover any lost profits.  (ECF No. 128 at 54.)  Plaintiff argues that §

8.2.1 pertains only to claims brought against Plaintiff for defects in its iRex product and

does not limit damages on this action between the parties.  (ECF No. 164 at 58-59.)

The Court finds that, based on the plain language of the Agreement, both

parties' interpretations of the Agreement are reasonable.  The fact that § 8.2.1 is set

apart from § 8.2.2 supports Defendant's contention that lost profits are not recoverable

on <u>any</u> contract claim.  Also, as Defendant points out, Defendant agreed to waive its

licensing fee when entering into the Agreement and the inclusion of § 8.2.4 shows that

the parties were aware that Defendant considered this limitation on damages to be an

important aspect of the Agreement.  (ECF No. 128 at 53.)

On the other hand, the fact that § 8.2.1 and § 8.2.2 are separated by the term

"or", as well as the fact that § 8.2.2 provides that no party shall recover any "other"

indirect, incidental or consequential damages supports Plaintiff's contention that § 8.2.1

and § 8.2.2 are to be read together.  (Agmt. § 8.)  If these sections are read together,

the phrase "with respect to the Jeppesen Data, the JIT, and other products and

services provided hereunder" could reasonably be interpreted to modify the limitation on recovery of lost profits.  (*Id.*)  Additionally, as Plaintiff argues, the Agreement does not contemplate that Defendant is paying Plaintiff any money for its services in developing the "System".  Thus, the only benefit to Plaintiff in entering into the Agreement is the profits which Plaintiff could receive for sale of its "Systems".  (ECF No. 164 at 59.)  The nature of the transaction is an important consideration in determining whether an ambiguity exists.  *In re Marriage of Thompson*, 802 P.2d at 1189.  If Plaintiff understood the Agreement to waive any recovery for lost profits if Defendant breached the Agreement, it would have effectively limited its damages to nothing.

Because the damages limitation provision is reasonably susceptible to more than one interpretation, the Court finds that it is ambiguous and the jury must decide what the parties intended by this clause of the Agreement.  Thus, Defendant's Motion for Summary Judgment is denied to the extent it seeks a ruling as a matter of law on Plaintiff's damages.

## C.   Remaining Claims

Plaintiff also brings the following claims against Defendant arising out of the factual circumstances discussed above: (1) promissory estoppel; (2) negligent misrepresentation; (3) fraud; and (4) intentional interferences with prospective business relations.  (SAC ¶¶ 91-96; 144-167.)  In a very cursory fashion[7], Defendant moves for summary judgment on all of these claims.  (ECF No. 56-59.)  The Court will briefly address below why Defendant's Motion is denied as to each of these claims.

-----

[7]  In a sixty-page Motion for Summary Judgment, Defendant devotes four pages to discussion of these four claims.  (ECF No. 128.)

1.    Promissory Estoppel

Defendant contends that summary judgment is appropriate on Plaintiff's

promissory estoppel claim because it is undisputed that there was a valid Agreement

between the parties.  (ECF No. 128 at 56.)  It is true that "[r]ecovery on a theory of

promissory estoppel is incompatible with the existence of an enforceable contract."

*Wheat Ridge Urban Renewal Auth. v. Cornerstone Grp. XXII, LLC*, 176 P.3d 737, 741

(Colo. 2007).  However, it is also true that a party is permitted to pursue a claim for

breach of contract and promissory estoppel in the alternative.  *Marquardt v. Perry*, 200

P.3d 1126, 1127 (Colo. App. 2008) ("[I]f a plaintiff fails to prove a breach of contract

claim, he or she may nevertheless be able to recover on a promissory estoppel claim.").

Where, as here, the scope of the contract is disputed, a jury is permitted to decide

between a breach of contract and a related tort claim.  *See Level 3 Commc'ns*, 535

F.3d at 1163 (district court should permit alternate contract and tort claims to go to the

jury when the scope of the contract is disputed).  If the jury determines that the

Agreement did not encompass the development of an iPad app, there is sufficient

evidence to permit it to find that Defendant made a promise to Plaintiff—outside of the

Agreement—about supporting its development of an iPad app, and that Plaintiff relied

on this promise to its detriment by putting in man-hours on the development of such

app.  *See Marquardt*, 200 P.3d at 1127 (elements of a promissory estoppel claim are:

(1) a promise; (2) that was reasonably expected to induce action; (3) which was relied

on to the promisee's detriment; and (4) which must be enforced to prevent injustice).

Because a reasonable juror could find in Plaintiff's favor on its promissory

estoppel claim, Defendant's Motion for Summary Judgment on this claim is denied.

2.     <u>Negligent Misrepresentation & Fraud</u>

Defendant contends that it is entitled to summary judgment on Plaintiff's

negligent misrepresentation claim for three reasons: (1) the alleged duty to support

Plaintiff's development of the app is the same duty as that provided under the

Agreement; (2) any promise to support Plaintiff's work in the future does not give rise to

a negligent misrepresentation claim; and (3) any reliance by Plaintiff on Defendant's

representations was not reasonable.  (ECF No. 128 at 57.)

Defendant also raises three arguments as to why summary judgment is

appropriate on Plaintiff's fraud claim: (1) the fraud claim is "wholly duplicative" of

Plaintiff's breach of contract claims; (2) Plaintiff cannot establish the requisite intent;

and (3) there is no evidence to support the contention that Defendant fraudulently

concealed its intentions regarding developing its own iPad app.  (ECF No. 128 at 58.)

The Court finds that there are disputed facts related to each of Defendant's

contentions.  First, for reasons similar to those described above with respect to the

promissory estoppel claim, a reasonable juror could find that the development of the

iPad app was not encompassed by the Agreement and, therefore, any obligation

imposed on Defendant would not duplicate an obligation under the Agreement.  Like

the promissory estoppel claim, Plaintiff is permitted to pursue these tort claims in the

alternative to the contract claims.  *See Level 3 Commc'ns*, 535 F.3d at 1163.

There is also evidence showing that Defendant acted with the requisite intent.

The record shows that Defendant did not disclose that it was developing its own iPad

app while it was encouraging Plaintiff's development of an iPad app.  (ECF No. 164 ¶¶

78-80.)  At one point, Defendant represented to Plaintiff that Plaintiff was authorized by

the Agreement to develop an iPad and did not convey a contrary position for months. (*Id*. ¶¶ 78, 81.) There is also evidence showing that Plaintiff relied on Defendant's representations regarding Plaintiff's authority to develop an iPad app in devoting man-hours to the development of such app. (*Id*. ¶¶ 72, 87.) Finally, given the parties' prior relationship with respect to working together on an electronic device for displaying Defendant's Terminal Charts, a juror could find that any reliance by Plaintiff on Defendant's representations by was reasonable.

Accordingly, the Court finds that a reasonable juror could find in Plaintiff's favor on its negligent misrepresentation and fraud claims. Therefore, Defendant's Motion for Summary Judgment is denied as to this claim, as well.

      3.    <u>Intentional Interference with Prospective Business Relations</u>

Plaintiff contends that Defendant interfered with its business relations with respect to both the iRex and non-iRex users. (ECF No. 164 at 62.) The Court finds that there is evidence from which a juror could find in Plaintiff's favor on this claim. With respect to the iRex users, particularly commercial customers, there is evidence that Defendant informed potential customers that Plaintiff was not authorized to sell the iRex device to commercial customers and that Defendant would not support Plaintiff's efforts to do so. (ECF No. 164 ¶ 173.) With respect to potential iPad app users, there is also evidence that Plaintiff did not support potential customers who expressly told Defendant that they were interested in an app developed by Plaintiff. (*Id*. ¶ 174.) A reasonable juror could also conclude that Defendant's actions were intentional and that they were done with the purpose of dissuading the customers from doing business with Plaintiff.

A reasonable juror could find that Plaintiff has shown that it had a reasonable

prospect of a business relationship and that Defendant interfered with this relationship.

Accordingly, Defendant's Motion for Summary Judgment is also denied as to Plaintiff's

intentional interference with prospective business relations claim.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Plaintiff's Motion for Partial Summary Judgment (ECF Nos. 94 & 96) is DENIED;

2. Defendant's Motion for Summary Judgment (ECF Nos. 128 & 130) is GRANTED IN PART and DENIED IN PART;

3. Summary Judgment in favor of Defendant is ENTERED on Plaintiff's Sherman Act claims (Claims Five, Six, Seven, Eight, Nine and Ten of the Second Amended Complaint);

4. Summary Judgment is DENIED as to all other claims;

5. The following claims shall proceed to trial as previously scheduled on April 13, 2014: (1) Breach of Contract (Claim One); (2) Breach of Contract—Implied Covenant of Good Faith and Fair Dealing (Claim Two); (3) Promissory Estoppel (Claim Three); (4) Negligent Misrepresentation (Claim Eleven); (5) Fraud (Claim Twelve); and (6) Intentional Interference with Prospective Business Relations (Claim Thirteen);

6. Following trial, if necessary, the Court will determine Plaintiff's claim for Declaratory Judgment (Claim Four); and

7. Not later than April 5, 2013, the parties shall inform the Court as to their position on whether, given the Court's ruling in this Order, the trial of this matter can be conducted in less than the currently scheduled 13 days.  If the parties agree that

the trial will be significantly shorter, the Court may *sua sponte* reset the trial.

Dated this 22nd day of March, 2013.

BY THE COURT:

William J. Martinez
United States District Judge